**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. _____-Civ **04-80954**

(U.S.D.J. _____)

STELOR PRODUCTIONS, INC., )
                  )
       Plaintiff )   Civil Action No., _____ ⌐UNS'
   v. )   _____
                  )   **NIGHT BOX**
STEVEN A. SILVERS, )   **FILED**
                  )
       Defendant. )   ⌐OCT 15 200.
_____ )

CLARENCE MADDOX
CLERK, USDC / SDFL / WPB

## COMPLAINT FOR INJUNCTIVE, DECLARATORY, AND OTHER RELIEF

Plaintiff, Stelor Productions, Inc. ("Stelor"), by its undersigned attorneys, files this Complaint against Steven A. Silvers ("Silvers" or "Defendant"), and alleges as follows:

### NATURE OF THE CASE

1.     This is a civil action seeking an injunction, a declaratory judgment, and other relief based upon Silvers' breach of two contracts between the parties and Silvers' threats and allegations that Stelor has breached one of the contracts. Defendant Silvers has refused to remedy his breaches, has threatened other breaches, and has thereby caused Stelor significant irreparable and other damage.

### BACKGROUND

2.     In or about 1991, Defendant authored a children's book entitled "Googles and the Planet of Goo." The book made little critical or commercial impact when it entered a marketplace crowded with children's titles from bigger and better financed publishers and more famous authors. Undaunted, Defendant envisioned a program to transform this creation into an expansive, multimedia entertainment and educational

empire. To that end, Defendant engaged the Florida-based Aurora Collection, Inc. That relationship, however, did not bear fruit. Still, Defendant did not abandon the project, but sought another partner to carry forward his vision and achieve his dream. Defendant had many personal and business hurdles to overcome. Significant among them was the increasingly adverse relationship between him and Aurora and other negative aspects of Defendant's background which made Defendant unsuited to serve as figurehead or spokesperson for an enterprise aimed at providing wholesome and enriching entertainment to an audience of impressionable children.

3.     Accordingly, when Stelor was formed to develop Defendant's "The Googles" concept into a reality, Stelor's enthusiasm and interest were tempered by legitimate concerns and reservations. Stelor saw potential in the "The Googles" story, trademarks, copyrights, and other intellectual property. Stelor's founders also had confidence in their ability to raise the needed funds and to create a compelling and attractive "Googles" universe that would enlighten, entertain, educate, and develop children by providing them with fascinating and uplifting products, programs, and services. But aware of Aurora's aborted effort, and wary that Defendant's background could jeopardize the "Googles" program, Stelor insisted that any arrangement with Defendant contain safeguards and protections.

4.     Thus, when on or around June 1, 2002 Stelor and Defendant entered into a "License, Distribution, and Manufacturing Agreement," and a Consulting Agreement, Stelor bargained for, and obtained, the following promises, commitments, and obligations from Defendant designed to ensure Stelor's ability to develop the "Googles" program free from undue interference by Defendant:

2

(a)    The License Agreement gives Stelor exclusive rights in the "Googles" products, trademarks, and intellectual property and specifies that those rights are exclusive even as to Defendant.

(b)    The License Agreement gives Stelor an irrevocable power of attorney to apply for, maintain, enforce and defend intellectual property rights, including trademarks, websites, and domain names. Stelor, not Defendant, assumed responsibility for handling all Googles Trademark and other Intellectual Property matters.

(c)    The License Agreement and Consulting Agreement require Defendant to fully cooperate with Stelor, while the Consulting Agreement makes plain that Defendant shall have no power to direct or control the daily activities of Stelor.

(d)    Finally, to protect Stelor from possible public embarrassment, both the License Agreement and Consulting Agreement expressly prohibit Defendant from initiating or maintaining "any relationship or conversation with [Stelor's] current or prospective clients, vendors, any company relationships with the media (press, etc.), without the prior express written request by [Stelor]."

5.    Anxious to achieve what he himself has described as his "dream," Defendant agreed to these and other contractual obligations and restrictions. Stelor, believing it had the necessary rights and protections, then threw itself enthusiastically into the task of using its best efforts to develop The Googles concept and intellectual property. To this end, Stelor has spent approximately three million dollars, and its

3

principals and employees have devoted themselves tirelessly to making Stelor and the "Googles" successful and profitable, both for themselves and for the benefit of Defendant.

6.    However, Defendant, having received from Stelor $186,500, obligations for options for Stelor stock, and health insurance, has not lived up to his part of the bargain. After giving Stelor the exclusive rights to develop and market the "Googles" concept without interference from him, Defendant commenced a campaign to inject and entwine himself into the very fabric of Stelor's business. In breach of his contractual obligation to cooperate fully with Stelor in protecting, preserving, and enforcing the Googles intellectual property rights, Defendant has subverted those efforts, going so far as to unilaterally divert official communications from the United States Patent and Trademark Office ("USPTO") from Stelor's intellectual property counsel to himself. Under the irrevocable power of attorney Defendant bestowed on Stelor under the License Agreement, all such communications from the USPTO must go directly to Stelor, as Stelor, not Defendant, shoulders all responsibility for protecting and enforcing the Googles Intellectual Property.

7.    Stelor, in fulfilling its duty to enforce and defend the Googles Intellectual Property, retained counsel to bring actions against Google, Inc. in the USPTO. Defendant wrote to Stelor's counsel and instructed them to act no further on these matters and threatened to obtain his own attorney to handle them despite Defendant's having given Stelor an irrevocable power of attorney to act for and on Defendant's behalf to enforce and defend the Googles Intellectual Property.

4

8.    In breach of his promise not to initiate or maintain any relationship or conversations with prospective clients and vendors, Defendant has held himself out as a Stelor representative at crucial industry trade shows. And despite Stelor's displeasure over that breach of contract, Defendant now threatens to initiate more contacts and conversations with the trade and press, oblivious and totally indifferent to his contractual obligations.

9.    Finally, Defendant flouts his duty to cooperate by withholding information vital to Stelor's ability to carry out the business of transforming the basic Googles idea into a thriving and profitable entertainment phenomenon. Stelor has developed and operates a website devoted to the "Googles" characters, offering a variety of services and features geared to delighting children and their parents. At present, the website is the public's window into the Googles' world. Being able to operate and modify this website is among Stelor's most important priorities. To ensure its ability to do so, Stelor must have immediate and unfettered access to the domain names. Despite Stelor's constant urging, Defendant insists on keeping those domain names under lock and key thereby jeopardizing Stelor's substantial investment of time, money, talent, and creative energy.

10.    In sum, and as detailed fully below, Defendant is fixated on controlling every aspect of the "Googles" development. Defendant continually and persistently eschews his contractual commitments and obligations, holding key information and documents hostage, interfering with Stelor's daily activities, and endangering Stelor's business prospects with threats to make unauthorized contacts with the media and prospective customers.

11.    By itself, Defendant's constant intermeddling, cajoling, and criticism of Stelor's genuine good faith efforts constitute a breach of Defendant's express contractual obligation to "cooperat[e] in every way necessary and desirable to strengthen, establish or maintain the "Googles" intellectual property and related assets." Defendant, however, couples this material breach with a series of past, current, and threatened material breaches, as touched upon above and explained more fully below. And now, in an attempt to divert attention from its own breaches of the contracts, Defendant charges Stelor with having breached its contractual obligations, without any basis in law or in fact.

12.    Stelor has embraced enthusiastically its duty to transform the "Googles" story and characters into a thriving entertainment phenomenon.  Stelor bargained for, and obtained, the right to do so with Defendant remaining squarely in the background, cooperating fully when called upon, and not placing stumbling blocks in Stelor's path. Stelor has lived up to its obligations, Defendant has not.  Having exhausted all reasonable avenues and approaches for resolving its differences with Defendant amicably, Stelor now brings this action for a specific performance of its contracts with Defendant, for a declaratory judgment that Stelor has complied with all of its contractual obligations, and for damages.

## THE PARTIES, JURISDICTION AND VENUE

13.    Stelor is a Delaware corporation having its principal place of business at 14701 Mockingbird Drive, Darnestown, Maryland 20874.

14.    Silvers is a resident of Palm Beach County, Florida.

15.    This court has subject matter jurisdiction based on diversity of citizenship under 28 U.S.C. § 1332(a).  The parties are residents of different states and the matter in controversy exceeds the sum or value of seventy-five thousand dollars ($75,000), exclusive of interest and costs.  This Court also has jurisdiction under the Declaratory Judgment Act, 28 U.S.C. § 2201, because the parties' irreconcilable differences in the interpretation of specific contractual provisions, combined with the Defendant's threats to terminate the License Agreement and to bring suit against Stelor for breach of contract, give Stelor a reasonable apprehension of imminent litigation and have created a justiciable case or controversy between the parties.

16.    Stelor's claims arise in whole or in part in the Southern District of Florida. One of the contracts at issue in this action specifically provides that all disputes under the contract are to be resolved by Florida courts and that the parties consent to jurisdiction in this Court.  Silvers also resides in this District.  Venue is accordingly proper pursuant to 28 U.S.C. § 1391(a).

