UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.

STELOR PRODUCTIONS, L.L.C., a
Delaware corporation, f/k/a STELOR
PRODUCTIONS, INC.,

**05-80393**

      Plaintiff,

vs.

CIV-HURLEY

STEVEN A. SILVERS, a Florida resident,

      Defendant.

_____/

## VERIFIED COMPLAINT

Plaintiff STELOR PRODUCTIONS, L.L.C., f/k/a STELOR PRODUCTIONS, INC. ("Stelor"), by and through its undersigned attorneys, hereby files this Complaint against Defendant STEVEN A. SILVERS ("Silvers") and alleges as follows:

1.     This is a civil action seeking an injunction, a declaratory judgment, and other relief based upon Silvers' breach of a settlement agreement between the parties, his failure to honor another agreement between the parties, and the harm and threatened harm engendered by his actions.

### Parties, Jurisdiction and Venue

2.     Stelor is a limited liability company organized and existing under the laws of the State of Delaware, and having its principal place of business in Darnestown, Maryland. Stelor converted from a corporation to a limited liability company effective on or about March 14, 2005.

3.     Silvers is a resident of Palm Beach County, Florida and is sui juris.

BURLINGTON · WEIL · SCHWIEP · KAPLAN ⑧ BLONSKY, P.A.
_____
OFFICE IN THE GROVE PENTHOUSE 2699 SOUTH BAYSHORE DRIVE MIAMI, FLORIDA 33133
T: 305.858.2900 F: 305.858.5261
EMAIL: INFO@BWSKB.COM WWW.BWSKB.COM

Dockets.Justia.com

4.    This Court has subject matter jurisdiction based on diversity of citizenship pursuant to 28 U.S.C. § 1332(a). The parties are residents of different states and the matter in controversy exceeds the sum or value of seventy-five thousand dollars ($75,000), exclusive of interest and costs. This Court also has jurisdiction under the Declaratory Judgment Act, 28 U.S.C. § 2201, because the parties' irreconcilable differences in the interpretation of specific contractual provisions, combined with Silvers' threats and breaches have created a justiciable case or controversy between the parties.

5.    Stelor's claims arise in whole or in part in the Southern District of Florida. The contracts at issue in this action specifically provide that all disputes are to be resolved by this Court and that the parties consent to jurisdiction in this Court. Silvers also resides in this District. Venue is accordingly proper pursuant to 28 U.S.C. § 1391(a).

## **Factual Allegations**

6.    In 1991, Silvers published a children's edutainment book entitled *Googles and the Planet of Goo* about four loveable alien creatures called "Googles". That book displayed the trademark GOOGLES & Design on the outside back cover. Silvers registered copyrights in that book and additional related works from 1991 through 1994. In 1995, Silvers applied for a design patent on a tennis shoe having the GOOGLES & Design trademark displayed in at least four places on it (and that patent was subsequently issued September 1, 1998). On August 2, 1996, a company controlled by Silvers, The Googles Children's Workshop, Inc., filed an application for federal registration in the United States Patent and Trademark Office ("USPTO") of GOOGLES & Design as a trademark for "children's books" claiming use since June 1994. That application matured into Registration No. 2,087,590 issued August 12, 1997.

2

BURLINGTON · WEIL · SCHWIEP · KAPLAN⟨&⟩BLONSKY, P.A.

OFFICE IN THE GROVE  PENTHOUSE  2699 SOUTH BAYSHORE DRIVE  MIAMI, FLORIDA 33133
T: 305.858.2900 F: 305.858.5261
EMAIL: INFO@BWSKB.COM  WWW.BWSKB.COM

7.      On July 18, 1997, Silvers registered the domain name googles.com and, on or about that date, started using GOOGLES as a service mark on his website for pre-school and young children (the GOOGLES & Design Trademark, Copyrights, Domain Name, and Patent will be collectively referred to as "GOOGLES IP"). As a natural expansion of the GOOGLES children's book and website, there have been sales of children's merchandise related to the Googles characters, namely, GOOGLES stickers, plush toys and music CDs, and distribution of GOOGLES children's T-shirts.

8.      Despite these efforts to preserve, expand and promote the GOOGLES IP, Silvers' venture made little impact in a marketplace crowded with children's materials from bigger and better financed providers. In an effort to successfully capitalize on the GOOGLES IP, Silvers sought partners to carry forward his vision. An initial effort between Silvers and Aurora Collection, Inc. ("Aurora") failed and Silvers thereafter sought another partner. Silvers was in no position to move forward alone, as he had many personal and business hurdles to overcome. Significant among them were a lack of capital, a lack of connections, a lack of experience, a lack of access to financing, an increasingly adverse relationship with Aurora, and negative aspects of Silvers' background that made him unsuited to serve as figurehead or spokesman for an enterprise aimed at providing wholesome and enriching entertainment to an audience of impressionable children.

9.      Accordingly, when Stelor was formed to develop Silvers' concept into a reality, Stelor's enthusiasm and interest were tempered by legitimate concerns and reservations. Stelor saw potential in the GOOGLES IP and Stelor's founders also had confidence in their ability to raise the needed funds and to create a compelling and attractive "Googles" universe that would

3

BURLINGTON · WEIL · SCHWIEP · KAPLAN(&)BLONSKY, P.A.

OFFICE IN THE GROVE PENTHOUSE 2699 SOUTH BAYSHORE DRIVE MIAMI, FLORIDA 33133
T: 305.858.2900 F: 305.858.5261
EMAIL: INFO@BWSKB.COM WWW.BWSKB.COM

enlighten, entertain, educate, and develop children by providing them with fascinating and uplifting products, programs and services. But aware of Aurora's aborted effort, and wary that Silvers' background could jeopardize the "Googles" program, Stelor insisted that any arrangement with Silvers contain safeguards and protections.

10.    Thus, when on or around June 1, 2002, Stelor and Silvers entered into a "License, Distribution and Manufacturing Agreement" ("License Agreement") and a Consulting Agreement (true and correct copies of which are attached hereto as Exhibits "A" and "B", respectively), Stelor bargained for, and obtained, promises, commitments and obligations from Silvers designed to ensure Stelor's ability to develop the "Googles" program free from undue interference by Silvers. The License Agreement gives Stelor the sole and exclusive worldwide license to commercialize the Googles characters and the GOOGLES IP. Among the pertinent provisions of the License Agreement and the Consulting Agreement are the following:

(a) The License Agreement gives Stelor exclusive rights in the "Googles" products, trademarks and intellectual property and specifies that those rights are exclusive even as to Silvers (Ex. "A" at ¶¶ IA, IB).

(b) The License Agreement gives Stelor an irrevocable power of attorney to apply for, maintain, enforce and defend intellectual property rights, including trademarks, websites and domain names. Stelor, not Silvers, assumed responsibility for handling all Googles trademark and other intellectual property matters (Ex. "A" at ¶ VIIIA).

(c) The License Agreement and the Consulting Agreement require Silvers to fully cooperate with Stelor, while the Consulting Agreement makes plain that Silvers shall have no power to direct or control the daily activities of Stelor (Ex. "A" at ¶ VIIIE; Ex. "B" at ¶ 3).

4

BURLINGTON · WEIL · SCHWIEP · KAPLAN (&) BLONSKY, P.A.

OFFICE IN THE GROVE PENTHOUSE  2699 SOUTH BAYSHORE DRIVE  MIAMI, FLORIDA 33133
T: 305.858.2900  F: 305.858.5261
EMAIL: INFO@BWSKB.COM  WWW.BWSKB.COM

(d) Finally, to protect Stelor from possible public embarrassment, both the License Agreement and the Consulting Agreement expressly prohibit Silvers from initiating or maintaining "any relationship or conversation with [Stelor's] current or prospective clients, vendors, any company relationships with the media (press, etc.), without the prior express written request by [Stelor]."

11.     Silvers freely agreed to these and other contractual obligations and restrictions. Stelor, believing it had the necessary rights and protections, then threw itself enthusiastically into the task of using its best efforts to develop The Googles concept and intellectual property. To this end, Stelor has spent millions of dollars, and its principals and employees have devoted themselves tirelessly to making Stelor and the "Googles" successful and profitable, both for themselves and for the benefit of Silvers.

12.     Notwithstanding his contractual agreements, Silvers displayed an unwillingness to abide by his obligations and commenced a campaign to inject and entwine himself into the very fabric of Stelor's business. He subverted Stelor's intellectual property rights by diverting communications from the USPTO from Stelor to himself. He interfered with litigation undertaken by Stelor against third parties. He held himself out as a Stelor representative at crucial industry trade shows. He threatened to communicate directly with the trade and press concerning the GOOGLES IP. He withheld information vital to Stelor's ability to carry out the business of transforming the basic Googles idea into a thriving and profitable business and denied it access to Googles domain names. All of these actions were in violation of the License Agreement.

BURLINGTON · WEIL · SCHWIEP · KAPLAN ⟨&⟩ BLONSKY, P.A.

OFFICE IN THE GROVE  PENTHOUSE  2699 SOUTH BAYSHORE DRIVE  MIAMI, FLORIDA 33133
T: 305.858.2900  F: 305.858.5261
EMAIL: INFO@BWSKB.COM  WWW.BWSKB.COM

13.     As a result of Silvers' actions, Stelor was left with no choice other than to file a complaint against him for injunctive, declaratory and other relief related to his breaches. The Complaint was filed on or about October 18, 2004 and the cause was styled <u>Stelor Productions, Inc. v. Steven A. Silvers</u>, Case No. 04-80954-Civ-Hurley, United States District Court for the Southern District of Florida ("the prior litigation"). The Complaint sought injunctive relief requiring Silvers to notify the USPTO that it was to communicate with Stelor, to provide Stelor with access to the Googles domain names, to refrain from communicating with the media and vendors concerning the GOOGLES IP, and to refrain from interfering in litigation undertaken by Stelor, as well as a declaration that Stelor was in compliance with the Licensing Agreement. Silvers subsequently filed a counterclaim asserting that Stelor was in breach and he purported to terminate the License Agreement.

14.     On or about January 28, 2005, Stelor and Silvers entered into a Confidential Settlement Agreement ("Settlement Agreement") resolving the prior litigation. A true and correct copy of the Settlement Agreement is being filed with the Court separately under seal, in accordance with its terms.

15.     Among other things, the Settlement Agreement vindicated the positions taken by Stelor in the prior litigation. The Settlement Agreement gives Stelor the right to control the domain names, requires Silvers to cooperate in all respects in pending and future trademark and domain name dispute proceedings filed by Stelor, withdraws Silvers' purported termination of the License Agreement and reaffirms his obligations under it, and makes Stelor's counsel the sole correspondent with the USPTO. The Settlement Agreement also required the dismissal of the prior litigation, with a reservation of exclusive continuing jurisdiction with the United States

BURLINGTON · WEIL · SCHWIEP · KAPLAN Ⓐ BLONSKY, P.A.