## FACTUAL BACKGROUND UNDERLYING STELOR'S CLAIMS

17.    Stelor was formed in 2002 to commercialize and bring to market various products and services based upon "The Googles," a high-quality, educationally-based concept targeted to children in the 2-10 year age range.  "The Googles" concept is designed to entertain and educate young children by presenting them with various social and environmental messages in the context of enjoyable storylines.  Stelor operates and maintains its primary website at www.googles.com.

18.    Defendant is the owner of the Googles Intellectual Property.  On June 1, 2002, Stelor and Defendant entered into a "License, Distribution, and Manufacturing

7

Agreement" (see Ex. 1, hereinafter referred to as the "License Agreement") which gave

Stelor the sole and exclusive, worldwide license to commercialize the GOOGLES

characters (the "Licensed Property") and the GOOGLES trademarks (the "Licensed

Trademarks" or the "Googles Trademarks"). Specifically, ¶1A of the License Agreement

provides:

> LICENSOR hereby grants to LICENSEE for the Term of this
> Agreement as recited in "Schedule A" hereto, the exclusive (even
> as to LICENSOR), worldwide, sub licensable right and license to
> use, reproduce, modify, create derivative works of, manufacture,
> have manufactured, market, advertise, sell, distribute, display,
> perform, and otherwise commercialize the Licensed Products and
> Licensed Properties in the Territory. The license includes a license
> under any and all intellectual property and interests therein,
> including by way of explanation, products which deal with the
> creative characters known as The Googles, anything that contains
> the letters GOO (in upper or lower case) together with any and all
> products, which comprise and which will comprise those
> characters, likenesses, which include Iggle, Oogle, Oggle, Gooroo,
> Gootian(s), the planet Goo, slides, computer websites, membership
> lists, clubs, materials, patterns, prototypes, logos, trademarks,
> service marks, clothing, merchandise, educational products,
> marketing and promotional data and tools, packaging and
> advertising, modifications, updates and variations, and all other
> items associated therewith whether in singular or plural.

With respect to the Licensed Trademarks, ¶1B provides:

> LICENSOR hereby grants to LICENSEE for the term of this
> Agreement as recited in "Schedule A" attached hereto, the
> exclusive (even as to LICENSOR), worldwide, sub licensable right
> and license to use the Licensed Trademarks on or in connection
> with the Licensed Products as well as on packaging, promotional,
> and advertising material associated therewith.

Significantly, the license has at all times been exclusive even as to the Defendant. (Ex.

1, ¶¶ 1A, 1B.)

19.     The Licensed Trademarks include the following trademarks: GOOGLES

(Reg. No. 2,087,590); GOOROO (App. No. 76/591,381); IGGLE (App. No. 75/655,710);

OGGLE (App. No. 75/655,709); OOGLE (App. No. 75/655,711); and about eighteen (18) others.

20.    Stelor's exclusive license specifically extends to websites and domain names (see Ex. 1, ¶1A), and includes the following domain names: GOOGLES.COM, GOOKIDS.COM, GOOTOYS.COM, PLANETOFGOO.COM, GOOMAIL.NET, THEGOOGLESMAIL.COM, GOOGLESMAIL.COM, GOOGLESFROMGOO.COM, OOGLESFROMGOO.COM, THEGOOGLES.COM, THEGOOGLESFROMGOO.COM and approximately eighty (80) more (hereinafter referred to as the "Googles Domain Names").

21.    Under the License Agreement, Defendant granted to Stelor "all right, power and interest to seek, obtain, and maintain all Intellectual Property Rights associated with the Licensed Intellectual Property and Licensed Trademarks, Licensed Copyrights, and other Intellectual Property Rights." (Ex. 1, ¶ 8A.) Defendant also agreed to "assist [Stelor] as may be required to apply for and obtain recordation of and from time to time enforce, maintain, and defend [the Licensed] Intellectual Property Rights." (Id.) Further, Defendant granted Stelor an irrevocable power of attorney to execute and file all documents necessary to secure, enforce, and maintain the rights to the Intellectual Property. (Id.) This power of attorney gives Stelor the exclusive right and duty to file, maintain, and renew all domain name registrations and trademark applications and registrations relating to the Intellectual Property. The License Agreement expressly requires Defendant to cooperate with and assist Stelor in securing and maintaining the rights to the Intellectual Property. (Id.)

22.     The irrevocable power of attorney granted to Stelor under Paragraph VIII(A) of the License Agreement, which gives Stelor the exclusive right to "maintain" all Intellectual Property Rights on behalf of the Defendant, specifically gives Stelor the exclusive right to "defend" all actions brought by third parties challenging the Intellectual Property Rights.  On November 22, 2004, Google, Inc. brought a cancellation proceeding at the Trademark Trial and Appeal Board ("TTAB") against the Defendant to cancel the Defendant's registration for GOOGLES & Design (Reg. No. 2,087,590).  This proceeding is currently pending before the TTAB.  An answer to Google, Inc.'s petition for cancellation is due on November 9, 2004.

23.     In furtherance of its rights and duties, Stelor has applied for and maintains numerous federal trademarks and service marks listing Silvers Entertainment, Defendant's company, as the owner and has specified that all correspondence between the USPTO and Stelor be mailed to Stelor's duly appointed counsel of record.

24.     The License Agreement expressly provides that Stelor "shall have the sole right, in its discretion and at its expense, to take any and all actions against third persons to protect the Intellectual Property Rights licensed in this Agreement." (Ex. 1, ¶11A.) Stelor duly exercised this right on July 6, 2004 when it filed at the TTAB a petition to cancel the trademark registration for GOOGLE (Reg. No. 2,806,075) by Google, Inc., and a Notice of Opposition against Google, Inc.'s application for GOOGLE (Ser. No. 76/314,783). These actions are currently pending before the TTAB. The License Agreement (see ¶ 11B) obligates Defendant to "cooperate in every way necessary and desirable" in any action brought by Stelor to protect the Licensed Intellectual Property Rights.

10

25.    On June 1, 2002, Stelor and Defendant also entered into a Consulting Agreement in which Stelor engaged Defendant as a creative consultant.  (See Ex. 2.) The Consulting Agreement expressly requires Defendant, inter alia, to "use his best efforts" to perform such services as may be requested by Stelor including "executing all papers and otherwise cooperating in every way necessary and desirable to strengthen, establish, or maintain any intellectual property right granted under this Agreement or the License, Distribution and Manufacturing Agreement." (Ex. 2, ¶ 3A.)  The Consulting Agreement further prohibits and excludes Defendant from attempting to "direct or control the daily activities" of Stelor.  (Ex. 2, ¶ 2.)

26.    Both the License Agreement and the Consulting Agreement provide that Defendant "shall not initiate or maintain any relationship or conversation with [Stelor's] current or prospective clients, vendors… the media (press etc.)" unless asked to do so or permitted by Stelor.  (Ex. 1, ¶ 8E; Ex. 2, ¶ 2.)  In short, through these Agreements, Defendant gives Stelor the opportunity and right to develop the Licensed Property and to exploit and protect the Licensed Trademarks and other Intellectual Property without unwanted participation by or interference from Defendant.

27.    The License Agreement imposes only three affirmative obligations upon Stelor.  Paragraph (V)(B)(iii) of the License Agreement requires Stelor to "use its commercially reasonable efforts to promote, market, sell and distribute the Licensed Products."  Paragraph (VI)(C) of the License Agreement provides that, "Prior to the commencement of manufacture and sale of the Licensed Products, [Stelor] shall submit to [Defendant] for his input, at no cost to [Defendant], a reasonable number of samples of all Licensed Products which [Stelor] intends to manufacture and sell and of all

11

promotional and advertising material associated therewith." And, lastly, Paragraph (VIII)(A) obligates Stelor to obtain, maintain, enforce, and defend the licensed intellectual property rights. Despite Defendant's claims to the contrary, Stelor has complied with its obligations under the License Agreement and the Consulting Agreement, and has further invested substantial sums of money to promote and protect the Googles Intellectual Property.

## DEFENDANT'S WRONGFUL ACTS

28.    In breach of the License Agreement and/or the Consulting Agreement, Defendant has engaged in a pattern and practice of interfering with Stelor's business operations in violation of his express duty to cooperate, in violation of his duty to refrain from interfering with the daily activities of Stelor, and in violation of the irrevocable power of attorney Defendant granted to Stelor. This pattern of interference includes, but is not limited to, the following:

> (a)    Defendant has unilaterally, without authorization from Stelor, instructed the USPTO to send all correspondence for each application and registration for the Googles Trademarks to "Steven A. Silvers / Silvers Entertainment Group, Inc. / 8983 Okeechobee Blvd., Ste 202, PMB 203 / West Palm Beach, FL 33411" instead of Stelor's duly appointed attorneys. This clearly violates Stelor's sole right, power, and duty to deal with the USPTO regarding the registration and maintenance of all the Googles Trademarks. Defendant's actions are not authorized under his limited role as a creative consultant and violate the parties' agreements.