OFFICE IN THE GROVE PENTHOUSE 2699 SOUTH BAYSHORE DRIVE MIAMI, FLORIDA 33133
T: 305.858.2900 F: 305.858.5261
EMAIL: INFO@BWSKB.COM WWW.BWSKB.COM

District Court for the Southern District of Florida to enforce its terms, with the prevailing party in any enforcement action recovering reasonable attorneys' fees and costs. Silvers was paid valuable consideration for entering into the Settlement Agreement.

16.    On February 8, 2005, Stelor and Silvers filed a Joint Stipulation of Dismissal without Prejudice of the prior litigation. The stipulation was granted by Order dated February 17, 2005 and the prior litigation was administratively closed.

17.    Unfortunately, soon thereafter, Silvers once again proved himself unwilling to abide by the terms of his contractual undertakings. He repeatedly failed to cooperate in pending and future trademark and domain name dispute proceedings. He repeatedly failed to provide evidence of paid insurance premiums. And, most importantly, he schemed to undo Stelor's business activities and steal its work.

18.    As he did in the prior litigation when he purported to terminate the License Agreement, only to withdraw the notice of termination and reaffirm his obligations under the License Agreement, Silvers has once again purported to terminate the License Agreement. By letter dated April 27, 2005, counsel for Silvers wrote to Steven Esrig of Stelor reinstating the notice of termination of the License Agreement based on five invalid grounds. A true and correct copy of the April 27 letter is attached hereto as Exhibit "C".

19.    Counsel for Stelor responded by letter dated April 29, 2005, in which Stelor refuted each of the specious grounds cited by Silvers, offered to cure any conceivable breaches, and demanded withdrawal of the notice of termination, confirmation that Silvers would abide by the terms of the License Agreement and the Settlement Agreement, and written assurance that Silvers will make no efforts to interfere in any manner with the business of Stelor. Specifically,

7

BURLINGTON · WEIL · SCHWIEP · KAPLAN & BLONSKY, P.A.

OFFICE IN THE GROVE  PENTHOUSE  2699 SOUTH BAYSHORE DRIVE  MIAMI, FLORIDA 33133
T: 305.858.2900 F: 305.858.5261
EMAIL: INFO@BWSKB.COM  WWW.BWSKB.COM

Stelor demonstrated that it has met its obligation to offer unit interests to Silvers, it has paid or attempted to pay all royalty advances that Silvers could possibly claim, it has cooperated in the audit of the books and records, it has offered to make samples of licensed products available, and it has provided a royalty statement showing that no royalties are owed. A true and correct copy of the April 29 letter is attached hereto as Exhibit "D".

20.     On May 2, 2005, Silvers' counsel dispatched a letter refusing to comply with the reasonable demands made by Stelor. Indeed, the letter, in stating that Silvers "intends to go in a different direction to develop his characters and intellectual property", essentially conceded that Silvers is planning immediate actions that are prohibited by the License Agreement and the Settlement Agreement and violative of Stelor's rights under those agreements, notwithstanding the fact that the License Agreement requires 60 days notice and an opportunity to cure prior to termination. See Ex. "A" at ¶ IX. A true and correct copy of the May 2 letter (which bears the erroneous year "2004" rather than "2005", as correctly reflected in the facsimile transmission information) is attached hereto as Exhibit "E".

21.     Silvers began acting on the threat made in his counsel's letter before the letter was dispatched, even though his notice of termination, even if valid, is not effective until June 26, 2005. On April 28, 2005, Stelor learned from godaddy.com, a domain name registrar, that Silvers had violated the License Agreement and the Settlement Agreement by changing 78 different Googles domain names from Stelor's control to Silvers' control and improperly excluded Stelor from being the administrative contact with the domain name registrar. Due to Silvers' actions in violation of the agreements, Stelor is currently unable to reassert control over the domain names that it has licensed.

8

BURLINGTON • WEIL • SCHWIEP • KAPLAN (&) BLONSKY, P.A.

OFFICE IN THE GROVE PENTHOUSE 2699 SOUTH BAYSHORE DRIVE MIAMI, FLORIDA 33133
T: 305.858.2900 F: 305.858.5261
EMAIL: INFO@BWSKB.COM WWW.BWSKB.COM

22.    Moreover, Silvers hijacked the entirety of the content of the website located at www.googles.com and developed, produced and operated by Stelor at great expense. Stelor received notice of this conduct on May 3, 2005 from Verio, Inc., a web hosting firm, which informed that another customer (obviously Silvers) had requested to add googles.com to their account, at which point Stelor learned that the website had been deactivated and brought down. Having taken this action in express violation of the agreements, Silvers has taken from Stelor content in which it has made a seven-figure investment, and has taken from Stelor the ability to control intellectual property that it has licensed and that it has created.

23.    In doing so, Silvers has essentially put Stelor out of business. Without its website content, Stelor cannot display its product and meet with potential licensees. It cannot demonstrate its product to its users and their customers. It cannot launch and protect pending expansions to its brand. Advertisements that have been placed promoting the website for an upcoming trade show have been rendered useless and, as a result, Stelor's reputation has been damaged and it has lost industry goodwill. Moreover, its ability to prepare and submit materials for that trade show has been compromised. Yesterday, Stelor was actively advancing the business on all fronts. Today, it can do nothing.

24.    Furthermore, Stelor developed the content and exclusively operated the website devoted to the "Googles" characters, offering a variety of services and features geared to delighting children and their parents. The website is the public's window into the Googles' world. Being able to operate and modify this website is among Stelor's most important priorities. Yesterday, the website was filled with intellectual property and content created by Stelor. Today, as a result of Silvers' dishonesty and maliciousness, the intellectual property has

9

BURLINGTON · WEIL · SCHWIEP · KAPLAN & BLONSKY, P.A.

OFFICE IN THE GROVE PENTHOUSE 2699 SOUTH BAYSHORE DRIVE MIAMI, FLORIDA 33133
T: 305.858.2900 F: 305.858.5261
EMAIL: INFO@BWSKB.COM WWW.BWSKB.COM

been taken from Stelor's control and the website has been destroyed, replaced with a message created by Silvers, presumably. A true and correct copy of the current website content established after Silvers hijacked the site is attached hereto as Exhibit "F". Without immediate entry of an injunction, the harm to Stelor will be irreparable.

25.    All conditions precedent to the commencement of this action have either occurred, been waived or been excused.

26.    Stelor has retained undersigned counsel to prosecute this action and is obligated to them for reasonable attorney's fees and costs in connection therewith.

## COUNT ONE
### (Breach of Contract)

27.    Stelor re-alleges and incorporates by reference the allegations of paragraphs 1 through 26, inclusive, as though fully set forth herein.

28.    Silvers' actions set forth above constitute material breaches of the Licensing Agreement and the Settlement Agreement.

29.    As a result of Silvers' actions, Stelor has been damaged.

30.    Silvers' breaches have caused irreparable injury to Stelor.

31.    Stelor has no adequate remedy at law.

32.    Furthermore, if Silvers is free to ignore the terms of the License Agreement and the Settlement Agreement, nothing prevents him from negotiating directly with Google, Inc. and Stelor is in reasonable fear that Silvers either has already done so or will do so if not enjoined. The Settlement Agreement expressly provides that any attempt to negotiate with Google, Inc. without Stelor's participation constitutes a breach of the Settlement Agreement that creates irreparable harm and for which injunctive relief will be necessary to maintain the rights of the

10

BURLINGTON · WEIL · SCHWIEP · KAPLAN (&) BLONSKY, P.A.

OFFICE IN THE GROVE PENTHOUSE 2699 SOUTH BAYSHORE DRIVE  MIAMI, FLORIDA 33133
T: 305.858.2900 F: 305.858.5261
EMAIL: INFO@BWSKB.COM  WWW.BWSKB.COM

non-breaching party. Both Stelor and Silvers agreed to the issuance of injunctive relief to prevent such a breach.

## COUNT TWO
## (Declaratory Judgment)

33.     Stelor re-alleges and incorporates by reference the allegations of paragraphs 1 through 26, inclusive, as though fully set forth herein.

34.     This is a claim for declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. § 2201.

35.     By virtue of his notice of termination (Exhibit "C"), Silvers has taken the position that Stelor has breached the Settlement Agreement and that the License Agreement is terminated. As detailed above, Silvers has also taken actions in violation of his obligations and undertakings pursuant to the License Agreement and the Settlement Agreement, in apparent reliance upon his purported termination of the License Agreement.

36.     Stelor believes that the Settlement Agreement and the License Agreement are valid and effective contractual commitments that continue to bind the parties. Stelor further contends that Silvers' prior actions, his current actions and his threatened future conduct both violate the terms of the Settlement Agreement and the License Agreement and threaten the business of Stelor. Stelor additionally has ongoing financial obligations under the Settlement Agreement that it is prepared to meet, but which are not required if the License Agreement has been terminated.

37.     Accordingly, Stelor is in doubt about its rights and Silvers' rights under the License Agreement and the Settlement Agreement.

11

BURLINGTON · WEIL · SCHWIEP · KAPLAN (&) BLONSKY, P.A.

OFFICE IN THE GROVE  PENTHOUSE  2699 SOUTH BAYSHORE DRIVE  MIAMI, FLORIDA 33133
T: 305.858.2900  F: 305.858.5261
EMAIL: INFO@BWSKB.COM  WWW.BWSKB.COM

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff STELOR PRODUCTIONS, L.L.C. prays that this Court issue and award the following relief:

(a)    a preliminary and permanent injunction enjoining Defendant STEVEN A. SILVERS from taking any action in violation of or contrary to the terms of the Licensing Agreement or the Settlement Agreement and affirmatively requiring him to restore the domain names and website to Stelor's control;

(b)    a declaratory judgment declaring that Stelor has complied with its obligations under the Licensing Agreement and the Settlement Agreement and that those agreements remain in full force and effect;

(c)    a judgment awarding Stelor its reasonable attorneys' fees and costs: and

(d)    a judgment awarding Stelor such other relief as may be deemed just and proper.

## **VERIFICATION**

This sworn verification is made under penalty of perjury under 28 U.S.C. § 1746. I, STEVEN A. ESRIG, Chief Executive Officer and President of STELOR PRODUCTIONS, L.L.C., declare under penalty of perjury under the law of the United States and Florida that I executed the foregoing Verified Complaint and that the factual allegations contained therein are true and correct.

By: _SEE ATTACHED_

Steven A. Esrig
Chief Executive Officer/President
Stelor Productions, L.L.C.

12

BURLINGTON • WEIL • SCHWIEP • KAPLAN ⟨&⟩ BLONSKY, P.A.