(b)     Defendant has repeatedly refused to provide Stelor with access to
the Googles Domain Names by locking these Domain Names with
the domain name registrar and by refusing to disclose to Stelor the
passwords for these Domain Names.  By not giving Stelor
immediate, full and unfettered access to the Domain Names,
Defendant is in material breach of the License Agreement and the
Consulting Agreement which forbid him from interfering with,
"direct[ing]", or "control[ling]" the daily activities of Stelor, and which
require Defendant to assist Stelor and cooperate "in every way
necessary" in connection with Stelor's maintenance of the Googles
Intellectual Property.  Defendant has also made it abundantly clear
in correspondence to Stelor's counsel that he has "absolutely no
intentions" of turning over to Stelor the passwords for any of the
Googles Domain Names, and that the only way he will turn over
these passwords is "when a judge orders [him] to do so."

(c)     Defendant has repeatedly threatened to communicate with the
press without requesting prior authorization from Stelor.

(d)     In breach of the License Agreement which expressly gives Stelor
the exclusive right to take legal action against third parties infringing
the Googles Intellectual Property, on October 5, 2004, Defendant
improperly sent a letter to Stelor's counsel purporting to instruct
Stelor's counsel to take no further action in the two proceedings
(the cancellation and opposition) before the TTAB instituted by

13

Stelor against Google, Inc. That law firm currently represents
Stelor in these proceedings against Google, Inc.

(e)    In breach of the License Agreement which expressly gives Stelor
the exclusive right to defend all actions brought by third parties
challenging the Googles Intellectual Property Rights, Defendant
has purported to instruct Stelor's counsel to take no action in the
proceeding brought by Google, Inc. at the TTAB to cancel the
registration for GOOGLES & Design (Reg. No. 2,087,590), and has
indicated to Stelor that he intends to defend the cancellation
proceeding himself, although the License Agreement gives Stelor
the sole right to do so.

29.    Each of the above actions, by itself, constitutes a material breach of the
Licensing Agreement and/or the Consulting Agreement. Taken together, they establish
a pattern and practice of undermining Stelor's legitimate business interests and have
prevented Stelor from receiving the full benefits of its rights under these agreements.

30.    In an attempt to divert attention from its own breaches of the Licensing
Agreement and the Consulting Agreement, Defendant has charged Stelor with
breaching various provisions of these agreements, without any basis in law or in fact.
Defendant has also threatened to take legal action if Stelor does not remedy its alleged
breaches.

## INJURY TO STELOR

31.    By ordering the USPTO to send communications directly to Defendant
rather than to Stelor, Defendant has improperly interfered with and impaired Stelor's

14

ability to obtain and maintain the commercially valuable Googles Trademarks and is preventing Stelor from complying with its obligations to do so. In the event Defendant fails to inform Stelor of required actions to maintain the applications and registrations for the Googles Trademarks, these applications and registrations will lapse and the rights to the Googles Trademarks could be irrevocably lost, causing Stelor irreparable injury.

32.    By keeping the passwords for the Googles Domain Names under lock and key and preventing Stelor from accessing these Domain Names, Defendant is improperly interfering with Stelor's ability to conduct its day-to-day business operations that depend on having full and unfettered access to the Domain Names.

33.    By denying Stelor free and unfettered access to the googles.com domain name and other Googles Domain Names, and ordering the USPTO to direct all correspondence to Defendant himself rather than to Stelor's appointed counsel, Defendant is improperly interfering with Stelor's ability to fully perform its obligations under the License Agreement to promote, market, sell, and distribute the Googles Intellectual Property. (Ex. 1, ¶ 5B.)

34.    By improperly instructing Stelor's counsel to take no further action in the cancellation and opposition proceedings Stelor has lawfully instituted against Google, Inc., and by Defendant's continued interference with Stelor's business, Defendant has forced Stelor to incur needless legal fees and expend the time and attention of management to deal with impulsive, counterproductive actions which Defendant has no right or authority to take, and which interfere with Stelor's exclusive rights under its Agreement with Defendant. Furthermore, Defendant is interfering with and attempting

to prevent Stelor from complying with its obligations to enforce the Intellectual Property rights.

35. By improperly instructing Stelor's counsel to take no action in the cancellation proceeding Google, Inc. has instituted to cancel the GOOGLES & Design registration, and indicating to Stelor that Defendant will defend the action himself, Defendant has improperly interfered with Stelor's rights and ability to maintain and defend the Googles Intellectual Property Rights. Defendant has expressed that he is "not in any position" to retain counsel and will likely defend this action pro se. Any unilateral actions or submissions by Defendant could undermine or conflict with Stelor's rights, efforts, and ability to defend the Googles Intellectual Property Rights, may result in the impairment or loss of these rights, and would irreparably harm Stelor.

36. By wrongfully accusing Stelor of having breached its contractual obligations and threatening to take legal action against Stelor, Defendant has forced Stelor to incur needless legal fees and expend the time and attention of management to deal with charges that have absolutely no basis in law or in fact.

37. As a direct and proximate result of the actions of Defendant as alleged in this Complaint, Stelor has been irreparably injured and has suffered monetary damages in an amount to be proven at trial, but in excess of $75,000.

38. Stelor has no adequate remedy at law.

## FIRST CLAIM FOR RELIEF
## BREACH OF CONTRACT UNDER FLORIDA STATE AND COMMON LAW

16

39.    Stelor repeats and realleges the allegations set forth in paragraphs 1 through 38 hereof.

40.    Defendant's material breaches of the License Agreement and the Consulting Agreement have caused, continue to cause, and will cause Stelor irreparable injury.

41.    Defendant's material breaches of the License Agreement and the Consulting Agreement constitute a breach of contract under Florida state and common law and have caused damages in an amount not yet determined.

## SECOND CLAIM FOR RELIEF
## DECLARATORY JUDGMENT UNDER THE
## DECLARATORY JUDGMENT ACT, 28 U.S.C. § 2201

42.    Stelor repeats and realleges the allegations set forth in paragraphs 1 through 41 hereof.

43.    Defendant's baseless charges that Stelor has breached its contractual obligations under the License Agreement, and Defendant's reliance on these alleged breaches to ignore his own contractual obligations, have given rise to irreconcilable differences in the interpretation of specific contractual provisions under the License Agreement.

44.    Defendant's threats to commence litigation and his refusal to comply with his contractual obligations without a court order, have created in Stelor a reasonable apprehension of imminent suit and given rise to a justiciable case or controversy between the parties.

45.    Without the court's declaration of Stelor's rights under the License

Agreement, and without the court's declaration that Stelor has at all times complied with

its obligations under the License Agreement, Defendant will continue to refuse to honor

its contractual obligations and thereby continue to cause irreparable injury to Stelor and

the Licensed Intellectual Property.

## PRAYER FOR RELIEF

WHEREFORE, Stelor prays that this Court enter judgment in its favor on each

and every claim for relief set forth above and award it relief including, but not limited to,

the following:

A.    A temporary restraining order and a preliminary and permanent injunction

requiring Defendant to instruct the USPTO to send all communications regarding the

Googles Trademarks to Stelor's duly appointed counsel:

|                  | Laurence R. Hefter |
|------------------|--------------------|
|                  | Finnegan, Henderson, Farabow, |
|                  | Garrett & Dunner, L.L.P. |
| prior to 1/15/05 | 1300 I Street NW |
|                  | Washington DC 20005 |
|                  |                    |
| after 1/15/05    | 901 New York Avenue |
|                  | Washington DC 20001 |

B.    A temporary restraining order and a preliminary and permanent injunction

enjoining Defendant from taking any action in the pending cancellation proceeding

Google, Inc. has brought against Defendant to cancel the registration for GOOGLES &

Design (Reg. No. 2,087,590).

C.    An Order (i) prohibiting Defendant from communicating with the USPTO

regarding the Googles Trademarks in the future; (ii) requiring Defendant to disclose to

18

Stelor the passwords to all the Googles Domain Names, and an Order prohibiting Defendant from changing the passwords to the Googles Domain Names in the future; and (iii) prohibiting Defendant from communicating with any of Stelor's current or prospective clients, vendors, the media, or the press.

D.    A Declaratory Judgment that Stelor has complied with its contractual obligations under the Licensing Agreement, and a Declaratory Judgment confirming that Stelor has the exclusive right to bring and defend actions relating to the Googles Intellectual Property Rights.

E.    Plaintiff further prays for a Judgment against Defendant in the amount of Stelor's damages plus its reasonable costs, disbursements, and attorneys' fees to the extent permitted by law; and such other relief as the Court may deem appropriate.

Dated:                                                    Respectfully submitted,

Stanley A. Beiley

Of Counsel:

Laurence R. Hefter
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, L.L.P.
1300 I Street, N.W.
Washington, D.C.  20005-3315
(202) 408-4000

Florida Bar No. 004848
SACHER, ZELMAN, VAN SANT, PAUL,
BEILEY, HARTMAN, ROLNICK &
WALDMAN P.A.
1401 Brickell Avenue, Suite 700
Miami, FL  33131
Tel:  305-371-8797
Fax:  305-374-2605

Attorneys for Plaintiff,
STELOR PRODUCTIONS, INC.