OFFICE IN THE GROVE  PENTHOUSE 2699 SOUTH BAYSHORE DRIVE  MIAMI, FLORIDA 33133
T: 305.858.2900 F: 305.858.5261
EMAIL: INFO@BWSKB.COM  WWW.BWSKB.COM

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff STELOR PRODUCTIONS, L.L.C. prays that this Court issue and award the following relief:

(a)    a preliminary and permanent injunction enjoining Defendant STEVEN A. SILVERS from taking any action in violation of or contrary to the terms of the Licensing Agreement or the Settlement Agreement and affirmatively requiring him to restore the domain names and website to Stelor's control;

(b)    a declaratory judgment declaring that Stelor has complied with its obligations under the Licensing Agreement and the Settlement Agreement and that those agreements remain in full force and effect;

(c)    a judgment awarding Stelor its reasonable attorneys' fees and costs; and

(d)    a judgment awarding Stelor such other relief as may be deemed just and proper.

## VERIFICATION

This sworn verification is made under penalty of perjury under 28 U.S.C. § 1746. I, STEVEN A. ESRIG, Chief Executive Officer and President of STELOR PRODUCTIONS, L.L.C., declare under penalty of perjury under the law of the United States and Florida that I executed the foregoing Verified Complaint and that the factual allegations contained therein are true and correct.

By: _____
Steven A. Esrig
Chief Executive Officer/President
Stelor Productions, L.L.C.

12

BURLINGTON · WEIL · SCHWIEP · KAPLAN ⊗ BLONSKY, P.A.

OFFICE IN THE GROVE PENTHOUSE 2699 SOUTH BAYSHORE DRIVE MIAMI, FLORIDA 33133
T: 305.858.2900 F: 305.858.5261
EMAIL: INFO@BWSKB.COM  WWW.BWSKB.COM

Dated this ____ day of May 2005.

Respectfully submitted,

BURLINGTON, WEIL, SCHWIEP,
   KAPLAN & BLONSKY, P.A.
Attorneys for Plaintiff
Office in the Grove, Penthouse A
2699 South Bayshore Drive
Miami, Florida 33133
Tel: 305-858-2900
Fax: 305-858-5261

By: _____

     Kevin C. Kaplan
     Florida Bar No. 933848
     Daniel F. Blonsky
     Florida Bar No. 972169
     David J. Zack
     Florida Bar No. 641685

13

BURLINGTON · WEIL · SCHWIEP · KAPLAN & BLONSKY, P.A.

OFFICE IN THE GROVE  PENTHOUSE  2699 SOUTH BAYSHORE DRIVE  MIAMI, FLORIDA 33133
T: 305.858.2900 F: 305.858.5261
EMAIL: INFO@BWSKB.COM  WWW.BWSKB.COM

# EXHIBIT A

# LICENSE, DISTRIBUTION
## AND MANUFACTURING AGREEMENT

This LICENSE, DISTRIBUTION AND MANUFACTURING AGREEMENT between Steven A. Silvers and Stelor Productions, Inc. is effective as of June 1, 2002 and is entered into by and between Steven A Silvers (LICENSOR), an Individual, whose official address is 3741 NE 163rd Street, PMB #325, North Miami Beach, FL 33160 and Stelor Productions, Inc. (LICENSEE), a Delaware corporation with its current offices located at: 14701 Mockingbird Drive, Darnestown, Maryland, 20874

### WITNESSETH

WHEREAS, LICENSOR is the sole and exclusive owner of the GOOGLES characters identified more fully in "Schedule A" attached hereto (the "Licensed Property");

WHEREAS, LICENSOR is the sole and exclusive owner of the GOOGLES trademarks identified more fully in "Schedule A" attached hereto (the "Licensed Trademarks");

WHEREAS, LICENSOR has the power and authority to grant to LICENSEE the right, privilege and license to use, manufacture, distribute, and sell these types of products that incorporate or are otherwise based on the Licensed Property as identified in "Schedule A" attached hereto (the "Licensed Products") and to use the Licensed Trademarks on or in association with such Licensed Products;

WHEREAS, LICENSEE has or will have the ability to manufacture, have manufactured, have sub-manufactured, distribute and sell or have sold and distributed the Licensed Products in the Licensed Territory more clearly defined in Schedule A (the Territory) and to use the Trademark(s) on or in association with the Licensed Products;

WHEREAS, LICENSEE desires to obtain from LICENSOR an exclusive license to use, manufacture, have manufactured and sell Licensed Products in the Territory and to use the Licensed Trademarks on or in association with the Licensed Products;

WHEREAS, LICENSEE has agreed, pursuant to a letter agreement, to act as a consultant for LICENSOR; and

NOW, THEREFORE, in consideration of the promises and agreements set forth herein, the parties, each intending to be legally bound hereby, do hereby agree as follows:

### 1. LICENSE GRANT

A.     LICENSOR hereby grants to LICENSEE, for the Term of this Agreement as recited in "Schedule A" attached hereto, the exclusive (even as to ) LICENSOR), worldwide, sub licensable right and license to use, reproduce, modify, create derivative, use of, manufacture, have manufactured, market, advertise, sell, distribute, display, perform, and otherwise commercialize the Licensed Products and Licensed Properties in the Territory. The license includes a license under any and all intellectual property rights and interests therein, including by way of explanation, products which deal with the creative characters known as The Googles, anything that contains the letters GOO (in upper or lower case) together with any and all products, which comprise and which will comprise those characters, likenesses, which include Iggle, Oogle, Oggle, Gooroo, Gootian(s), the planet Goo, slides, computer web site(s), membership lists, clubs, materials, patterns, prototypes, logos, trademarks, service marks, clothing, merchandise, educational products, marketing and promotional data and tools, packaging and advertising, modifications, updates and variations, and all other items associated therewith whether in singular or plural

B.   LICENSOR hereby grants to LICENSEE for the term of this Agreement as recited in "Schedule A" attached hereto, the exclusive (even as to LICENSOR), worldwide, sub licensable right and license to use the Licensed Trademarks on or in association with the Licensed Products as well as on packaging, promotional, and advertising material associated therewith

C   LICENSEE shall have the right to sublicense LICENSEE's rights under this Agreement, provided that any and all such sublicenses shall be subject to the terms and conditions of this Agreement

D.   No licenses will be deemed to have been granted by either party to any of its Intellectual Property Rights, except as otherwise expressly provided in this Agreement

E.   LICENSEE agrees to place on all Licensed Products, where practicable, the phrase "created by Steven A Silvers" or other similar wording

## II. TERM OF THE AGREEMENT

This Agreement and the provisions hereof, except as otherwise provided, shall be in full force and effect commencing on the date of execution by both parties and shall extend for a Term as recited in "Schedule A" attached hereto (the "Term")

## III. COMPENSATION

A   In consideration for the licenses granted hereunder, LICENSEE agrees to pay to LICENSOR, during the Term of this Agreement, a royalty in the amount recited in "Schedule A" attached hereto (the "Royalty") based on LICENSEE's Net Sales of Licensed Products "Net Sales" shall mean the gross revenues on a cash basis (i.e., actually collected by LICENSEE but without counting any gross revenues twice) excluding shipping and handling charges, sales taxes, VAT, and other taxes imposed upon sales less (i) customary trade discounts, (ii) allowances actually shown on the invoice (except cash discounts not deductible in the calculation of Royalty) (iii) bona fide returns, charge backs, refunds or credits (net of all returns actually made or allowed as supported by memoranda actually issued to the customers), (iv) sales of remainder inventory made at less than the total of LICENSEE's actual cost of goods and actual direct selling costs solely for purposes of liquidation or close-out, (v) other uncollectible accounts, (vi) cooperative advertising allowances, (vii) sales commissions paid

B.   The Royalty owed LICENSOR shall be calculated on a quarterly calendar basis on collected funds (the "Royalty Period") and shall be payable no later than thirty (30) days after the termination of the preceding full calendar quarter, i e, commencing on the first (1st) day of January, April, July and October with the exception of the first and last calendar quarters which may be "short" depending upon the effective date of this Agreement

C   With each Royalty Payment, LICENSEE shall provide LICENSOR with a written royalty statement in a form acceptable to Licensor Such royalty statement shall be certified as accurate by a duly authorized officer of Licensee, reciting on a country-by-country basis, the stock number, item, units sold, description, quantity shipped, gross invoice, amount billed to customers less discounts, allowances, returns and reportable sales for each Licensed Product. Such statements shall be furnished to Licensor whether or not any Licensed Products were sold during the Royalty Period The LICENSEE hereby further agrees to provide the LICENSOR with a list of all of it's sub licensees added during the current royalty period.

D.   If LICENSEE sells any Licensed Products to any party affiliated with LICENSEE, or in any way directly or indirectly related to or under the common control with LICENSEE, at a price less than the average weighted price charged to other parties, the Royalty payable to LICENSOR shall be computed on the basis of the averaged weighted price charged to other parties if the Licensed Products are not ultimately resold to unaffiliated third parties



2

E.    All payments due hereunder shall be made in United States currency drawn on a United States bank, unless otherwise specified between the parties and may offset or be offset from any other payments due to LICENSEE under this or any other agreement between the parties.

F.    Late payments shall incur interest at the rate of ONE PERCENT (1%) per month from the date such payments were originally due.

## IV. AUDIT

A.    LICENSOR shall have the right, at its own expense, to have a nationally recognized certified public accounting firm, upon at least thirty (30) days written notice and no more than twice per calendar year, to inspect during normal business hours, LICENSEE's books and records and all other documents and material in the possession of or under the control of LICENSEE with respect to the subject matter of this Agreement at the place or places where such records are normally retained by LICENSEE.

B.    In the event that such inspection reveals an underpayment discrepancy greater than 5% of the amount of Royalty owed LICENSOR from what was actually paid, LICENSEE shall have the opportunity to conduct its own audit. If LICENSEE agrees to the amount, if any, of any discrepancy, LICENSEE shall pay such discrepancy, plus interest, calculated at the rate of ONE AND ONE-HALF PERCENT (1 1/2%) per month. Upon settlement of any underpayment discrepancy, no further audit by LICENSOR shall be requested that year. That period end date shall represent the new period start date for future audits for underpayment discrepancies. In the event that such discrepancy is in excess of TEN THOUSAND UNITED STATES DOLLARS ($10,000.00), LICENSEE shall also reimburse LICENSOR for the cost of auditing fees in connection therewith.

C.    All books and records relative to LICENSEE's obligations hereunder shall be maintained and kept accessible and available to LICENSOR for inspection for at least three (3) years after the expiration of the initial or any subsequent term.

D.    In the event that an investigation of LICENSEE's books and records is made, certain confidential and proprietary business information of LICENSEE may necessarily be made available to the person or persons conducting such investigation. It is agreed that such confidential and proprietary business information shall be held in confidence by LICENSOR and shall not be used by LICENSOR or disclosed to any third party for a period of two (2) years from the date of disclosure, or without the prior express written permission of LICENSEE unless required by law, except LICENSOR may not disclose at any time to any third party any such confidential and proprietary business information which are trade secrets of LICENSEE. It is understood and agreed, however, that such information may be used by LICENSOR in any proceeding based on LICENSEE's failure to pay its actual Royalty obligation.