# EXHIBIT 1

# LICENSE, DISTRIBUTION
# AND MANUFACTURING AGREEMENT

This LICENSE, DISTRIBUTION AND MANUFACTURING AGREEMENT between Steven A. Silvers and Stelor Productions, Inc. is effective as of June 1, 2002 and is entered into by and between Steven A. Silvers (LICENSOR), an Individual, whose official address is 3741 NE 163rd Street, PMB #325, North Miami Beach, FL 33160 and Stelor Productions, Inc. (LICENSEE), a Delaware corporation with its current offices located at: 14701 Mockingbird Drive, Darnestown, Maryland, 20874.

## WITNESSETH

WHEREAS, LICENSOR is the sole and exclusive owner of the GOOGLES characters identified more fully in "Schedule A" attached hereto (the "Licensed Property").

WHEREAS, LICENSOR is the sole and exclusive owner of the GOOGLES trademarks identified more fully in "Schedule A" attached hereto (the "Licensed Trademarks");

WHEREAS, LICENSOR has the power and authority to grant to LICENSEE the right, privilege and license to use, manufacture, distribute, and sell those types of products that incorporate or are otherwise based on the Licensed Property as identified in "Schedule A" attached hereto (the "Licensed Products") and to use the Licensed Trademarks on or in association with such Licensed Products;

WHEREAS, LICENSEE has or will have the ability to manufacture, have manufactured, have sub-manufactured, distribute and sell or have sold and distributed the Licensed Products in the Licensed Territory more clearly defined in Schedule A (the Territory) and to use the Trademark(s) on or in association with the Licensed Products;

WHEREAS, LICENSEE desires to obtain from LICENSOR an exclusive license to use, manufacture, have manufactured and sell Licensed Products in the Territory and to use the Licensed Trademarks on or in association with the Licensed Products;

WHEREAS, LICENSEE has agreed, pursuant to a letter agreement, to act as a consultant for LICENSOR; and

NOW, THEREFORE, in consideration of the promises and agreements set forth herein, the parties, each intending to be legally bound hereby, do hereby agree as follows:

## I. LICENSE GRANT

A      LICENSOR hereby grants to LICENSEE, for the Term of this Agreement as recited in "Schedule A" attached hereto, the exclusive (even as to LICENSOR), worldwide, sub licensable right and license to use, reproduce, modify, create derivative works of, manufacture, have manufactured, market, advertise, sell, distribute, display, perform, and otherwise commercialize the Licensed Products and Licensed Properties in the Territory. The license includes a license under any and all intellectual property rights and interests therein, including by way of explanation, products which deal with the creative characters known as The Googles, anything that contains the letters GOO (in upper or lower case) together with any and all products, which comprise and which will comprise those characters, likenesses, which include Iggle, Oogle, Oggle, Gooroo, Gootian(s), the planet Goo, slides, computer web site(s), membership lists, clubs, materials, patterns, prototypes, logos, trademarks, service marks, clothing, merchandise, educational products, marketing and promotional data and tools, packaging and advertising, modifications, updates and variations, and all other items associated therewith whether in singular or plural

B.    LICENSOR hereby grants to LICENSEE for the term of this Agreement as recited in "Schedule A" attached hereto, the exclusive (even as to LICENSOR), worldwide, sub licensable right and license to use the Licensed Trademarks on or in association with the Licensed Products as well as on packaging, promotional, and advertising material associated therewith

C.    LICENSEE shall have the right to sublicense LICENSEE's rights under this Agreement, provided that any and all such sublicenses shall be subject to the terms and conditions of this Agreement

D.    No licenses will be deemed to have been granted by either party to any of its Intellectual Property Rights, except as otherwise expressly provided in this Agreement

E.    LICENSEE agrees to place on all Licensed Products, where practicable, the phrase "created by Steven A. Silvers" or other similar wording

## II. TERM OF THE AGREEMENT

This Agreement and the provisions hereof, except as otherwise provided, shall be in full force and effect commencing on the date of execution by both parties and shall extend for a Term as recited in "Schedule A" attached hereto (the "Term")

## III. COMPENSATION

A    In consideration for the licenses granted hereunder, LICENSEE agrees to pay to LICENSOR, during the Term of this Agreement, a royalty in the amount recited in "Schedule A" attached hereto (the "Royalty") based on LICENSEE's Net Sales of Licensed Products. "Net Sales" shall mean the gross revenues on a cash basis (i.e., actually collected by LICENSEE but without counting any gross revenues twice) excluding shipping and handling charges, sales taxes, VAT, and other taxes imposed upon sales less (i) customary trade discounts, (ii) allowances actually shown on the invoice (except cash discounts not deductible in the calculation of Royalty) (iii) bona fide returns, charge backs, refunds or credits (net of all returns actually made or allowed as supported by memoranda actually issued to the customers), (iv) sales of remainder inventory made at less than the total of LICENSEE's actual cost of goods and actual direct selling costs solely for purposes of liquidation or close-out, (v) other uncollectible accounts, (vi) cooperative advertising allowances, (vii) sales commissions paid

B.    The Royalty owed LICENSOR shall be calculated on a quarterly calendar basis on collected funds (the "Royalty Period") and shall be payable no later than thirty (30) days after the termination of the preceding full calendar quarter, i.e., commencing on the first (1st) day of January, April, July and October with the exception of the first and last calendar quarters which may be "short" depending upon the effective date of this Agreement

C    With each Royalty Payment, LICENSEE shall provide LICENSOR with a written royalty statement in a form acceptable to Licensor. Such royalty statement shall be certified as accurate by a duly authorized officer of Licensee, reciting on a country-by-country basis, the stock number, item, units sold, description, quantity shipped, gross invoice, amount billed to customers less discounts, allowances, returns and reportable sales for each Licensed Product. Such statements shall be furnished to Licensor whether or not any Licensed Products were sold during the Royalty Period. The LICENSEE hereby further agrees to provide the LICENSOR with a list of all of it's sub licensees added during the current royalty period.

D.    If LICENSEE sells any Licensed Products to any party affiliated with LICENSEE, or in any way directly or indirectly related to or under the common control with LICENSEE, at a price less than the average weighted price charged to other parties, the Royalty payable to LICENSOR shall be computed on the basis of the averaged weighted price charged to other parties if the Licensed Products are not ultimately resold to unaffiliated third parties

2

E.    All payments due hereunder shall be made in United States currency drawn on a United States bank, unless otherwise specified between the parties and may offset or be offset from any other payments due to LICENSEE under this or any other agreement between the parties.

F    Late payments shall incur interest at the rate of ONE PERCENT (1%) per month from the date such payments were originally due.

## IV. AUDIT

A.    LICENSOR shall have the right, at its own expense, to have a nationally recognized certified public accounting firm, upon at least thirty (30) days written notice and no more than twice per calendar year, to inspect during normal business hours, LICENSEE's books and records and all other documents and material in the possession of or under the control of LICENSEE with respect to the subject matter of this Agreement at the place or places where such records are normally retained by LICENSEE.

B.    In the event that such inspection reveals an underpayment discrepancy greater than 5% of the amount of Royalty owed LICENSOR from what was actually paid, LICENSEE shall have the opportunity to conduct its own audit. If LICENSEE agrees to the amount, if any, of any discrepancy, LICENSEE shall pay such discrepancy, plus interest, calculated at the rate of ONE AND ONE-HALF PERCENT (1 1/2%) per month Upon settlement of any underpayment discrepancy, no further audit by LICENSOR shall be requested that year. That period end date shall represent the new period start date for future audits for underpayment discrepancies. In the event that such discrepancy is in excess of TEN THOUSAND UNITED STATES DOLLARS ($10,000.00), LICENSEE shall also reimburse LICENSOR for the cost of auditing fees in connection therewith.

C    All books and records relative to LICENSEE's obligations hereunder shall be maintained and kept accessible and available to LICENSOR for inspection for at least three (3) years after the expiration of the initial or any subsequent term.

D    In the event that an investigation of LICENSEE's books and records is made, certain confidential and proprietary business information of LICENSEE may necessarily be made available to the person or persons conducting such investigation. It is agreed that such confidential and proprietary business information shall be held in confidence by LICENSOR and shall not be used by LICENSOR or disclosed to any third party for a period of two (2) years from the date of disclosure, or without the prior express written permission of LICENSEE unless required by law, except LICENSOR may not disclose at any time to any third party any such confidential and proprietary business information which are trade secrets of LICENSEE. It is understood and agreed, however, that such information may be used by LICENSOR in any proceeding based on LICENSEE's failure to pay its actual Royalty obligation.

## V. WARRANTIES AND OBLIGATIONS

A.    LICENSOR represents and warrants that:

(i)    the execution, delivery and performance of this Agreement have been duly authorized by all necessary action of LICENSOR and this Agreement is a valid and binding obligation of LICENSOR, enforceable in accordance with its terms;

(ii)    the execution, delivery and performance by LICENSOR of this Agreement will not violate or conflict with any applicable U S. law or regulation, or any order, writ, judgment or decree of any court or governmental authority to which LICENSOR is subject, or result in a violation, breach of, or default under any contract, lease, or other agreement binding on LICENSOR;

(iii)    LICENSOR owns the exclusive rights in and to the Licensed Intellectual Property, Licensed Trademarks, Licensed Patents and Licensed Copyrights necessary to effectuate the granting of the Licensing Rights from the LICENSOR to the LICENSEE as contemplated herein.