## V. WARRANTIES AND OBLIGATIONS

A.    LICENSOR represents and warrants that:

(i)    the execution, delivery and performance of this Agreement has been duly authorized by all necessary action of LICENSOR and this Agreement is a valid and binding obligation of LICENSOR, enforceable in accordance with its terms;

(ii)    the execution, delivery and performance by LICENSOR of this Agreement will not violate or conflict with any applicable U.S. law or regulation, or any order, writ, judgment or decree of any court or governmental authority to which LICENSOR is subject, or result in a violation, breach of, or default under any contract, lease, or other agreement binding on LICENSOR.

(iii)    LICENSOR owns the exclusive rights in and to the Licensed Intellectual Property, Licensed Trademarks, Licensed Patents and Licensed Copyrights necessary to effectuate the granting of the Licensing Rights from the LICENSOR to the LICENSEE as contemplated herein.

2

(iv) the Licensed Intellectual Property and Licensed Trademarks do not infringe the rights, including without limitation, Intellectual Property Rights, of any third party, and

(v) except as set forth in Schedule B attached hereto, LICENSOR has not received any notice from any third party of any alleged or actual infringement of the Licensed Intellectual Property or Licensed Trademarks and the Licensed Intellectual Property and/or Licensed Trademarks are not the subject, and has not been the subject, of any previous or pending litigation with the exception of the Ganz litigation which has been resolved.

B. LICENSEE represents and warrants that

(i) the execution, delivery and performance of this Agreement have been duly authorized by all necessary action of LICENSEE and this Agreement is a valid and binding obligation of LICENSEE, enforceable in accordance with its terms;

(ii) the execution, delivery and performance by LICENSEE of this Agreement will not violate or conflict with any applicable U.S. law or regulation, or any order, writ, judgment or decree of any court or governmental authority to which LICENSEE is subject, or result in a violation, breach of, or default under any contract, lease, or other agreement binding on LICENSEE, and

(iii) it will use its commercially reasonable efforts to promote, market, sell and distribute the Licensed Products

C. Disclaimer of Warranties. EXCEPT AS EXPRESSLY PROVIDED ABOVE, NEITHER PARTY MAKES ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND, EITHER EXPRESS OR IMPLIED, REGARDING THIS AGREEMENT AS TO ANY MATTER INCLUDING, BUT NOT LIMITED TO IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE

D. LICENSEE shall be solely responsible for the manufacture, production, sale and distribution of the Licensed Products or to have such Licensed Products manufactured, produced, sold and distributed, and will bear all related costs associated therewith

## VI. NOTICES, QUALITY CONTROL, AND SAMPLES

A. The Licensed Products, as well as all promotional, packaging and advertising material relative thereto, shall include all appropriate legal notices

B. The Licensed Products shall be of a high quality which is at least equal to comparable products manufactured and marketed by LICENSEE and in conformity with a standard sample provided by LICENSEE.

C. Prior to the commencement of manufacture and sale of the Licensed Products, LICENSEE shall submit to LICENSOR for his input, at no cost to LICENSOR, a reasonable number of samples of all Licensed Products which LICENSEE intends to manufacture and sell and of all promotional and advertising material associated therewith.

For "input," not approval

## VII. NOTICES AND PAYMENT

A. Any notice required to be given pursuant to this Agreement shall be in writing and delivered personally to the other designated party at the above-stated address or mailed by certified or registered mail, return receipt requested or delivered by a recognized national overnight courier service

B. Either party may change the address to which notice or payment is to be sent by written notice to the other in accordance with the provisions of this paragraph.

## VIII. INTELLECTUAL PROPERTY PROTECTION

A.       LICENSOR hereby grants LICENSEE all right, power and interest to seek, obtain and maintain all Intellectual Property Rights associated with the Licensed Intellectual Property and Licensed Trademarks, Licensed Copyrights and any other Intellectual Property Rights granted herein. LICENSOR further agrees to assist LICENSEE as may be required to apply for and obtain recordation of and from time to time enforce, maintain and defend such Intellectual Property Rights. LICENSOR hereby grants LICENSEE an irrevocable power of attorney for the initial and any subsequent terms of this Agreement to act for and on LICENSOR's behalf and instead of LICENSOR, at LICENSEE's expense, to execute and file any such document(s) and to do all other lawfully permitted acts to further the purposes of the foregoing with the same legal force and effect as if executed by LICENSOR

B.       LICENSOR shall retain all rights, title and interest in the Licensed Intellectual Property and Licensed Trademarks and any modifications thereto based solely on such Licensed Intellectual Property. LICENSEE acknowledges LICENSOR's exclusive rights in the Licensed Intellectual Property and, further, acknowledges that the Licensed Intellectual Property and/or the Licensed Trademarks rights are unique and original to LICENSOR and that LICENSOR is the owner thereof. LICENSEE shall not, at any time during or after the effective Term of the Agreement, dispute or contest, directly or indirectly, LICENSOR's exclusive right and title to the Licensed Intellectual Property and/or the Licensed Trademarks(s) or the validity thereof.

C.       LICENSEE agrees that its use of the Licensed Intellectual Property and/or the Licensed Trademarks(s) inures to the benefit of LICENSOR and that the LICENSEE shall not acquire any rights in the Licensed Intellectual Property and/or the Licensed Trademarks(s) except for the license granted herein

D.       LICENSOR shall retain all rights, title and interest in and to the Licensed Intellectual Properties. The LICENSOR owns the exclusive rights to the Licensed Intellectual Property. LICENSOR hereby waives and releases LICENSEE from any and all current or future claims or causes of actions by third parties, whether known or unknown, arising out of or relating to such Licensed Intellectual Properties including, but not limited to, any claim that Licensed Products violate, infringe on or misappropriate any of LICENSOR's Intellectual Property Rights.

E       Each party shall execute all papers, testify on all matters, and otherwise cooperate in every way necessary and desirable to effect any of the provisions under this Section (Intellectual Property Protection) The party requesting such shall reimburse the other party for the expenses incurred as a result of such cooperation. The parties agree to take any actions or prepare or execute any documents reasonably requested by the other party. Furthermore, during the term of this agreement, LICENSOR shall not initiate or maintain any relationship or conversations with LICENSEE'S current or prospective clients, vendors, any Company relationships with the media (press etc.) without the prior express written request by LICENSEE.

## IX. TERMINATION

A .,       Right to Terminate on Notice. This Agreement may be terminated by either party upon sixty (60) days written notice to the other party in the event of a breach of a material provision of this Agreement by the other party, provided that, during the sixty (60) days period, the breaching party fails to cure such breach



**B .**    LICENSEE shall have the right to terminate this Agreement at any time on thirty (30) days written notice to LICENSOR. In such event, all moneys paid to LICENSOR shall be deemed non-refundable and LICENSEE's obligation to pay any unpaid royalties shall be accelerated and shall become immediately due and payable

**C.**    Additionally, if, after five years of the initial intellectual property license, there are three consecutive years during which royalty payments to LICENSOR are less than one hundred thousand dollars ($100,000.00), LICENSOR has the option to cancel this Agreement in accordance with Section IX. TERMINATION, Para. A.

## X.   POST TERMINATION RIGHTS

**A**    Not less than thirty (30) days prior to the expiration of this Agreement or immediately upon termination thereof, LICENSEE shall provide LICENSOR with a complete schedule of all inventory of Licensed Products then on hand or on order (the "Inventory").

**B.**    Upon expiration or termination of this Agreement, LICENSEE shall be entitled, for an additional period of six (6) months, to continue to sell such Inventory. Such sales shall be made subject to all of the provisions of this Agreement and to an accounting for and the payment of a Royalty thereon. Such accounting and payment shall be due and paid within thirty (30) days of the quarterly calendar cited as the period basis for royalty calculation. LICENSEE shall have the right to continue the use of the name(s) associate with the products and articles that encompass this Agreement for so long as LICENSEE is actively selling its inventory of articles and products  At the conclusion of LICENSEE'S efforts in this regard, LICENSEE agrees to discontinue the use of names, trademarks, signs, advertising and anything else that might make it appear that the LICENSEE is still handling the articles and products of LICENSOR.

**C.**    Upon the expiration or termination of this Agreement, all of the license rights of LICENSEE under this Agreement shall forthwith terminate and immediately revert to LICENSOR and LICENSEE, except as detailed above in Section (B) of the "Post Termination Rights" Section, shall immediately discontinue all use of the Licensed Property and the like, at no cost whatsoever to LICENSOR.

**D.**    Upon termination of this Agreement for any reason whatsoever, LICENSEE agrees to immediately return to LICENSOR all material relating to the Licensed Intellectual Property  Furthermore, upon termination or expiration of this Agreement, LICENSEE agrees to immediately inform all of it's sub licensees regarding the said termination or expiration of this Agreement.

## XI. INFRINGEMENTS

**A.**    During the Term of this Agreement and any and all option/renewal periods, LICENSEE shall have the sole right, in its discretion and at its expense, to take any and all actions against third persons to protect the Intellectual Property Rights licensed in this Agreement.

**B**    Upon request by either party to the other, the other party shall execute all papers, testify on all matters, and otherwise cooperate in every way necessary and desirable for the prosecution of any such lawsuit.  Each party shall reimburse the other party for the expenses incurred as a result of such cooperation.

## XII. INDEMNITY

**A.**    LICENSEE agrees to indemnify and hold harmless LICENSOR, its agents, heirs, assigns and representatives, against all costs, expenses and losses (including reasonable attorneys' fees and costs) incurred through claims of third parties against LICENSOR based on product liability but excluding any claims based solely upon the use of the Licensed Intellectual Property or Licensed Trademarks by LICENSEE in accordance with the terms of this Agreement.



B.    LICENSOR agrees to indemnify and hold harmless LICENSEE, its officers, directors, agents and employees, against all costs, expenses and losses (including reasonable attorneys' fees and costs) incurred through claims of third parties against LICENSEE based on or arising from (i) any infringement, misappropriation or other related action involving the Licensed Intellectual Property or Licensed Trademarks, or (ii) any breach of LICENSOR's obligations, representations, warranties or duties under this agreement.

C.    With respect to any claims falling within the scope of the foregoing indemnifications: (i) each party agrees promptly to notify the other of and keep the other fully advised with respect to such claims and the progress of any suits in which the other party is not participating, (ii) each party shall have the right to assume, at its sole expense, the defense of a claim or suit made or filed against the other party; (iii) each party shall have the right to participate, at its sole expense, in any suit instituted against it; and (iv) a party assuming the defense of a claim or suit against the other party shall not settle such claim or suit without the prior written approval of the other party, which approval shall not be unreasonably withheld or delayed.