2

(iv)      the Licensed Intellectual Property and Licensed Trademarks do not infringe the rights, including without limitation, Intellectual Property Rights, of any third party, and

(v)      except as set forth in Schedule B attached hereto, LICENSOR has not received any notice from any third party of any alleged or actual infringement of the Licensed Intellectual Property or Licensed Trademarks and the Licensed Intellectual Property and/or Licensed Trademarks are not the subject, and has not been the subject, of any previous or pending litigation with the exception of the Ganz litigation which has been resolved.

B. LICENSEE represents and warrants that

(i)      the execution, delivery and performance of this Agreement have been duly authorized by all necessary action of LICENSEE and this Agreement is a valid and binding obligation of LICENSEE, enforceable in accordance with its terms;

(ii)      the execution, delivery and performance by LICENSEE of this Agreement will not violate or conflict with any applicable U.S. law or regulation, or any order, writ, judgment or decree of any court or governmental authority to which LICENSEE is subject, or result in a violation, breach of, or default under any contract, lease, or other agreement binding on LICENSEE; and

(iii)      it will use its commercially reasonable efforts to promote, market, sell and distribute the Licensed Products.

C      Disclaimer of Warranties. EXCEPT AS EXPRESSLY PROVIDED ABOVE, NEITHER PARTY MAKES ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND, EITHER EXPRESS OR IMPLIED, REGARDING THIS AGREEMENT AS TO ANY MATTER INCLUDING, BUT NOT LIMITED TO IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

D      LICENSEE shall be solely responsible for the manufacture, production, sale and distribution of the Licensed Products or to have such Licensed Products manufactured, produced, sold and distributed, and will bear all related costs associated therewith

## VI. NOTICES, QUALITY CONTROL, AND SAMPLES

A      The Licensed Products, as well as all promotional, packaging and advertising material relative thereto, shall include all appropriate legal notices

B      The Licensed Products shall be of a high quality which is at least equal to comparable products manufactured and marketed by LICENSEE and in conformity with a standard sample provided by LICENSEE.

C.      Prior to the commencement of manufacture and sale of the Licensed Products, LICENSEE shall submit to LICENSOR for his input, at no cost to LICENSOR, a reasonable number of samples of all Licensed Products which LICENSEE intends to manufacture and sell and of all promotional and advertising material associated therewith.

## VII. NOTICES AND PAYMENT

A      Any notice required to be given pursuant to this Agreement shall be in writing and delivered personally to the other designated party or mailed by certified or registered mail, return receipt requested or delivered by a recognized national overnight courier service.

B      Either party may change the address to which notice or payment is to be sent by written notice to the other in accordance with the provisions of this paragraph.

## VIII. INTELLECTUAL PROPERTY PROTECTION

A.    LICENSOR hereby grants LICENSEE all right, power and interest to seek, obtain and maintain all Intellectual Property Rights associated with the Licensed Intellectual Property and Licensed Trademarks, Licensed Copyrights and any other Intellectual Property Rights granted herein. LICENSOR further agrees to assist LICENSEE as may be required to apply for and obtain recordation of and from time to time enforce, maintain and defend such Intellectual Property Rights. LICENSOR hereby grants LICENSEE an irrevocable power of attorney for the initial and any subsequent terms of this Agreement to act for and on LICENSOR's behalf and instead of LICENSOR, at LICENSEE's expense, to execute and file any such document(s) and to do all other lawfully permitted acts to further the purposes of the foregoing with the same legal force and effect as if executed by LICENSOR.

B.    LICENSOR shall retain all rights, title and interest in the Licensed Intellectual Property and Licensed Trademarks and any modifications thereto based solely on such Licensed Intellectual Property. LICENSEE acknowledges LICENSOR's exclusive rights in the Licensed Intellectual Property and, further, acknowledges that the Licensed Intellectual Property and/or the Licensed Trademarks rights are unique and original to LICENSOR and that LICENSOR is the owner thereof. LICENSEE shall not, at any time during or after the effective Term of the Agreement, dispute or contest, directly or indirectly, LICENSOR's exclusive right and title to the Licensed Intellectual Property and/or the Licensed Trademarks(s) or the validity thereof.

C.    LICENSEE agrees that its use of the Licensed Intellectual Property and/or the Licensed Trademarks(s) inures to the benefit of LICENSOR and that the LICENSEE shall not acquire any rights in the Licensed Intellectual Property and/or the Licensed Trademarks(s) except for the license granted herein

D.    LICENSOR shall retain all rights, title and interest in and to the Licensed Intellectual Properties. The LICENSOR owns the exclusive rights to the Licensed Intellectual Property. LICENSOR hereby waives and releases LICENSEE from any and all current or future claims or causes of actions by third parties, whether known or unknown, arising out of or relating to such Licensed Intellectual Properties including, but not limited to, any claim that Licensed Products violate, infringe on or misappropriate any of LICENSOR's Intellectual Property Rights.

E.    Each party shall execute all papers, testify on all matters, and otherwise cooperate in every way necessary and desirable to effect any of the provisions under this Section (Intellectual Property Protection). The party requesting such shall reimburse the other party for the expenses incurred as a result of such cooperation. The parties agree to take any actions or prepare or execute any documents reasonably requested by the other party. Furthermore, during the term of this agreement, LICENSOR shall not initiate or maintain any relationship or conversations with LICENSEE'S current or prospective clients, vendors, any Company relationships with the media (press etc.) without the prior express written request by LICENSEE.

## IX. TERMINATION

A .    Right to Terminate on Notice. This Agreement may be terminated by either party upon sixty (60) days written notice to the other party in the event of a breach of a material provision of this Agreement by the other party, provided that, during the sixty (60) days period, the breaching party fails to cure such breach

B. LICENSEE shall have the right to terminate this Agreement at any time on thirty (30) days written notice to LICENSOR. In such event, all moneys paid to LICENSOR shall be deemed non-refundable and LICENSEE's obligation to pay any unpaid royalties shall be accelerated and shall become immediately due and payable.

C. Additionally, if, after five years of the initial intellectual property license, there are three consecutive years during which royalty payments to LICENSOR are less than one hundred thousand dollars ($100,000.00), LICENSOR has the option to cancel this Agreement in accordance with Section IX. TERMINATION, Para. A.

### X. POST TERMINATION RIGHTS

A. Not less than thirty (30) days prior to the expiration of this Agreement or immediately upon termination thereof, LICENSEE shall provide LICENSOR with a complete schedule of all inventory of Licensed Products then on hand or on order (the "Inventory").

B. Upon expiration or termination of this Agreement, LICENSEE shall be entitled, for an additional period of six (6) months, to continue to sell such Inventory. Such sales shall be made subject to all of the provisions of this Agreement and to an accounting for and the payment of a Royalty thereon. Such accounting and payment shall be due and paid within thirty (30) days of the quarterly calendar cited as the period basis for royalty calculation. LICENSEE shall have the right to continue the use of the name(s) associate with the products and articles that encompass this Agreement for so long as LICENSEE is actively selling its inventory of articles and products. At the conclusion of LICENSEE'S efforts in this regard, LICENSEE agrees to discontinue the use of names, trademarks, signs, advertising and anything else that might make it appear that the LICENSEE is still handling the articles and products of LICENSOR.

C. Upon the expiration or termination of this Agreement, all of the license rights of LICENSEE under this Agreement shall forthwith terminate and immediately revert to LICENSOR and LICENSEE, except as detailed above in Section (B) of the "Post Termination Rights" Section, shall immediately discontinue all use of the Licensed Property and the like, at no cost whatsoever to LICENSOR.

D. Upon termination of this Agreement for any reason whatsoever, LICENSEE agrees to immediately return to LICENSOR all material relating to the Licensed Intellectual Property. Furthermore, upon termination or expiration of this Agreement, LICENSEE agrees to immediately inform all of it's sub licensees regarding the said termination or expiration of this Agreement.

### XI. INFRINGEMENTS

A. During the Term of this Agreement and any and all option/renewal periods, LICENSEE shall have the sole right, in its discretion and at its expense, to take any and all actions against third persons to protect the Intellectual Property Rights licensed in this Agreement.

B. Upon request by either party to the other, the other party shall execute all papers, testify on all matters, and otherwise cooperate in every way necessary and desirable for the prosecution of any such lawsuit. Each party shall reimburse the other party for the expenses incurred as a result of such cooperation.

### XII. INDEMNITY

A. LICENSEE agrees to indemnify and hold harmless LICENSOR, its agents, heirs, assigns and representatives, against all costs, expenses and losses (including reasonable attorneys' fees and costs) incurred through claims of third parties against LICENSOR based on product liability but excluding any claims based solely upon the use of the Licensed Intellectual Property or Licensed Trademarks by LICENSEE in accordance with the terms of this Agreement.



B.    LICENSOR agrees to indemnify and hold harmless LICENSEE, its officers, directors, agents and employees, against all costs, expenses and losses (including reasonable attorneys' fees and costs) incurred through claims of third parties against LICENSEE based on or arising from (i) any infringement, misappropriation or other related action involving the Licensed Intellectual Property or Licensed Trademarks; or (ii) any breach of LICENSOR's obligations, representations, warranties or duties under this agreement.