## XIII.  LIMITATION OF LIABILITY

A.    IN NO EVENT WILL EITHER PARTY BE LIABLE UNDER THIS AGREEMENT FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT (INCLUDING LOSS OF PROFITS, USE, DATA, OR OTHER ECONOMIC ADVANTAGE), NO MATTER WHAT THEORY OF LIABILITY, EVEN IF THE EXCLUSIVE REMEDIES PROVIDED FOR IN THIS AGREEMENT FAIL OF THEIR ESSENTIAL PURPOSE AND EVEN IF EITHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OR PROBABILITY OF SUCH DAMAGES  THE PROVISIONS OF THIS SECTION "LIMITATION OF LIABILITY" ALLOCATE THE RISKS UNDER THIS AGREEMENT BETWEEN LICENSOR AND LICENSEE AND THE PARTIES HAVE RELIED UPON THE LIMITATIONS SET FORTH HEREIN IN DETERMINING WHETHER TO ENTER INTO THIS AGREEMENT.

B.    EACH PARTY'S LIABILITY TO THE OTHER UNDER THIS AGREEMENT FOR CLAIMS RELATING TO THIS AGREEMENT, WHETHER FOR BREACH OF CONTRACT OR IN TORT, SHALL BE LIMITED TO THE AGGREGATE ROYALTY FEES PAID BY LICENSEE TO LICENSOR DURING THE TWELVE MONTH PERIOD PRECEDING THE CLAIM

## XIV.  INSURANCE

LICENSEE shall, throughout the Term of this Agreement, obtain and maintain at its own cost and expense from a qualified insurance company licensed to do business as required by state and federal law(s), standard Product Liability Insurance naming LICENSOR as an additionally named insured  Such policy shall provide protection against any and all claims, demands and causes of action arising out of any defects or failure to perform, alleged or otherwise, of the Licensed Products or any material used in connection therewith or any use thereof.  The amount of coverage shall be as specified in "Schedule A" attached hereto  LICENSEE agrees to furnish LICENSOR a certificate of insurance evidencing same within ninety (90) days after issuance of same, and, in no event, shall LICENSEE manufacture, distribute or sell the Licensed Products prior to receipt by LICENSOR of such evidence of insurance

## XV.  FORCE MAJEURE

LICENSEE shall not be liable for any failure of performance hereunder due to causes beyond its reasonable control, including but not limited to acts of God, fire, explosion, vandalism, strikes, lockouts, work stoppages, other labor difficulties, supplier failures, storm or other similar catastrophes, any law, order, regulation, direction, action or request of the state, local or federal government or of any government agency, commission, court, bureau, corporation or other instrumentality of any one or more of such governments, or of any civil or military authority, national emergencies, insurrections, riots, or wars.

7

## XVI. JURISDICTION AND DISPUTES

A. This Agreement shall be governed in accordance with the laws of the State of Florida without regard to its principles of conflicts of laws.

B. All disputes under this Agreement shall be resolved by the courts of the State of Florida including the United States District Court for Florida and the parties all consent to the jurisdiction of such courts, agree to accept service of process by mail, and hereby waive any jurisdictional or venue defenses otherwise available to it.

## XVII. AGREEMENT BINDING ON SUCCESSORS

The provisions of the Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their heirs, administrators, successors and assigns

## XVIII. WAIVER

No waiver by either party of any default shall be deemed as a waiver of prior or subsequent default of the same or other provisions of this Agreement.

## XIX. SEVERABILITY

If any term, clause or provision hereof is held invalid or unenforceable by a court of competent jurisdiction, such invalidity shall not effect the validity or operation of any other term, clause or provision and such invalid term, clause or provision shall be deemed to be severed from the Agreement.

## XX. NO JOINT VENTURE

Nothing contained herein shall constitute this arrangement to be employment, a joint venture or a partnership.

## XXI. ASSIGNABILITY

Neither party may assign by any act or operation of law the rights and obligations of this Agreement unless in connection with a transfer of substantially all of the assets of LICENSEE and/or with the consent of LICENSOR which shall not be unreasonably withheld or delayed. By way of example and not limitation, LICENSEE may freely assign its rights and obligations under this Agreement to Stelor Productions, Inc

## XXII. INTEGRATION

This Agreement constitutes the entire understanding of the parties, and revokes and supersedes all prior agreements between the parties, including any option agreements which may have been entered into between the parties, and is intended as a final expression of their Agreement It shall not be modified or amended except in writing signed by the parties hereto and specifically referring to this Agreement. This Agreement shall take precedence over any other documents which may be in conflict with said Agreement

## XXIII. RATIFICATION

The LICENSOR hereby agrees to the transfer of this License from the LICENSEE (The Aurora Collection, Inc.) to Stelor Productions, Inc as contemplated by the Asset & Purchase Agreement, dated May 1", 2002, and          executed          between          the          above          mentioned          parties







## "SCHEDULE A"

### LICENSED INTELLECTUAL PROPERTY

The following Licensed Intellectual Property forms part of this Agreement: A License under any and all intellectual property rights and interests therein, including by way of explanation, products which deal with a creative character known as Googles, anything that contains the letters GOO (in upper or lower case), together with any and all products, which comprise and which will comprise those characters, likenesses, which include Iggle, Oogle, Oggle, Goonoo, Goouian(s), the Planet Goo, slides, computer web site(s), membership lists, clubs, materials, patterns, prototypes, logos, trademarks, service marks, clothing, merchandise, educational products, marketing and promotional data and tools, packaging and advertising, modifications, updates and variations, and all other items associated therewith whether in singular or plural

### LICENSED TRADEMARKS

The following Licensed Trademarks form part of this Agreement: (i) "The Googles" (word and design) Trademarks in International Class Code (016) of the U.S.P.T.O. and the co-existent Trademarks Agreement with Ganz, Inc. of Canada in International Class Code (028) of the U.S.P.T.O., which is hereto attached and made a part of this "Schedule A" document, (ii) "Oogle", (iii) "Iggle", (iv) "Oggle", (v) "GooRoo", (vi) "Planet Goo", (vii) "GooMu", (viii) "GooToons", (ix) "GooStuff", (x) "GooKids", (xi) "GooStore" and (xii) any other trademarks, whether registered, pending or future or common law, used in connection with the Licensed Property, including , but not limited to, any trademark incorporating the phrase "Goo" currently in existence.

### LICENSED PRODUCTS

The following Licensed Products form part of this Agreement: all products which comprise the likenesses, stories, ideas, concepts, or designs of the Licensed Property, including without limitation, stuffed toy figurines, videos, stickers, t-shirts or other clothing items, slides, movies, cartoons, books (comic and otherwise), posters, playing, trading and collector cards, CDs, cassette tapes, DVDs, TV programs, motion pictures, all other forms of communication and publication, programs, computer Web site(s), membership lists and clubs, and any other products.

### DERIVATIVES

A Derivative as defined in this agreement shall mean a product or service that is utilized by the LICENSEE and developed by a party other than the LICENSOR but is used in conjunction with licensed products, articles and /or services  It can be a product or service produced by the LICENSEE or a third party (inventor, sub licensee etc,) that in its use enhances the value of the Googles Universe but does not have a conflict with an already existing Googles product idea or concept as outlined in this agreement  It may not possess the "Googles" or "GOO" in it's name and would therefore fall under the LICENSOR'S exclusive ownership as defined in the amended agreement but can be used in conjunction with the "Goo" Universe by the LICENSEE.

### TERRITORY

The following countries shall constitute the Territory: Global/Worldwide rights.

### TERM

This Agreement shall commence on the date executed below by both parties and shall be for a thirty (30) year term  This Agreement shall automatically renew for one additional ten (10) year term on the same terms and conditions provided for herein ("Renewal Term")  Upon expiration of the first Renewal Term of ten (10) years, this Agreement shall automatically renew for a second ten (10) year  extended Term on the

10



same terms and conditions provided for herein, unless LICENSOR provides written notice of its intention to not to renew this Agreement within one hundred eighty (180) days prior to expiration of the Renewal Term.

## ROYALTY RATE

LICENSEE shall pay the following royalty rates: (i) SIX PERCENT (6%) of Net Sales of Licensed Products that are based solely on the Licensed Intellectual Property and (ii) THREE PERCENT (3%) of Net Sales of Licensed Products that are based solely on Derivative Products and (iii) In the case of Sub Licenses royalties will be TEN PERCENT (10%) of Net sales after subtracting licensing costs and royalties paid to third parties only.

## PRODUCT LIABILITY INSURANCE

Minimum Product Liability Insurance shall be Two Million U.S. dollars ($2,000,000.00) combined single limit for each single occurrence for bodily injury and/or for property damage.

Succession

Rights of Survivor

In the event of the Death of Licensor all of the Licensers rights under this agreement Shall go to his heirs, assigns or legal representatives as he has lawfully designated in writing.

5/09/02

5/9/02

MICHAEL LUM
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires April 1, 2003
5/9/02

11

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound hereby, have each caused to be affixed hereto its or his/her hand and seal the day indicated.

STEVEN A. SILVERS

STELOR PRODUCTIONS, INC.

Steven A. Silvers

Title: Owner/LICENSOR
Dated: _5/09/02_

By: _____
Printed Name: _Steven A. Silvers_
Title: _President_
Dated: _5/9/02_

Received Ten Thousand Dollar signing bonus ($10,000.00)

MICHAEL LUM
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires April 1, 2003

5/9/02

o



# AMENDMENT
## TO
## LICENSE, DISTRIBUTION
## AND MANUFACTURING AGREEMENT

This AMENDMENT TO THE LICENSE, DISTRIBUTION AND MANUFACTURING AGREEMENT between Steven A. Silvers and Aurora Collection is effective as of April 30, 2002, and is entered into by and between Steven A. Silvers (LICENSOR), an Individual, whose official address is 3741 NE 163rd Street, PMB #325, North Miami Beach, FL 33160, and The Aurora Corporation, Inc. (LICENSEE), a Florida corporation with its current offices located at 4651 SW 51st Street, Suite 806, Davie, FL 33314.