C.    With respect to any claims falling within the scope of the foregoing indemnifications: (i) each party agrees promptly to notify the other of and keep the other fully advised with respect to such claims and the progress of any suits in which the other party is not participating; (ii) each party shall have the right to assume, at its sole expense, the defense of a claim or suit made or filed against the other party; (iii) each party shall have the right to participate, at its sole expense, in any suit instituted against it; and (iv) a party assuming the defense of a claim or suit against the other party shall not settle such claim or suit without the prior written approval of the other party, which approval shall not be unreasonably withheld or delayed.

## XIII.  LIMITATION OF LIABILITY

A.    IN NO EVENT WILL EITHER PARTY BE LIABLE UNDER THIS AGREEMENT FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT (INCLUDING LOSS OF PROFITS, USE, DATA, OR OTHER ECONOMIC ADVANTAGE), NO MATTER WHAT THEORY OF LIABILITY, EVEN IF THE EXCLUSIVE REMEDIES PROVIDED FOR IN THIS AGREEMENT FAIL OF THEIR ESSENTIAL PURPOSE AND EVEN IF EITHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OR PROBABILITY OF SUCH DAMAGES. THE PROVISIONS OF THIS SECTION "LIMITATION OF LIABILITY" ALLOCATE THE RISKS UNDER THIS AGREEMENT BETWEEN LICENSOR AND LICENSEE AND THE PARTIES HAVE RELIED UPON THE LIMITATIONS SET FORTH HEREIN IN DETERMINING WHETHER TO ENTER INTO THIS AGREEMENT.

B.    EACH PARTY'S LIABILITY TO THE OTHER UNDER THIS AGREEMENT FOR CLAIMS RELATING TO THIS AGREEMENT, WHETHER FOR BREACH OF CONTRACT OR IN TORT, SHALL BE LIMITED TO THE AGGREGATE ROYALTY FEES PAID BY LICENSEE TO LICENSOR DURING THE TWELVE MONTH PERIOD PRECEDING THE CLAIM.

## XIV.  INSURANCE

LICENSEE shall, throughout the Term of this Agreement, obtain and maintain at its own cost and expense from a qualified insurance company licensed to do business as required by state and federal law(s), standard Product Liability Insurance naming LICENSOR as an additionally named insured. Such policy shall provide protection against any and all claims, demands and causes of action arising out of any defects or failure to perform, alleged or otherwise, of the Licensed Products or any material used in connection therewith or any use thereof. The amount of coverage shall be as specified in "Schedule A" attached hereto. LICENSEE agrees to furnish LICENSOR a certificate of insurance evidencing same within ninety (90) days after issuance of same, and, in no event, shall LICENSEE manufacture, distribute or sell the Licensed Products prior to receipt by LICENSOR of such evidence of insurance.

## XV.  FORCE MAJEURE

LICENSEE shall not be liable for any failure of performance hereunder due to causes beyond its reasonable control, including but not limited to acts of God, fire, explosion, vandalism, strikes, lockouts, work stoppages, other labor difficulties, supplier failures, storm or other similar catastrophes, any law, order, regulation, direction, action or request of the state, local or federal government or of any government agency, commission, court, bureau, corporation or other instrumentality of any one or more of such governments, or of any civil or military authority, national emergencies, insurrections, riots, or wars.

7

## XVI. JURISDICTION AND DISPUTES

A. This Agreement shall be governed in accordance with the laws of the State of Florida without regard to its principles of conflicts of laws.

B. All disputes under this Agreement shall be resolved by the courts of the State of Florida including the United States District Court for Florida and the parties all consent to the jurisdiction of such courts, agree to accept service of process by mail, and hereby waive any jurisdictional or venue defenses otherwise available to it.

## XVII. AGREEMENT BINDING ON SUCCESSORS

The provisions of the Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their heirs, administrators, successors and assigns.

## XVIII. WAIVER

No waiver by either party of any default shall be deemed as a waiver of prior or subsequent default of the same or other provisions of this Agreement.

## XIX. SEVERABILITY

If any term, clause or provision hereof is held invalid or unenforceable by a court of competent jurisdiction, such invalidity shall not affect the validity or operation of any other term, clause or provision and such invalid term, clause or provision shall be deemed to be severed from the Agreement.

## XX. NO JOINT VENTURE

Nothing contained herein shall constitute this arrangement to be employment, a joint venture or a partnership.

## XXI. ASSIGNABILITY

Neither party may assign by any act or operation of law the rights and obligations of this Agreement unless in connection with a transfer of substantially all of the assets of LICENSEE and/or with the consent of LICENSOR which shall not be unreasonably withheld or delayed. By way of example and not limitation, LICENSEE may freely assign its rights and obligations under this Agreement to Stelor Productions, Inc

## XXII. INTEGRATION

This Agreement constitutes the entire understanding of the parties, and revokes and supersedes all prior agreements between the parties, including any option agreements which may have been entered into between the parties, and is intended as a final expression of their Agreement. It shall not be modified or amended except in writing signed by the parties hereto and specifically referring to this Agreement. This Agreement shall take precedence over any other documents which may be in conflict with said Agreement.

## XXIII. RATIFICATION

The LICENSOR hereby agrees to the transfer of this License from the LICENSEE (The Aurora Collection, Inc.) to Stelor Productions, Inc. as contemplated by the Asset & Purchase Agreement, dated May 1ª, 2002, and      executed      between      the      above      mentioned      parties

e





## "SCHEDULE A"

### LICENSED INTELLECTUAL PROPERTY

The following Licensed Intellectual Property forms part of this Agreement: A License under any and all intellectual property rights and interests therein, including by way of explanation, products which deal with a creative character known as Googles, anything that contains the letters GOO (in upper or lower case), together with any and all products, which comprise and which will comprise those characters, likenesses, which include Iggle, Oogle, Oggle, Gooroo, Gootian(s), the Planet Goo, slides, computer web site(s), membership lists, clubs, materials, patterns, prototypes, logos, trademarks, service marks, clothing, merchandise, educational products, marketing and promotional data and tools, packaging and advertising, modifications, updates and variations, and all other items associated therewith whether in singular or plural

### LICENSED TRADEMARKS

The following Licensed Trademarks form part of this Agreement: (i) "The Googles" (word and design) Trademarks in International Class Code (016) of the U.S.P.T.O and the co-existent Trademarks Agreement with Ganz, Inc. of Canada in International Class Code (028) of the U.S.P.T.O., which is hereto attached and made a part of this "Schedule A" document, (ii) "Oogle", (iii) "Iggle", (iv) "Oggle", (v) "GooRoo", (vi) "Planet Goo", (vii) "GooMu", (viii) "GooToons", (ix) "GooStuff", (x) "GooKids", (xi) "GooStore" and (xii) any other trademarks, whether registered, pending or future or common law, used in connection with the Licensed Property, including , but not limited to, any trademark incorporating the phrase "Goo" currently in existence.

### LICENSED PRODUCTS

The following Licensed Products form part of this Agreement: all products which comprise the likenesses, stories, ideas, concepts, or designs of the Licensed Property, including without limitation, stuffed toy figurines, videos, stickers, t-shirts or other clothing items, slides, movies, cartoons, books (comic and otherwise), posters, playing, trading and collector cards, CDs, cassette tapes, DVDs, TV programs, motion pictures, all other forms of communication and publication, programs, computer Web site(s), membership lists and clubs, and any other products.

### DERIVATIVES

A Derivative as defined in this agreement shall mean a product or service that is utilized by the LICENSEE and developed by a party other than the LICENSOR but is used in conjunction with licensed products, articles and /or services. It can be a product or service produced by the LICENSEE or a third party (inventor, sub licensee etc.) that in its use enhances the value of the Googles Universe but does not have a conflict with an already existing Googles product idea or concept as outlined in this agreement. It may not possess the "Googles" or "GOO" in it's name and would therefore fall under the LICENSOR'S exclusive ownership as defined in the amended agreement but can be used in conjunction with the "Goo" Universe by the LICENSEE.

### TERRITORY

The following countries shall constitute the Territory . Global/Worldwide rights.

### TERM

This Agreement shall commence on the date executed below by both parties and shall be for a thirty (30) year term   This Agreement shall automatically renew for one additional ten (10) year term on the same terms and conditions provided for herein ("Renewal Term"). Upon expiration of the first Renewal Term of ten (10) years, this Agreement shall automatically renew for a second ten (10) year  extended Term on the



same terms and conditions provided for herein, unless LICENSOR provides written notice of its intention to not to renew this Agreement within one hundred eighty (180) days prior to expiration of the Renewal Term.

## ROYALTY RATE

LICENSEE shall pay the following royalty rates: (i) SIX PERCENT (6%) of Net Sales of Licensed Products that are based solely on the Licensed Intellectual Property and (ii) THREE PERCENT (3%) of Net Sales of Licensed Products that are based solely on Derivative Products and (iii) In the case of Sub Licenses royalties will be TEN PERCENT (10%) of Net sales after subtracting licensing costs and royalties paid to third parties only.

## PRODUCT LIABILITY INSURANCE

Minimum Product Liability Insurance shall be Two Million U.S. dollars ($2,000,000.00) combined single limit for each single occurrence for bodily injury and/or for property damage.