### WITNESSETH

WHEREAS, LICENSOR is the sole and exclusive owner of the GOOGLES characters identified more fully in "Schedule A" attached hereto (the "Licensed Property");

WHEREAS, LICENSOR is the sole and exclusive owner of the GOOGLES trademarks identified more fully in "Schedule A" attached hereto (the "Licensed Trademarks");

WHEREAS, LICENSOR has the power and authority to grant to LICENSEE the right, privilege and license to use, manufacture, distribute, and sell those types of products that incorporate or are otherwise based on the Licensed Property as identified in "Schedule A" attached hereto (the "Licensed Products") and to use the Licensed Trademarks on or in association with such Licensed Products;

WHEREAS, LICENSEE has or will have the ability to manufacture, have manufactured, have sub-manufactured, distribute and sell or have sold and distributed the Licensed Products in the Licensed Territory more clearly defined in Schedule A (the Territory) and to use the Trademark(s) on or in association with the Licensed Products;

WHEREAS, LICENSEE desires to obtain from LICENSOR an exclusive license to use, manufacture, have manufactured and sell Licensed Products in the Territory and to use the Licensed Trademarks on or in association with the Licensed Products;

WHEREAS, LICENSEE has agreed, pursuant to a letter agreement, to act as a consultant for LICENSOR; and

NOW, THEREFORE, in consideration of the promises and agreements set forth herein, the parties, each intending to be legal bound hereby, do hereby agree as follows:

### I. LICENSE GRANT

A.    LICENSOR hereby grants to LICENSEE, for the Term of this Agreement as recited in "Schedule A" attached hereto, the exclusive (even as to LICENSOR), worldwide, sub-licensable right and license to use, reproduce, modify, create derivative works of, manufacture, have manufactured, market, advertise, sell, distribute, display, perform, and otherwise commercialize the Licensed Products and Licensed Properties in the Territory. The license includes a license under any and all intellectual property rights and interests therein, including by way of explanation, products which deal with creative characters known as Googles, anything that contains the letters GOO (in upper or lower case) together with any and all products, which comprise and which will comprise those characters, likenesses, which include Iggle, Oogle, Oggle, Gooroo, Gootian(s), the planet Goo, slides, computer web site(s), membership lists, clubs, materials, patterns, prototypes, logos, trademarks, service marks, clothing, merchandise, educational

# EXHIBIT B

June 1, 2002

Mr. Steven Silvers
3741 N.E. 163rd Street
PMB # 324
North Miami Beach, FL 33160

Dear Steven:

This letter agreement ("Agreement") will serve to memorialize the terms of the consultancy arrangement between Stelor Productions, Inc. ("Company") and Steven A. Silvers ("Consultant").

1.    Engagement of Consultant.

a.    Company hereby engages Consultant as an independent contractor to the Company. Consultant's title shall be Executive Creative Consultant. Company is relying on Mr. Silvers to continue his role of "Papa Googles" and continue to offer his creative input to the Company.

b.    In consideration for the covenants of Consultant contained herein, Company will pay Consultant the following: (i) a signing bonus of ten thousand dollars ($10,000) and (ii) a monthly consultancy fee of five thousand five hundred dollars ($5,500) beginning on June 1, 2002, and continuing each month thereafter for twelve (12) months. Company shall pay Consultant six thousand dollars ($6,000) monthly for a second 18-month period, beginning June 1, 2003. All payments made to Consultant will not be offset against any royalties paid by the Company to Consultant pursuant to the License, Distribution and Manufacturing Agreement. Company will continue to reimburse The Aurora Collection, Inc. for the existing health plan if available, or if not available, will reimburse consultant $300 per month during the term of this Agreement. During the term of the Agreement, Company will reimburse The Aurora Collection, Inc. for, if available, the use of a leased company vehicle, with company to reimburse The Aurora Collection, Inc for insurance coverage. Consultant agrees to pay all costs of maintenance and upkeep. Stelor will write an agreement with Consultant granting him options for 1,000 shares of Stelor's stock under Stelor's stock option plan. If the number of options available under the Stelor Productions current plan is increased during the Consultant's service Company will issue an additional one thousand option shares (1,000)

c.    It is agreed by company that in the event the Company fails to compensate the Consultant as outlined in this Agreement and in accordance with the terms of this Agreement (including all option periods surrounding same) for two consecutive months and if after thirty (30) days fails to cure alleged breach, then Consultant has the right (option) to terminate this Agreement and among other legal remedies afforded Consultant to seek redress before the Court, the License Agreement shall, likewise immediately terminate. This caveat shall exist only if Consultant is not paid for other than "good Cause" termination as outlined below at section five (5) b of this Agreement.

2.    Relationship of Parties. The relationship of Company and Consultant established under this Agreement is of an independent contractor. Nothing in this Agreement shall be construed to give any party the power to direct or control the daily activities of any of the other parties, or to constitute the parties as principal and agent, employer and employee, franchiser and franchisee, partners, joint venturers, co-owners, or otherwise as participants in a joint undertaking. The parties understand and agree that none of the parties grants any other party the power or authority to make or give any agreement, statement, representation, warranty, or other commitment on behalf of any other party, or to enter into any contract or otherwise incur any liability or obligation, express or implied, on behalf of any other party, or to transfer, release, or waive any right, title, or interest of any other party. Furthermore, during the term of

this agreement, LICENSOR shall not initiate or maintain any relationship or conversations with LICENSEE'S current or prospective clients, vendors, any Company relationships with the media (press etc.) without the prior express written request by LICENSEE.

3.     Duties of Consultant. Consultant's duties hereunder are as follows:

      a.     Consultant shall use his best efforts to perform such services as may be requested by Company from time to time consistent and commensurate with his position as Executive Creative Consultant, including, but not limited to, executing all papers, testifying on all Company related matters and otherwise cooperating in every way necessary and desirable to strengthen, establish or maintain any intellectual property right granted under this Agreement or the License, Distribution and Manufacturing Agreement (as amended) between Company and Consultant The Consultant shall make himself available to the Company by way of telephone, fax, email, video conferencing (if deemed necessary) on an as needed basis and during reasonable business hours Monday through Friday. Consultant shall further make himself available, in person, if deemed necessary, to the Company so long as the Consultant is given a minimum of ten (10) days written notice if Consultant is, at the time of said request, residing outside of the Continental United States and three (3) days written notice by the Company if Consultant is residing, at the time of said request, within the Continental United States. In either case, Consultant must maintain a United States address for purposes of receiving correspondence, samples, checks etc. Written notice may also be deemed given if communicated via Consultant's personal email address or a fax number to be provided to the Company. Written notice must be sent via U.S. Mail certified, return receipt requested, or via a nationally recognized mail carrier service with "signature" required. Written notice may also be sent if communicated via Consultant's personal email address or a fax number to be provided to the Company. However, the latter shall not be used for any "official" notice purposes.

      b.     During the term of this Agreement and for a period of (1) years after the termination or expiration of this Agreement, Consultant shall not, either individually or in conjunction with a third party, engage in any business, trade, or profession as owner, officer, manager, employee, consultant or otherwise if such business competes in any material way with Company's business of developing, creating, selling, manufacturing, distributing, or marketing products, media or materials for children.

      c.     Consultant shall offer Company a right of first refusal to license, develop, manufacture, market or sell any and all children's characters or other products, ideas, inventions or creations created by Consultant that are not within the scope of this Agreement or the License, Distribution and Manufacturing Agreement (as amended) between Company and Consultant. If Consultant provides Company with any new idea's either relating to The Googles as well as anything entirely new that may not relate to the current universe of characters and /or idea's, that upon submission of such new idea or concept which shall be placed in writing Company shall have one hundred and twenty (120) days to accept and enter into an agreement for said property.

      d.     Consultant agrees to hold harmless, defend and indemnify Company and its officers, directors, employees, agents and servants from and against any and all claims, damages and expenses, including reasonable legal fees and expenses, of whatever kind and nature directly or indirectly arising out of or on account of or resulting from the Consultant's activities (other than as expressly authorized by Company) including, without limitation, Consultant's failure to comply with his obligations under this Agreement, acts or omissions.

4.     Duties of Company.

a.      Company shall reimburse Consultant for all reasonable travel and living expenses that are deemed to be essential to Company's success and are pre-approved by an authorized officer of the Company and incurred as a direct result of Consultant's obligations under this Agreement such as attending tradeshows, board meetings, etc. The Company shall, upon proper documentation having been presented to the Company, or its official/designated representative, within seven (7) days of receipt of same, reimburse Consultant said incurred expenses as approved by Company.

5.      Term and Termination.

a.      Subject to the provisions for termination as provided herein, this Agreement shall commence upon execution and shall have a term of thirty (30) months.

b.      Company may immediately terminate this Agreement upon the occurrence of any of the following: (i) a material breach of any provision of this Agreement by Consultant; (ii) a failure by Consultant, after written notice, to perform such duties required of Consultant as outlined in this agreement; (iii) the initiation of any bankruptcy, receivership, trust deed, creditors arrangement, composition or comparable proceeding by Consultant, or if any such proceeding is instituted against Consultant; (iv) the conviction of Consultant of any felony crime; (v) any use, sale or possession by Consultant of any illegal drug or controlled substance that is prosecutable under US Federal Laws. Written notice to mean by way of Certified mail, return receipt requested, or by way of a Nationally recognized mail service, Courier service etc.

c.      Upon termination or expiration of this Agreement by either party, Consultant shall immediately return to Company all Proprietary Information (as defined below) in Consultant's possession, custody or control in whatever form held (including copies, compilations, summaries, or embodiments thereof relating to Proprietary Information) and provide written certification that all such material has been returned.

d.      Company agrees to provide Consultant thirty (30) days Notice, from date of said written notice of termination by the Company, within which to cure any alleged breach it has made against the Consultant identified in paragraph three (3) under "Duties of Consultant".

6.      Proprietary Information; Proprietary Rights.

a.      In the course of performing his duties under this Agreement, Consultant may obtain information relating to Company and/or its customers, suppliers or other third parties that is of a confidential and proprietary nature ("Proprietary Information"). Such Proprietary Information may include, without limitation, trade secrets, research and development, customer lists, vendor lists, schedule of accounts, plan, programs, inventions, computer software, know-how, inventions, product information, techniques, processes, schematics, data, financial information and sales and marketing plans. Consultant shall, at all times, both during the term of this Agreement and for a period of two (2) years thereafter its termination, keep in trust and confidence all such Proprietary Information, and shall not use such Proprietary Information other than in the course of performing his duties as expressly provided in this Agreement, nor shall Consultant disclose any such Proprietary Information to any person without Company's prior written consent except as required or needed in any legal and/or Court action by Consultant against the Company or any other third party. This pertains to only that information not otherwise gathered from public sources, knowledge already in the public eye or a matter of public record, and/or any other third party other than Consultant.

3

b.    The Company acknowledges that the Consultant is not being hired as a work for hire but rather is being compensated, pursuant to this Consulting agreement, as a Consultant for the express purpose of advising, recommending, counseling, and otherwise utilizing Consultant's expertise in the decision making process as it pertains to the existing and "further development" of the Google's project only.

c.    The services and rights which Company is granting to Consultant hereunder are extraordinary and unique and cannot be replaced or adequately compensated in money damages, and any breach by Consultant of this Agreement will cause irreparable injury to Company. Therefore, Consultant agrees that in the event of a breach of this Agreement, Company, in addition to any other remedies that might be available to it, shall be entitled to bring suit at law or equity for money or other damages. Consultant shall not oppose such relief on the grounds that there is an adequate remedy at law, and such right shall be cumulative and in addition to any other remedies at law or in equity (including monetary damages) which Company may have upon the breach of the obligations of confidentiality hereunder.