Succession
Rights of Survivor

In the event of the Death of Licensor all of the Licensor's rights under this agreement Shall go to his heirs, assigns or legal representatives as he has lawfully designated in writing.

Steven A. Silvers
5/09/02

5/9/02

MICHAEL LUM
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires April 1, 2003
5/9/02

11

**IN WITNESS WHEREOF**, the parties hereto, intending to be legally bound hereby, have each caused to be affixed hereto its or his/her hand and seal the day indicated.

STEVEN A. SILVERS

STELOR PRODUCTIONS, INC.

Steven A. Silvers
Title: Owner/LICENSOR
Dated: _5/08/02_

By: _____
Printed Name: _Steven A U Esrib_
Title: _President_
Dated: _5/9/02_

Received Ten Thousand Dollar signing bonus ($10,000.00)

MICHAEL LUM
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires April 1, 2003
5/9/02

o



# AMENDMENT
# TO
# LICENSE, DISTRIBUTION
# AND MANUFACTURING AGREEMENT

This AMENDMENT TO THE LICENSE, DISTRIBUTION AND MANUFACTURING AGREEMENT between Steven A. Silvers and Aurora Collection is effective as of April 30, 2002, and is entered into by and between Steven A. Silvers (LICENSOR), an Individual, whose official address is 3741 NE 163rd Street, PMB #325, North Miami Beach, FL 33160, and The Aurora Corporation, Inc. (LICENSEE), a Florida corporation with its current offices located at 4651 SW 51st Street, Suite 806, Davie, FL 33314.

### WITNESSETH

WHEREAS, LICENSOR is the sole and exclusive owner of the GOOGLES characters identified more fully in "Schedule A" attached hereto (the "Licensed Property");

WHEREAS, LICENSOR is the sole and exclusive owner of the GOOGLES trademarks identified more fully in "Schedule A" attached hereto (the "Licensed Trademarks");

WHEREAS, LICENSOR has the power and authority to grant to LICENSEE the right, privilege and license to use, manufacture, distribute, and sell those types of products that incorporate or are otherwise based on the Licensed Property as identified in "Schedule A" attached hereto (the "Licensed Products") and to use the Licensed Trademarks on or in association with such Licensed Products;

WHEREAS, LICENSEE has or will have the ability to manufacture, have manufactured, have sub-manufactured, distribute and sell or have sold and distributed the Licensed Products in the Licensed Territory more clearly defined in Schedule A (the Territory) and to use the Trademark(s) on or in association with the Licensed Products;

WHEREAS, LICENSEE desires to obtain from LICENSOR an exclusive license to use, manufacture, have manufactured and sell Licensed Products in the Territory and to use the Licensed Trademarks on or in association with the Licensed Products;

WHEREAS, LICENSEE has agreed, pursuant to a letter agreement, to act as a consultant for LICENSOR; and

NOW, THEREFORE, in consideration of the promises and agreements set forth herein, the parties, each intending to be legally bound hereby, do hereby agree as follows:

### I. LICENSE GRANT

A.    LICENSOR hereby grants to LICENSEE, for the Term of this Agreement as recited in "Schedule A" attached hereto, the exclusive (even as to LICENSOR), worldwide, sub licensable right and license to use, reproduce, modify, create derivative works of, manufacture, have manufactured, market, advertise, sell, distribute, display, perform, and otherwise commercialize the Licensed Products and Licensed Properties in the Territory. The license includes a license under any and all intellectual property rights and interests therein, including by way of explanation, products which deal with creative characters, known as Googles, anything that contains the letters GOO (in upper or lower case) together with any and all products, which comprise and which will comprise those characters, likenesses, which include Iggle, Oogle, Oggle, Gooroo, Gootian(s), the planet Goo, slides, computer web site(s), membership lists, clubs, materials, patterns, prototypes, logos, trademarks, service marks, clothing, merchandise, educational

2

# EXHIBIT 2

5- 7-04: 5:27PM;XE    220ST                                    ;3019903636            # 2/

June 1, 2002

Mr. Steven Silvers
3741 N.E. 163rd Street
PMB # 324
North Miami Beach, FL 33160

Dear Steven:

This letter agreement ("Agreement") will serve to memorialize the terms of the consultantcy arrangement between Stelor Productions, Inc. ("Company") and Steven A. Silvers ("Consultant").

1.    Engagement of Consultant.

a.    Company hereby engages Consultant as an independent contractor to the Company. Consultant's title shall be Executive Creative Consultant. Company is relying on Mr. Silvers to continue his role of "Papa Googles" and continue to offer his creative input to the Company.

b.    In consideration for the covenants of Consultant contained herein, Company will pay Consultant the following: (i) a signing bonus of ten thousand dollars ($10,000) and (ii) a monthly consultancy fee of five thousand five hundred dollars ($5,500) beginning on June 1, 2002, and continuing each month thereafter for twelve (12) months. Company shall pay Consultant six thousand dollars ($6,000) monthly for a second 18-month period, beginning June 1, 2003. All payments made to Consultant will not be offset against any royalties paid by the Company to Consultant pursuant to the License, Distribution and Manufacturing Agreement. Company will continue to reimburse The Aurora Collection, Inc. for the existing health plan if available, or if not available, will reimburse consultant $300 per month during the term of this Agreement. During the term of the Agreement, Company will reimburse The Aurora Collection, Inc. for, if available, the use of a leased company vehicle, with company to reimburse The Aurora Collection, Inc for insurance coverage. Consultant agrees to pay all costs of maintenance and upkeep. Stelor will write an agreement with Consultant granting him options for 1,000 shares of Stelor's stock under Stelor's stock option plan. If the number of options available under the Stelor Productions current plan is increased during the Consultant's service Company will issue an additional one thousand option shares (1,000)

c.    It is agreed by company that in the event the Company fails to compensate the Consultant as outlined in this Agreement and in accordance with the terms of this Agreement (including all option periods surrounding same) for two consecutive months and if after thirty (30) days fails to cure alleged breach, then Consultant has the right (option) to terminate this Agreement and among other legal remedies afforded Consultant to seek redress before the Court, the License Agreement shall, likewise immediately terminate. This caveat shall exist only if Consultant is not paid for other than "good Cause" termination as outlined below at section five (5) b of this Agreement.

2.    Relationship of Parties. The relationship of Company and Consultant established under this Agreement is of an independent contractor. Nothing in this Agreement shall be construed to give any party the power to direct or control the daily activities of any of the other parties, or to constitute the parties as principal and agent, employer and employee, franchiser and franchisee, partners, joint venturers, co-owners, or otherwise as participants in a joint undertaking. The parties understand and agree that none of the parties grants any other party the power or authority to make or give any agreement, statement, representation, warranty, or other commitment on behalf of any other party, or to enter into any contract or otherwise incur any liability or obligation, express or implied, on behalf of any other party, or to transfer, release, or waive any right, title, or interest of any other party. Furthermore, during the term of

this agreement, LICENSOR shall not initiate or maintain any relationship or conversations with LICENSEE'S current or prospective clients, vendors, any Company relationships with the media (press etc.) without the prior express written request by LICENSEE.

   3.   <u>Duties of Consultant.</u>   Consultant's duties hereunder are as follows:

      a.   Consultant shall use his best efforts to perform such services as may be requested by Company from time to time consistent and commensurate with his position as Executive Creative Consultant, including, but not limited to, executing all papers, testifying on all Company related matters and otherwise cooperating in every way necessary and desirable to strengthen, establish or maintain any intellectual property right granted under this Agreement or the License, Distribution and Manufacturing Agreement (as amended) between Company and Consultant. The Consultant shall make himself available to the Company by way of telephone, fax, email, video conferencing (if deemed necessary) on an as needed basis and during reasonable business hours Monday through Friday. Consultant shall further make himself available, in person, if deemed necessary, to the Company so long as the Consultant is given a minimum of ten (10) days written notice if Consultant is, at the time of said request, residing outside of the Continental United States and three (3) days written notice by the Company if Consultant is residing, at the time of said request, within the Continental United States. In either case, Consultant must maintain a United States address for purposes of receiving correspondence, samples, checks etc. Written notice may also be deemed given if communicated via Consultant's personal email address or a fax number to be provided to the Company. Written notice must be sent via U.S. Mail certified, return receipt requested, or via a nationally recognized mail carrier service with "signature" required. Written notice may also be sent if communicated via Consultant's personal email address or a fax number to be provided to the Company. However, the latter shall not be used for any "official" notice purposes.

      b.   During the term of this Agreement and for a period of (1) years after the termination or expiration of this Agreement, Consultant shall not, either individually or in conjunction with a third party, engage in any business, trade, or profession as owner, officer, manager, employee, consultant or otherwise if such business competes in any material way with Company's business of developing, creating, selling, manufacturing, distributing, or marketing products, media or materials for children.

      c.   Consultant shall offer Company a right of first refusal to license, develop, manufacture, market or sell any and all children's characters or other products, ideas, inventions or creations created by Consultant that are not within the scope of this Agreement or the License, Distribution and Manufacturing Agreement (as amended) between Company and Consultant. If Consultant provides Company with any new idea's either relating to The Googles as well as anything entirely new that may not relate to the current universe of characters and/or idea's, that upon submission of such new idea or concept which shall be placed in writing Company shall have one hundred and twenty (120) days to accept and enter into an agreement for said property.

      d.   Consultant agrees to hold harmless, defend and indemnify Company and its officers, directors, employees, agents and servants from and against any and all claims, damages and expenses, including reasonable legal fees and expenses, of whatever kind and nature directly or indirectly arising out of or on account of or resulting from the Consultant's activities (other than as expressly authorized by Company) including, without limitation, Consultant's failure to comply with his obligations under this Agreement, acts or omissions.