7.    Limitations of Liability. TO THE MAXIMUM EXTENT PERMITTED BY LAW, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR ANY THIRD PARTY FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES (INCLUDING, WITHOUT LIMITATION, INDIRECT, SPECIAL, PUNITIVE, OR EXEMPLARY DAMAGES) FOR ANY CLAIM BY ANY OTHER PARTY, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

8.    Miscellaneous.

This Agreement is a legally binding agreement between Company and Consultant and shall be governed by and construed in accordance with the laws of the State of Florida. This Agreement may be executed in one or more counterparts, each of which shall be an original Agreement, and all of which taken together shall constitute one and the same instrument. This Agreement may not be assigned by consultant without the prior written consent of Company. This Agreement shall not be modified, amended, or in any way altered except by an instrument in writing signed by both Company and Consultant. Each party shall refrain from making or issuing any statements, disclosures, or other communications related to this Agreement, the subject matter of this Agreement, or the services provided hereunder. This Agreement constitutes the entire agreement between Company and Consultant with respect to the subject matter of this Agreement, and supersedes all prior agreements, whether written or oral, with respect to the subject matter contained in this Agreement.
Please indicate your acceptance of the terms of this Agreement by signing in the space indicated below.

STEVEN A. SILVERS    Date 5/c7/a2

Stelor Productions, Inc.
By
Name: Steven A. Esery    Title: President    Date 5/9/02

Received Ten Thousand Dollar signing bonus ($10,000.00)

MICHAEL LUM
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires April 1, 2003
5/9/02

4

# EXHIBIT C

LAW OFFICES

## KOZYAK TROPIN & THROCKMORTON, P.A.

2525 PONCE DE LEON • 9TH FLOOR
CORAL GABLES, FLORIDA 33134-6037

GAIL A. MCQUILKIN
DIRECT DIAL (305) 377-0656
gam@kttlaw.com

TELEPHONE (305) 372-1800
TELECOPIER (305) 372-3508

Via Federal Express
AWB# 7929-0844-8480

April 27, 2005

Steven A. Esrig
Stelor Productions, Inc.
14701 Mockingbird Drive
Darnestown, Maryland 20874

      Re:    Silvers/Stelor License Agreement

Dear Mr. Esrig:

On November 12, 2004, we served notice on Stelor that it was in breach of several material provisions of both the License Agreement and Letter Agreement, a copy of which is attached. Because Stelor did not cure those breaches, on January 13, 2005 we served on Stelor a notice of termination of the License Agreement, a copy of which is attached.

On January 28, 2005, Stelor and Silvers entered into a Settlement Agreement in which Silvers agreed to withdraw his notice of termination provided Stelor perform its obligations under the Settlement Agreement. Stelor, however, has:

- failed to provide Silvers with unit interests in Stelor LLC under paragraph 9;

- failed to pay Silvers monthly installments on royalty advances on the first of every month under paragraph 10 (a);

- failed to pay on April 1, 2005 the monthly advance on royalties required by Silver to maintain his insurance coverage through the Aurora Collection under paragraph 10 (b);

- failed to cooperate in the audit of the books and records of Stelor under paragraph 14; and

- failed to provide Silvers samples of Licensed Products that are being offered for sale under paragraph 15.

Furthermore, although Stelor has provided a written statement that it is not offering any

Page 2

Furthermore, although Stelor has provided a written statement that it is not offering any products for sale, and no royalties due, that statement has proven to be false.

Stelor continues to be in breach of the License Agreement as outlined in our letter of November 12, 2004. This is to provide notice to you that due to Stelor's failure to perform its obligations under the Settlement Agreement, and failure to cure the breaches under the License Agreement, Silvers is reinstating his notice of termination of the License Agreement effective immediately.

Pursuant to paragraph X of the License Agreement, Stelor must immediately provide Silvers with a complete schedule of all inventory of Licensed Products on hand or on order. Stelor has six (6) months to continue to sell this Inventory, if any, in accordance with the License Agreement. So long as Stelor is actively selling its inventory of Licensed Products, it may continue the use of the Licensed Intellectual Property associated with the inventory for this period. Outside the scope of its efforts to sell its inventory of Licensed Products, Stelor must immediately cease use of the Licensed Intellectual Property, including names, trademarks, signs, advertising, web site, and anything else that might make it appear that it is still handling the articles and products relating to the Googles IP. Further, Stelor must return to Silvers all material relating to the Licensed Intellectual Property and inform its sub-licensees and those selling Googles related merchandise of the termination of the License Agreement.

Because the License Agreement is now terminated, Stelor may not represent Silvers' interest in any legal proceeding or action.

Sincerely,

Gail A. McQuilkin

c:    Steven A. Silvers
      Laurence Hefter
      Kevin Kaplan

251939.1

LAW OFFICES

## KOZYAK TROPIN & THROCKMORTON, P.A.

2525 PONCE DE LEON • 9TH FLOOR

CORAL GABLES, FLORIDA 33134-6037

TELEPHONE (305) 372-1800
TELECOPIER (305) 372-3508

Via Federal Express
AWB#7927-7747-7745

November 12, 2004

Steven A. Esrig
Stelor Productions, Inc.
14701 Mockingbird Drive
Darnestown, Maryland 20874

     Re:    Silvers/Stelor License Agreement

Dear Mr. Esrig:

We represent Steven Silvers, Licensor under that License, Distribution and Manufacturing Agreement dated June 1, 2002 ("Agreement"). Pursuant to paragraph IX-A of the Agreement, this serves as notice that Stelor has breached the Agreement and that Mr. Silvers will exercise his right to terminate the Agreement unless Stelor cures the following breaches within 60 days:

    a.    Failure to pay royalties under paragraph III (A);

    b.    Failure to provide a written certified royalty statement under paragraph III (C);

    c.    Failure to provide a list of all sub licenses under paragraph III (C);

    d.    Failure to use commercially reasonable efforts to promote, market, sell and distribute the Licensed Products under paragraph V (B)(iii);

    e.    Failure to accommodate Licensor's request to audit the books and records of Stelor made under paragraph IV (A) and (C);

    f.    Failure to provide samples of all Licensed Products you intend to manufacture and sell, and all promotional and advertising materials associated with those products under paragraph VI (C);

    g.    Failure to include appropriate legal notices with the Licensed Products under paragraph VI(A);

    h.    Failure to maintain the requisite level of quality for the Licensed Products under paragraph VI (B);

LAW OFFICES
KOZYAK TROPIN & THROCKMORTON, P.A.
2525 PONCE DE LEON • 9TH FLOOR
CORAL GABLES, FLORIDA 33134-6037

GAIL A. MCQUILKIN
DIRECT DIAL (305) 377-0656
gam@kttlaw.com

TELEPHONE (305) 372-1800
TELECOPIER (305) 372-3508

Via Federal Express
AWB# 7914-4506-9106

January 13, 2005

Steven A. Esrig
Stelor Productions, Inc.
14701 Mockingbird Drive
Darnestown, Maryland 20874

        Re:    Silvers/Stelor License Agreement

Dear Mr. Esrig:

        As you know we represent Steven Silvers, Licensor under the License, Distribution and Manufacturing Agreement dated June 1, 2002 ("License Agreement"), and party to the Letter Agreement dated June 1, 2002 ("Letter Agreement"). On November 12, 2004 we served notice on Stelor that it was in breach of several material provisions of both the License Agreement and Letter Agreement, a copy of which is attached.

        Pursuant to paragraph 1(c) of the Letter Agreement, and paragraph IX-A of the License Agreement, this serves as notice that Mr. Silvers is exercising his option to terminate the License Agreement for Stelor's failure to cure its breach of the Letter Agreement within thirty (30) days, and breach of the License Agreement within sixty (60) days.

        Pursuant to paragraph X of the License Agreement, Stelor must immediately provide Mr. Silvers with a complete schedule of all inventory of Licensed Products on hand or on order. Stelor has six (6) months to continue to sell this Inventory in accordance with the License Agreement. So long as Stelor is actively selling its inventory of Licensed Products, it may continue the use of the Licensed Intellectual Property associated with the inventory for this period. Outside the scope of its efforts to sell its inventory of Licensed Products, Stelor must immediately cease use of the Licensed Intellectual Property, including names, trademarks, signs, advertising and anything else that might make it appear that it is still handling the articles and products of Mr. Silver. Further, Stelor must return to Mr. Silvers all material relating to the Licensed Intellectual Property and inform its sub-licensees of the termination of the License Agreement.

        Because the License Agreement is terminated, Stelor may not proceed to represent the interests of Mr. Silvers in TTAB Opposition Proceeding No. 91161251, TTAB Cancellation Proceeding No. 92043496, the domain dispute against Google pending before the National

Steven A. Esrig
Page 2


Arbitration Forum, or participate in TTAB Cancellation Proceeding No. 92043737. And, because the License Agreement is terminated, the action pending in federal district court is now moot. Thus, we will file the appropriate notices in these proceedings.

Our client regrets that this relationship did not work out, and would like very much to keep the relationship amicable throughout the six month inventory sell-off period.

Sincerely,

Gail A. McQuilkin

c:    Steven A. Silvers
      Laurence Hefter
      Yano A. Rubinstein
      William Borchard

/248587.1

# EXHIBIT D

BURLINGTON · WEIL · SCHWIEP · KAPLAN Ⓡ BLONSKY, P.A.

OFFICE IN THE GROVE PENTHOUSE 2699 SOUTH BAYSHORE DRIVE MIAMI, FLORIDA 33133
T: 305.858.2900 F: 305.858.5261
EMAIL: DBLONSKY@BWSKB.COM    WWW.BWSKB.COM

April 29, 2005

## VIA FACSIMILE AND U.S. MAIL

Gail A. McQuilkin, Esq.
Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon Blvd.
9th Floor
Coral Gables, Florida 33134

   Re: Silvers/Stelor

Dear Gail:

   I write in response to your letter dated April 27, 2005 to Steven Esrig of Stelor Productions purporting to terminate the License Agreement. It is the position of Stelor that the License Agreement and the Settlement Agreement remain enforceable and binding documents and that the purported grounds for termination are all invalid and improper. We will respond to each of those grounds in turn.

   First, Stelor has only recently converted to an LLC and Mr. Silvers has been provided an option letter for unit interests, to which he has not responded.

   Second, monthly installments on royalty advancements have been paid. Indeed, enclosed are copies of royalty advancement checks for April and May that we are prepared to release upon withdrawal of the notice of termination.

   Third, monthly advances on royalties to maintain insurance coverage have also been paid. Enclosed are checks for April and May that we are prepared to release upon withdrawal of the notice of termination. It must be noted, however, that, despite demand, Mr. Silvers has never confirmed the amount of insurance to be paid. As a show of good faith, Stelor has nonetheless paid the maximum each month, but such confirmation must be provided forthwith.

   Fourth, Stelor has cooperated in the audit of the books and records. In fact, just a week ago, on April 22, 2005, you sent an email to Kevin Kaplan stating that "[t]he auditor is preparing a letter that will outline the documents and records he will need available at Stelor to do the audit." We have received no such letter. Whenever Stelor receives such a letter, it will cooperate.