   4.   <u>Duties of Company.</u>

a.    Company shall reimburse Consultant for all reasonable travel and living expenses that are deemed to be essential to Company's success and are pre-approved by an authorized officer of the Company and incurred as a direct result of Consultant's obligations under this Agreement such as attending tradeshows, board meetings, etc. The Company shall, upon proper documentation having been presented to the Company, or its official/designated representative, within seven (7) days of receipt of same, reimburse Consultant said incurred expenses as approved by Company.

5.    Term and Termination.

a.    Subject to the provisions for termination as provided herein, this Agreement shall commence upon execution and shall have a term of thirty (30) months.

b.    Company may immediately terminate this Agreement upon the occurrence of any of the following: (i) a material breach of any provision of this Agreement by Consultant; (ii) a failure by Consultant, after written notice, to perform such duties required of Consultant as outlined in this agreement; (iii) the initiation of any bankruptcy, receivership, trust deed, creditors arrangement, composition or comparable proceeding by Consultant, or if any such proceeding is instituted against Consultant; (iv) the conviction of Consultant of any felony crime; (v) any use, sale or possession by Consultant of any illegal drug or controlled substance that is prosecutable under US Federal Laws. Written notice to mean by way of Certified mail, return receipt requested, or by way of a Nationally recognized mail service, Courier service etc.

c.    Upon termination or expiration of this Agreement by either party, Consultant shall immediately return to Company all Proprietary Information (as defined below) in Consultant's possession, custody or control in whatever form held (including copies, compilations, summaries, or embodiments thereof relating to Proprietary Information) and provide written certification that all such material has been returned.

d.    Company agrees to provide Consultant thirty (30) days Notice, from date of said written notice of termination by the Company, within which to cure any alleged breach it has made against the Consultant identified in paragraph three (3) under "Duties of Consultant".

6.    Proprietary Information; Proprietary Rights.

a.    In the course of performing his duties under this Agreement, Consultant may obtain information relating to Company and/or its customers, suppliers or other third parties that is of a confidential and proprietary nature ("Proprietary Information"). Such Proprietary Information may include, without limitation, trade secrets, research and development, customer lists, vendor lists, schedule of accounts, plans, programs, inventions, computer software, know-how, inventions, product information, techniques, processes, schematics, data, financial information and sales and marketing plans. Consultant shall, at all times, both during the term of this Agreement and for a period of two (2) years thereafter its termination, keep in trust and confidence all such Proprietary Information, and shall not use such Proprietary Information other than in the course of performing his duties as expressly provided in this Agreement, nor shall Consultant disclose any such Proprietary Information to any person without Company's prior written consent except as required or needed in any legal and/or Court action by Consultant against the Company or any other third party. This pertains to only that information not otherwise gathered from public sources, knowledge already in the public eye or a matter of public record, and/or any other third party other than Consultant.

3

5- 7-04: 5:27PM:XI    220ST    ;3019903636    # 5/



b.    The Company acknowledges that the Consultant is not being hired as a work for hire but rather is being compensated, pursuant to this Consulting agreement, as a Consultant for the express purpose of advising, recommending, counseling, and otherwise utilizing Consultant's expertise in the decision making process as it pertains to the existing and "further development" of the Google's project only.

c.    The services and rights which Company is granting to Consultant hereunder are extraordinary and unique and cannot be replaced or adequately compensated in money damages, and any breach by Consultant of this Agreement will cause irreparable injury to Company. Therefore, Consultant agrees that in the event of a breach of this Agreement, Company, in addition to any other remedies that might be available to it, shall be entitled to bring suit at law or equity for money or other damages. Consultant shall not oppose such relief on the grounds that there is an adequate remedy at law, and such right shall be cumulative and in addition to any other remedies at law or in equity (including monetary damages) which Company may have upon the breach of the obligations of confidentiality hereunder.

7.    <u>Limitations of Liability</u>.  TO THE MAXIMUM EXTENT PERMITTED BY LAW, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR ANY THIRD PARTY FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES (INCLUDING, WITHOUT LIMITATION, INDIRECT, SPECIAL, PUNITIVE, OR EXEMPLARY DAMAGES) FOR ANY CLAIM BY ANY OTHER PARTY, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

8.    <u>Miscellaneous</u>.

This Agreement is a legally binding agreement between Company and Consultant and shall be governed by and construed in accordance with the laws of the State of Florida.  This Agreement may be executed in one or more counterparts, each of which shall be an original Agreement, and all of which taken together shall constitute one and the same instrument.  This Agreement may not be assigned by consultant without the prior written consent of Company. This Agreement shall not be modified, amended, or in any way altered except by an instrument in writing signed by both Company and Consultant. Each party shall refrain from making or issuing any statements, disclosures, or other communications related to this Agreement, the subject matter of this Agreement, or the services provided hereunder.  This Agreement constitutes the entire agreement between Company and Consultant with respect to the subject matter of this Agreement, and supersedes all prior agreements, whether written or oral, with respect to the subject matter contained in this Agreement.

Please indicate your acceptance of the terms of this Agreement by signing in the space indicated below.

STEVEN A. SILVERS    Date 5/09/02

Stelor Productions, Inc.

By:    Date 5/9/02
Name:  Steven A. Esrig    Title: President

Received Ten Thousand Dollar signing bonus ($10,000.00)

MICHAEL LUM
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires April 1, 2003
5/9/02

4

JS 44 (Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974 is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**

STELOR PRODUCTIONS, INC.

**DEFENDANTS**

STEVEN A. SILVERS

OCT 15 200

CLARENCE MADDOX
CLERK, FSDX
S FSDC / WPB

**(b)** County of Residence of First Listed Plaintiff  Montgomery, MD
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
   TRACT OF LAND INVOLVED

04 CV 80954  DTKH  JmH

**04-80954**

**CIV-HURLEY**

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Stanley A. Beiley
Sacher, Zelman, Van Sant, Paul, Beiley, Hartman,
Rolnick & Waldman, P.A.
1401 Brickell Ave., Suite 700  (305)371-8797
Miami, Florida 33131    (See Attachment)

Attorneys (If Known)

County Where Action Arose: Palm Beach

JAMES M. HOPKINS

| **II. BASIS OF JURISDICTION** (Place an "X" in One Box Only) | | **III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff |
|---|---|---|

| | | | (For Diversity Cases Only) | | and One Box for Defendant) |
|---|---|---|---|---|---|
| | | | | PTF DEF | | PTF DEF |
| ☐ 1 | U.S. Government Plaintiff | ☐ 3 Federal Question (U.S. Government Not a Party) | Citizen of This State | ☐ 1 ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 ☐ 4 |
| ☐ 2 | U.S. Government Defendant | ☒ 4 Diversity (Indicate Citizenship of Parties in Item III) | Citizen of Another State | ☐ 2 ☐ 2 | Incorporated and Principal Place of Business In Another State | ☒ 5 ☐ 5 |
| | | | Citizen or Subject of a Foreign Country | ☐ 3 ☐ 3 | Foreign Nation | ☐ 6 ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— Med. Malpractice | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury— Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 830 Patent | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ Exchange |
| ☒ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. Security Act | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions |
| | | ☐ 555 Prison Condition | | | |

**V. ORIGIN** (PLACE AN "X" IN ONE BOX ONLY)

| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Appeal to District Judge from Magistrate Judgment |
|---|---|---|---|---|---|---|

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

Breach of Contract  28 USC SECTION 1332  Length of Trial - 2-3 days

| **VII. REQUESTED IN COMPLAINT:** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | DEMAND $ in excess of $75,000 | CHECK YES only if demanded in complaint: JURY DEMAND: ☐ Yes ☒ No |
|---|---|---|---|

**VIII. RELATED CASE(S) IF ANY** (See instructions):  None

JUDGE _____   DOCKET NUMBER _____

DATE  October 14, 2004

SIGNATURE OF ATTORNEY OF RECORD  Stanley A. Beiley

**FOR OFFICE USE ONLY**

RECEIPT #  721303   AMOUNT  $150.°°   APPLYING IFP _____   JUDGE  DTKH   MAG. JUDGE  JMH

## ATTACHMENT TO CIVIL COVER SHEET

STELOR PRODUCTIONS, INC.,

      Plaintiff,

v.

STEVEN SILVERS,

      Defendant.

_____/

      The other attorney for the Plaintiff is:

            Laurence R. Hefter
            FINNEGAN, HENDERSON, FARABOW,
            GARRETT & DUNNER, L.L.P.
            1300 I Street, N.W.
            Washington, D.C. 20005-3315
            (202) 408-4000