   Fifth, samples of licensed products have been collected and are available to Mr. Silvers pursuant to the agreement, provided that the notice of termination is withdrawn and it is understood that the agreements remain in place.

Gail A. McQuilkin, Esq.
April 29, 2005
Page 2

Finally, no royalties are owed to your client and the advances paid far exceed royalties that have been accumulated. A royalty statement is enclosed reflecting full payment of any amounts due. To the extent that there are any concerns, they can be raised with us. However, there is simply no basis for termination. Instead, the continuing failure of Mr. Silvers to meet his obligations under paragraph 2 of the Settlement Agreement, which has been the subject of prior correspondence, is a breach that he needs to be cured immediately.

Mr. Silvers is obliged to honor the License Agreement and the Settlement Agreement. We hereby demand receipt of written notice by Noon on Monday, May 2, 2005 that the notice of termination has been withdrawn and that Mr. Silvers agrees to abide by his contractual agreements. We also demand written assurance that Mr. Silvers will make no efforts to interfere in any manner with the business of Stelor. Furthermore, Mr. Silvers needs to agree to the submission to the federal court of a consent decree confirming the enforceability of the agreements and the rights that have been conveyed to Stelor. Failing receipt of such notice and assurances, Stelor will initiate an action seeking to enforce the agreements through declaratory and injunctive relief.

All rights and remedies are reserved. Govern yourselves accordingly.

Sincerely,

Daniel Blonsky

DFB:gr
Enclosures
cc: Client (w/ encls.)
    Kevin C. Kaplan, Esq. (w/ encls.)

**2751**

**STELOR PRODUCTIONS, INC.**
PO BOX 8000
GAITHERSBURG, MD 20883

CITIBANK, F.S.B.
WASHINGTON, DC 20036-0967
7-216-520

04/28/05

PAY TO THE
ORDER OF___  Silvers Entertainment Group                                    $ **5,000.00

Five Thousand and 00/100************************************************************** DOLLARS

Silvers Ent. Group
8983 Okeechobee Blvd
PMB 203 Suite 202
West Palm Beach, FL 33411

MEMO   Advance Against Royalty April 05

⑈002751⑈ ⑆052002166⑆   ⑈175974050⑈

---

**STELOR PRODUCTIONS, INC.**
   Silvers Entertainment Group                          04/28/05              2751
04/28/05                         Bill #roymay                                5,000.00

Citibank Checkin  Advance Against Royalty April 05                          5,000.00



**2752**

**STELOR PRODUCTIONS, INC.**
PO BOX 8000
GAITHERSBURG, MD 20883

CITIBANK, F.S.B.
WASHINGTON, DC 20036-0967
7-216-520

04/28/05

PAY TO THE
ORDER OF___ Silvers Entertainment Group _____ $ **5,000.00

Five Thousand and 00/100*********************************************************** DOLLARS

Silvers Ent. Group
8983 Okeechobee Blvd
PMB 203 Suite 202
West Palm Beach, FL 33411

MEMO    Advance Against Royalty May 05

⑈002752⑈ ⑊052002166⑊    ⑈175974059⑈

---

**STELOR PRODUCTIONS, INC.**
      Silvers Entertainment Group                          04/28/05              2752
   04/28/05                        Bill #royapril                          5,000.00


Citibank Checkin  Advance Against Royalty May 05                          5,000.00




2753

**STELOR PRODUCTIONS, INC.**
PO BOX 8000
GAITHERSBURG, MD 20883

CITIBANK, F.S.B.
WASHINGTON, DC 20036-0967
7-216-520

04/28/05

PAY TO THE
ORDER OF___ Silvers Entertainment Group _____ $ **1,000.00

One Thousand and 00/100**************************************************************** DOLLARS

Silvers Ent. Group
8983 Okeechobee Blvd
PMB 203 Suite 202
West Palm Beach, FL 33411

MEMO    Royalty/insurance advance, Apr '05

⑈002753⑈ ⑆052002166⑈    ⑈175974051⑈

STELOR PRODUCTIONS, INC.
    Silvers Entertainment Group                                04/28/05                2753
04/28/05                              Bill #052005                                        1,000.00

Citibank Checkin  Royalty/insurance advance, Apr '05                                 1,000.00



**STELOR PRODUCTIONS, INC.**
PO BOX 8000
GAITHERSBURG, MD 20883

CITIBANK, F.S.B.
WASHINGTON, DC 20036-0967
7-216-520

04/28/05

PAY TO THE
ORDER OF___ Silvers Entertainment Group

$ **1,000.00

One Thousand and 00/100*************************************************************
DOLLARS

Silvers Ent. Group
8983 Okeechobee Blvd
PMB 203 Suite 202
West Palm Beach, FL 33411

MEMO    Royalty/insurance advance May '05

⑂002755⑂ ⑂052002166⑂    ⑂175974054⑂

---

**STELOR PRODUCTIONS, INC.**
  Silvers Entertainment Group                                      04/28/05                2755
04/28/05                      Bill #042005                                    1,000.00

Citibank Checkin  Royalty/insurance advance May '05                                      1,000.00



**Royalty Statement**
**Silvers Entertainment Group**
**January 1, 2005 – March 31, 2005**

| Transaction | Net Revenue | Royalty Rate | Royalty Amount | Pre-paid Royalty Balance |
|---|---|---|---|---|
| February advance against royalties | | | $5,000 | $5,000 |
| February advance against royalties for insurance premiums | | | $1,000 | $6,000 |
| Net revenue from licensed properties (iTunes) | $47.35 | 6% | $2.84 | $5,997.16 |
| Net revenue from derivative properties (iTunes) | $1.47 | 3% | $0.04 | $5,997.12 |
| March advance against royalties | | | $5,000 | $10,997.12 |
| March advance against royalties for insurance premiums | | | $1,000 | $11,997.12 |

# EXHIBIT E

Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon, 9th Floor
Coral Gables, Florida 33134

Gail A. McQuilkin
gam@kttlaw.com

Telephone (305) 372-1800
Fax (305) 372-3508

May 2, 2004

Daniel Blonsky, Esq.
Burlington Weil Schwiep Kaplan & Blonsky, P.A.
2699 South Bayshore Drive
Miami, Florida 33133

Re:    Stelor Productions, Inc. v. Steven A. Silvers

Dear Dan:

This is in response to your letter of April 29, 2005. My client is not interested in Stelor's offer of late compliance with the terms of the Settlement Agreement or its obligations under the License Agreement. Mr. Silvers has terminated the License and intends to go in a different direction to develop his characters and intellectual property. We expect Stelor to honor its obligations under the termination provisions of the License Agreement.

Sincerely,

Gail A. McQuilkin

/252630.1

# EXHIBIT F



Googles.com is currently undergoing major renovations!
We will be back online shortly.

Click Here to Contact Googles.

Copyright © 2005 Googles.com. All Rights Reserved.

**CIVIL COVER SHEET**

JS 44

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

STELOR PRODUCTIONS, INC.

## DEFENDANTS

STEVEN A. SILVERS    CIV-HURLEY

, HOPKINS

Palm Beach

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    Foreign
(EXCEPT IN U.S. PLAINTIFF CASES)

West Palm Beach / 05-80393-CIV-Hurley Hopkins

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT    Palm Beach
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Daniel Blonsky, Esq., Burlington, Weil
PH-A, 2699 S. Bayshore Dr., Miami, FL
33133; (305) 858-2900

ATTORNEYS (IF KNOWN)

**(d)** CIRCLE COUNTY WHERE ACTION AROSE:
DADE, MONROE, BROWARD, PALM BEACH, MARTIN, ST. LUCIE, INDIAN RIVER, OKEECHOBEE, HIGHLANDS

## II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question (U.S. Government Not a Party)

☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

IVa.  **3**  days estimated (for both sides) to try entire case.

## V. NATURE OF SUIT (PLACE AN x IN ONE BOX ONLY)

| A CONTRACT | A TORTS | | B FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | PERSONAL INJURY | PERSONAL INJURY | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med Malpractice | ☐ 625 Drug Related Seizure of | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury— | Property 21 USC 881 | | B ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | A PROPERTY RIGHTS | ☐ 460 Deportation |
| & Enforcement of | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| Judgment | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs | ☐ 830 Patent | Corrupt Organizations |
| ☐ 151 Medicare Act | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 810 Selective Service |
| B ☐ 152 Recovery of Defaulted | ☐ 340 Marine | PERSONAL PROPERTY | Safety/Health | | ☐ 850 Securities/Commodities/ |
| Student Loans | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | B SOCIAL SECURITY | Exchange |
| (Excl. Veterans) | Liability | B ☐ 371 Truth in Lending | A LABOR | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge |
| B ☐ 153 Recovery of Overpayment | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | 12 USC 3410 |
| of Veteran's Benefits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 160 Stockholders' Suits | Product Liability | ☐ 385 Property Damage | B ☐ 720 Labor/Mgmt. | ☐ 864 SSID Title XVI | ☐ 892 Economic Stabilization |
| ☐ 190 Other Contract | ☐ 360 Other Personal | Product Liability | Relations | ☐ 865 RSI (405(g)) | Act |
| ☐ 195 Contract Product Liability | Injury | | B ☐ 730 Labor/Mgmt. | | ☐ 893 Environmental Matters |
| | | | Reporting & | A FEDERAL TAX SUITS | ☐ 894 Energy Allocation Act |
| A REAL PROPERTY | A CIVIL RIGHTS | B PRISONER PETITIONS | Disclosure Act | ☐ 870 Taxes (U.S. Plaintiff | ☐ 895 Freedom of |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 740 Railway Labor | or Defendant) | Information Act |
| B ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | Act | ☐ 871 IRS—Third Party | ☐ 900 Appeal of Fee Determination |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Habeas Corpus: | ☐ 790 Other Labor | 26 USC 7609 | Under Equal Access to |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | Litigation | | Justice |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | B ☐ 791 Empl. Ret. Inc. | | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | Security Act | | State Statutes |
| | | ☐ 550 Civil Rights | | | ☒ 890 Other Statutory Actions |
| | | | | | *A or B |

## VI. ORIGIN (PLACE AN x IN ONE BOX ONLY)

Transferred from another district (specify)

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Refiled

☐ 5

☐ 6 Multidistrict Litigation

Appeal to District

☐ 7 Judge from Magistrate Judgment

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER F.R.C.P. 23

DEMAND $ 75,000 + Check YES only if demanded in complaint:
JURY DEMAND:    ☐ YES    ☒ NO

## VIII. RELATED CASE(S) IF ANY (See instructions).

JUDGE _____    DOCKET NUMBER _____

DATE    5.5.05

SIGNATURE OF ATTORNEY OF RECORD

---

UNITED STATES DISTRICT COURT
S/T 1-2
IEO (6/3)

FOR OFFICE USE ONLY:  Receipt No. _____    Amount: 250 00

Date Paid: _____    x/ifp: _____