UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Palm Beach Division

STEVEN A. SILVERS, an individual

    Plaintiff,

v.

GOOGLE, INC., a Delaware corporation

    Defendant,

CASE NO.





## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Steven A. Silvers, files this action against Google, Inc. and alleges as follows:

### SUMMARY OF ACTION

1. This is a classic "reverse confusion" trademark infringement case involving two nearly identical marks: "Googles" and "Google." Typically, a suit for trademark infringement involves "direct confusion" where a smaller, lesser known company has adopted a trademark that is substantially similar to a larger, well-known company to create the impression with consumers that its products come from or are associated with the larger, well-known company. "Reverse confusion" occurs when someone adopts a mark already in use by another, and then becomes so large and well known that consumers begin to believe the smaller, lesser known, yet senior user of the mark is associated with the junior user. The result is that the senior user loses the value of its trademark, its product identity, control over its goodwill and reputation, and ability to move into new markets.

2. Here, plaintiff Steven A. Silvers ("Silvers" or "Plaintiff") is the senior user of the mark "Googles" which he has used as a trademark for over twenty years in connection with goods and services directed to children's education and entertainment. Silvers is also the senior user of the Internet domain name "googles.com" which he has used since 1997 for his "Googles" Website.

3. Defendant Google, Inc. ("Google" or "Defendant") owns and operates the very well-

known Internet search engine "Google." In 1998, with knowledge of Silvers' prior use and registration of the "Googles" mark, and "googles.com" domain name and Website, Google's founders adopted the mark "Google" as a name for an Internet based search engine company. The actual "Google" search engine was launched commercially a year later in 1999. Google has had meteoric success and is now immensely more powerful than Silvers. And, Google's "Google" mark is now so infinitely more well known, that it has practically obliterated the value of the "Googles" mark which is preventing Silvers from flourishing in the children's market and entering new markets. Google is now using the fame of its mark to expand into a variety of new markets. In particular, it is now using the "Google" mark in connection with the advertising and sale of children's goods and services on the Internet, and has filed a federal trademark application to obtain the exclusive right to use the "Google" mark in the children's market - - where the "Googles" mark has been for nearly two decades. Unless Google is enjoined from using its mark in connection with children's goods and services, consumers will mistakenly associate the "Googles" mark, Website, and merchandise with Google, and care likely to mistakenly believe that Silvers has adopted and is using the "Googles" mark with the intent to infringe and capitalize on the "Google" mark.

4. Moreover, Google has unlawfully appropriated Silvers' "Googles" mark and is using that mark in connection with new domain names and its Internet services. Further, Google is claiming superior rights to all marks that incorporate the GOO- and -OOGLE formatives, despite Silvers' prior use and superior rights in these marks.

5. Silvers has filed this action to protect his superior and exclusive right to use the "Googles" mark on the Internet in connection with children's goods and services, and to enjoin Google from using the "Google" mark in connection with the advertising, promoting, marketing and sale of children's goods and services. Silvers also seeks damages that he has incurred from the reverse confusion caused by Google's unlawful conduct.

## JURISDICTION

6.  Silvers is an individual domiciled in Palm Beach County, Florida.

7  Google is a Delaware corporation with its principal place of business at Mountain View, California.

8.  This trademark infringement and unfair competition action arises under the Lanham Act, 15 U.S.C. §§ 1051-1127 and the common law of the State of Florida.

9.  Jurisdiction is proper pursuant to 28 U.S.C. §1331, 28 U.S.C. §1332, 28 U.S.C.§ 1338, the principles of supplemental jurisdiction pursuant to 28 U.S.C. § 1367, and because the parties are citizens of different states in a controversy that exceeds $75,000 exclusive of interest and costs.

10.  Venue is proper in this judicial district pursuant to 28 U.S.C. Sections 1391(b) and (c) because Silvers resides in this District, and the injury to Silvers from Google's unlawful conduct arose in this District.

## GENERAL ALLEGATIONS

### 1979 - 1997: The "Googles" Trademark and Intellectual Property

11.  Over 25 years ago, Silvers developed a animated character concept called the "Googles From The Planet Goo" designed to appeal to children. *See Exhibit 1.* Throughout the 1980s, Silvers continued to sketch out and develop the "Googles" concept and refine his characters. *See Exhibit 2.* His initial use of the "Googles" name appeared in the mid-1980s in connection with his first merchandising idea - "Googles the Perfect Pet."

12.  In 1986, Silvers obtained a copyright for the "Googles the Perfect Pet" art work. *See Exhibit 3.*

13.  By 1990, Silvers had developed the "Googles" character concept into a ten-series storyline about the "Googles And The Planet Of Goo" that was intended to both educate and entertain children, something known in the children's market as "edutainment." *See Exhibit 4.* The "Googles"

are lovable, friendly four-eyed alien creatures that live on the planet Goo. *Id.* Silvers' idea was to use the "Googles" to communicate to children in non-violent themes social lessons, conceptual awareness and educational values, and give "children of today, visions of tomorrow." *Id.*

14. In 1991, Silvers obtained a copyright registration for the first of his ten-series stories entitled "Googles & The Planet of Goo." *See Exhibit 5.* Two years later he obtained a copyright on the second story entitled "Googles, The Return Flight To The Planet Of Goo." *See Exhibit 6.*

15. From 1991 through 1994, Silvers worked to refine the "Googles" characters, and develop the art for the "Googles" stories. *See Exhibit 7.*

16. In 1994, Silvers created the "Googles" logo. *See Exhibit 8.* Silvers obtained a copyright registration for the "Googles" logo on July 26, 1994. *See Exhibit 9.*

17. Shortly after creating the "Googles" logo, Silvers' father, Michael Silvers, formed "The Googles Children's Workshop" for the benefit of Silvers, and to assist with promoting and marketing the "Googles" concept. The "Googles" name and logo appeared on business cards and letterhead that were distributed across the country in connection with promoting the concept to the children's industry *See Composite Exhibit 10.*

18. By 1994, the "Googles" characters were refined to feature the four eyes of the "Googles" trademark design. *See Exhibit 9.* A key feature of the "Googles" characters are the multi-color tennis shoes worn by each character.

19. Silvers expanded on the tennis shoe feature of the "Googles" characters and developed a "Gooshoe" for children that featured the "Googles" trademark. *See Exhibit 12.* In 1994, Silvers obtained a copyright registration for "The Gooshoe" artwork. *See Exhibit 13.*

20. By January, 1995 Silvers had created the first three-dimensional version of a "Googles" character and was generating local press interest in the "Googles" concept. *See Exhibits 14 and 15.* Silvers' intention always has been to develop the "Googles" concept for commercial exploitation, and

in 1995 Silvers developed a prototype to merchandise the "Googles" characters. *See Exhibit 16.*

21.    In March, 1995, Silvers applied for a design patent for the "Googles" tennis shoe which matured into United States Patent Number 397,543. *See Exhibit 17.*

22.    In late 1995, Silvers contracted Morris Publishing to print 1,000 copies of the "Googles And The Planet Of Goo." *See Exhibit 18.* The book was officially printed in May 1996 and featured the "Googles" trademark and design and the "Googles" characters. *See Composite Exhibit 19.*

23.    From June, 1996, Silvers sold and shipped copies of the book around the country. *See Exhibit 20.* Silvers continued from that time to promote and sell his book and related "Googles" merchandise through direct and consignment sales. *See Composite Exhibit 21 and 22.* In November 1996, Silvers was featured in a newspaper article published in the Washington, D.C. area with a photograph of the "Googles And The Planet Of Goo" book and the "Googles" trademark. *See Exhibit 23.*

24    In 1996, Silvers applied to register the "Googles" trademark for use in connection with children's books. That application matured into Federal Trademark Registration No. 2,087,590 issued August 12, 1997. *See Exhibit 24.*

25.    In August 1997, Silvers also obtained a copyright registration for the first "Googles" song. See Exhibit 25.

### 1997: The "Googles" on the Web

26.    When Silvers published "Googles And The Planet Of Goo" he realized that the Web was fast becoming the marketplace of the future providing a far reaching opportunity to further develop and market the "Googles" to children throughout the world. In July 1997, Silvers registered for and obtained the Internet domain name "googles.com" as the address for his "Googles" Website. *See Exhibit 26.* A few months later, the "Googles" Website was operational, featuring the "Googles" trademark, "Googles" characters, "Googles" merchandise, "Googles" song, "Googles And The Planet Of Goo" book, together

with sales and order information. *See Composite Exhibit 27.*

27. Silvers intended to develop "googles.com" into a highly interactive children's Website to promote and sell children's books, merchandise, and related goods and services. In 1998, Silvers added a new feature called the "FOG" Club meaning "Friends of Googles." *See Exhibit 28.* As the "googles.com" Website caught on, hundreds of "Googles" fans used the Internet to register on the "Googles" Website as "FOG" Club members. *See Exhibit 29.*

### 1998 - 2005: The "Googles" Concept Becomes Popular On The Internet

28. By late 1998, Silvers worked with a manufacturer to make the "Googles" characters "Oogle," "Iggle," and "Oogle" into plush toys. *See Exhibits 30 and 31.* In March 1999, Silvers applied for a federal trademark registration for each name which resulted in Federal Trademark Registration Nos. 2496755, 2496754, 2496753. *See Composite Exhibit 32.*

29. By 1999, Silvers had entered into a license agreement with The Aurora Collection for the commercial exploitation of the "Googles" trademark, related intellectual property, Website, and products. That agreement was memorialized in July 2000. *See Exhibit 33.* Soon after, the "Googles" characters drawings were further refined for commercial use. *See Composite Exhibits 34 and 35.*

30. From 2000 - 2001, the "Googles" continued to develop on the Web and were featured in the Internet based educational site called "Fun With Science Club." *See Exhibit 36.* That Website featured the "Googles" theme song, animated cartoons called "GooToons," and stories about each of the "Googles" characters. *See Composite Exhibit 37.*

31. To further promote the "Googles," Silvers and Aurora created a "Googles" theater show that played to children around the country. *See Composite Exhibits 38 and 39.* In 2001, the "Googles" performed live on national television during the Jerry Lewis Telethon.

### Meanwhile: A Prototype Search Engine Project Called "BackRub" Is Born

32. In 1996, Sergey Brin and Larry Page, two graduate students at Stanford University,

collaborated on a university research project to develop a prototype search engine for the Web. *See Exhibit 40.* The project was named "BackRub" for its unique ability to analyze the "back links" that point to a given Website. *Id.*

33. While the two students worked on the research project through 1997, a demo version of the developing search engine was available through the Internet at backrub.stanford.edu. *See Exhibit 41.*

34. Upon information and belief, sometime in 1997, after giving much thought about a better name for this prototype search engine, Page decided on the name "googol." "Googol" is a word that means the mathematical number 1 followed by one hundred zeros ad denotes the largest finite number short of infinity. The word fit the goal of the research project to organize an almost infinite amount of information on the Web.

35. Upon information and belief, after Page decided to name the prototype search engine "googol," he searched the Web to determine if he could obtain the domain name "googol.com." That domain name, however, had been registered by Tim Beauchamp in 1995 and thus was unavailable.

36. Upon information and belief, Page searched the Web for other domain names similar in spelling to "googol" to determine what was available. Page settled on the word "Google" and registered the domain name "google.com." Upon information and belief, Page knew when he registered "google.com" that the domain name "googles.com" had been registered by Silvers three months earlier and was in use, and that Silvers had a federal trademark registration for the "Googles" mark.

37. Upon information and belief, sometime in late 1997, Page and Brin changed the name of their research project from "BackRub" to "Google." *See Exhibit 42.* Upon information and belief, access to the demo of the research project remained, however, at "backrub.stanford.edu" throughout 1997 *See Exhibit 43.* Around this same time, both Brin and Page displayed information about their prototype search engine project on their Stanford University home Webpage, each playing with the

design of the word "Google." *See Composite Exhibit 44 at pages 2 and 3.* The design displayed by Brin on his home Webpage showed the word "Google" with the two "o's" as eyes.

38. Upon information and belief, sometime in 1998, Page and Brin began using the domain name "google.stanford.edu" as the Web address of their search engine demo site. *See Exhibit 45.* Throughout most of 1998, however, the "Google" prototype search engine was associated with Stanford University. *See Exhibit 46 at page 2.*

39. Upon information and belief, in and around August 1998, Page and Brin commissioned a formal trademark and domain name search to determine whether the name "Google" was available for use as a trademark. The search result revealed Silvers' "Googles" trademark, "googles.com" domain name, and picture of the "Googles" Website. *See Exhibit 47.* Based on the trademark search results, Page and Brin both had actual knowledge that Silvers owned the "Googles" mark and owned and operated the "googles.com" Website before they adopted and used the "Google" mark as a trademark. Further, based on Silvers' federal copyrights and patent incorporating the "Googles" name, Page and Brin had constructive notice of the extent of Silvers' use of the "Googles" mark.

40. On or about September 4, 1998, a year after Page acquired the "google.com" domain name, Page and Brin adopted the name "Google" as their company name and incorporated Google Technology, Inc. in California. *See Exhibit 48.* Page and Brin decided to adopt the name "Google" rather than "Googol" because "googol.com" was not available as a domain name, and could not be trademarked. *See Exhibit 49 at page 2.* This decision was influenced also by the child-like sound of the word "google" and the colorful sense of fun that it invoked.

41. On September 16, 1998, Google, Inc. filed an Intent-To-Use federal trademark registration application to register the mark "Google" for use in connection with computer hardware (Int'l class 9), and computer services (Int'l class 42). *See Exhibit 50.* An Intent-To-Use application means that the applicant has not yet used the mark in commerce but has a bona fide intent to use the

mark in commerce at some future date.

42. Up through 1998 and into 1999, the "Google" search engine remained in the realm of a non-commercial experimental academic model. *See Exhibit 51 at page 1, 3, 4, 5 and 10.* Page intended to keep the "Google" search engine in the non-commercial academic realm because it avoided the advertising supported business model of most search engines.

43. On March 15, 1999, "Google, Inc." filed an Amendment to Allege Use in the pending federal trademark application alleging, in contradiction to its original declaration that it had an intent to use, that it had used the "Google" mark in interstate commerce in connection with Int'l class 42 services since September 1997, a full year before the Intent-To-Use application date. *See Exhibit 52.* The Amendment To Allege Use was filed together with Page's Declaration that based on his own knowledge the "Google" mark was in use in commerce as of March 9, 1999, another contradiction. *See Exhibit 53.*

44. On or about September 23, 1999, the "Google" search engine was commercially launched.

45. Three years later, on September 23, 2002, "Google, Inc." was incorporated as a California corporation. *See Exhibit 54.* Upon information and belief, on October 11, 2002, Google, Inc. purported to assign federal trademark application Serial Number 75/978469 (for "Google") to Google Technology, Inc. On August 27, 2003, Google, Inc. was reincorporated as a Delaware corporation. Upon information and belief, on that same date, Google Technology, Inc. purported to assigned federal trademark application Serial No. 75/978469 to Google, Inc., the Delaware corporation. Upon information and belief, sometime in 2004, Google Technology, Inc. was merged into Google, Inc..

### 1998: Silvers Attempts to Contact Larry Page To Avoid Confusion

46. In or around late 1998, Silvers tried to contact Larry Page about his intended use of the "Google" name on the Web and to discuss ways to avoid potential confusion with the "Googles" mark

and the "googles.com" Website. Silvers did not receive a response.

47. On August 12, 2001, Silvers again tried to contact Larry Page about his use of the "Google" name. *See Exhibit 55*. In his e-mail directed to Page, Silvers noted that confusion had started between the Websites, and asked simply if they could work out a mutual plan to avoid confusion, especially regarding traffic to each other's Websites. Silvers did not receive a response.

### 2001-2004: The "Googles" Continue to Develop Commercially

48. From 1999-2002 Silvers and Aurora continued to develop the "Googles" concept with new music, adventures, and improved interactive Website. By 2001, the "Googles" were attracting media attention and were featured in *Kidscreen Magazine*. *See Exhibit 56*.

49. In 2002, Aurora sold its licensing rights in the "Googles" trademark, domain name, Website, and related "Googles" intellectual property to Stelor Productions.

50. Since 2002, Stelor as Silvers' licensee has continued to promote and develop the "Googles" trademark, Website, and related intellectual property in connection with children's goods and services. *See Composite Exhibit 57*.

51. By March 2003, the "googles.com" Website was being inundated with people looking for the "google.com" Website. To protect the identity of the "Googles" mark and combat confusion between the "Google" and "Googles" Websites, a feature was added to the googles.com Website that asked the Internet visitor if the "Googles" site was where it intended to be. *See Exhibit 58*. Upon information and belief, Google has taken no action to avoid confusion with the "Googles" mark.

### Google Intends To Broaden Its Use of The "Google" Mark

52. Since adopting the "Google" mark in 1999, and with knowledge of Silvers' superior rights to the "Googles" mark, googles.com domain name and Website, Google has expanded the use of its "Google" mark into all areas of commerce, including the market for children's goods and services. Despite Silvers' superior right to use the "Googles" mark in connection with children's goods and

services on the Web, Google has filed a federal trademark application to expand its right to use the "Google" mark for children's goods, including books and clothing. *See Exhibit 59.* Google has also unlawfully appropriated the word "googles" and incorporated that word into domain names such as googlesadwords.com, googlesadsense,com, and googles-adwords.com.

53. Google now uses the "Google" mark and "google.com" domain name and "Google" Website to advertise, promote, market and sell children's books, merchandise, and related goods and services, and has encroached upon Silvers' federal and common law trademark rights. In further violation of Silvers' rights, Google now offers for sale a product called "Google Goo." *See Exhibit 60.*

54. Google has become so well-known through publicity, advertising and marketing that it now overwhelms the public recognition of the "Googles" trademark, domain name, and Website, and is preventing Silvers from flourishing on the Web or entering new markets within his natural scope of expansion. And, Google is now attempting to assert exclusive rights over all marks with the GOO- and -OOGLE formative, despite Silvers' prior use and superior rights in these marks.

## COUNT ONE
### (Trademark Infringement)

55. Silvers realleges and incorporate by reference the allegations of paragraphs 1 through 54, inclusive, as though fully set forth.

56. Silvers is the senior user of the mark "Googles" for use in connection with children's books, merchandise, music, toys, and related goods and services. Since 1997, Silvers and those associated with him have used the Internet to market and promote the "Googles" mark.

57. With knowledge of Silvers' superior and exclusive rights in the "Googles" mark, the "googles.com" domain name, and Website, Google adopted the mark "Google," which is the singular version of and almost identical to Silvers' "Googles" mark, and Google has used that mark extensively in connection with goods and services offered to consumers through the Internet.

58. With knowledge of Silvers' superior rights in the "Googles" mark, "googles.com"

domain name, and Website, Google registered the domain name "google.com" and has used that domain name extensively in connection with its Internet based services.

59. Google's unauthorized and unlawful use of the name "Google," which is substantially identical to Silvers' "Googles" mark, has caused and will continue to cause "reverse confusion" in that the consuming public will now falsely believe that Silvers' goods and services, "googles.com" domain name, and Website are connected, affiliated, associated, sponsored, endorsed or approved by Google, and that Google is the source of origin of the "Googles" concept, books, music, "googles.com" domain name, Website, merchandise, and related goods and services, in violation of 15 U.S.C. § 1114.

60. Google's use of the "Google" name and "google.com" domain name for Internet based services, which include advertising for and providing links to sites selling children's books, games and other educational and entertainment products and services, and unlawful use of the "Googles" name, and related names, is diminishing the identity and value of Silvers' "Googles" mark, "googles.com" domain name, and Website, and is preventing Silvers from flourishing on the Web, or expanding his goods and services at the "googles.com" Website, and otherwise causing Silvers great harm.

61. As a direct and proximate result of Google's unauthorized and unlawful acts, Silvers has suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law. Unless restrained, Google's conduct as described above, will continue to cause confusion and will continue to injure, if not obliterate, the value of Silvers' "Googles" mark, domain name, and Website, causing great harm and damage to Silvers.

62. As a direct and proximate result of Google's wrongful conduct, Silvers has also suffered and will continue to suffer monetary damages from the "reverse confusion" caused by Google.

WHEREFORE, Plaintiff requests that this Court provide relief against said acts of Defendant as set forth in the Wherefore clause in Count Two below.

## COUNT TWO
### (Unfair Competition Under Florida Law)

63. Silvers realleges and incorporates by reference the allegations of paragraphs 1 through 54, inclusive, as though fully set forth.

64. Google's unauthorized and unlawful use of the name "Google," which is substantially identical to Silvers' "Googles" mark, has caused and will continue to cause "reverse confusion" in that the consuming public will now falsely believe that Silvers' goods and services, "googles.com" domain name, and Website are connected, affiliated, associated, sponsored, endorsed or approved by Google, and that Google is the source of origin of the "Googles" concept, books, music, googles.com domain name, Website, merchandise, and related goods and services, which constitutes unfair competition under Florida common law.

65. Google's use of the "Google" name and "google.com" domain name for Internet based services, which include advertising for and providing links to sites selling children's books, games and other educational and entertainment products and services, and unlawful use of the "Googles" name, and related names, is diminishing the identity and value of Silvers' "Googles" mark, "googles.com" domain name, and Website, and is preventing Silvers from flourishing on the Web, or expanding his Internet based services and goods at the googles.com Website, and otherwise causing Silvers great harm.

66. Further, Google is attempting to establish rights *in gross* to the term "Google" to prevent anyone else from using any derivation of the "Google" mark whatsoever, including the formatives GOO- and -OOGLE.

67. Google's attempt to prevent others from using any derivation of the "Google" mark whatsoever also constitutes unfair competition under Florida law.

68. As a direct and proximate result of Google's unauthorized and unlawful acts, Silvers has suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law Unless restrained, Google's conduct as described above, will continue to cause confusion and will

2525 Ponce de Leon, 9th Floor, Miami, Florida 33134 | Phone 305.372.1800 | Fax 305.372.3508 | kttlaw.com

continue to injure, if not obliterate, the value of Silvers' "Googles" mark, domain name, and Website, causing great harm and damage to Silvers.

69. As a direct and proximate result of Google's wrongful conduct, Silvers has also suffered and will continue to suffer monetary damages from the "reverse confusion" caused by Google.

WHEREFORE, Plaintiff requests that this Court provide relief against said acts of Defendant as follows:

a. That Defendant, its agents, servants and employees, and other such persons in concert or participation with Defendant, including licensees, pursuant to 15 U.S.C. § 1116, be preliminarily and then permanently enjoined from the further use of the mark "Google" or any confusingly similar variation thereof, in connection with the advertising, promotion, marketing, and sale of children's goods and services;

b. That Defendant's pending federal trademark application Serial No. 76/314783 for the "Google" mark, or registration if so registered, be ordered cancelled;

c. That Plaintiff be awarded compensatory damages for the reverse confusion caused by Google consistent with, but not limited to, all remedies available under 15 U.S.C. § 1114 and 1117, and Florida common law.

d. That Plaintiff be awarded his costs, and attorneys fees pursuant to the exceptional case provisions of 15 U.S.C. §1117(a) and (b);

e. That Defendant's domain name registrations for googlesadsense.com, googlesadwords.com, and googles-adwords.com, and any other domain name incorporating the word "googles" be cancelled;

f. That Defendant, its agents, servants and employees, and other such persons in concert or participation with Defendant, including licensees, be preliminarily and then permanently enjoined from the further use of the name "Googles" in connection with any domain name;

g.  That Defendant, its agents, servants and employees, and other such persons in concert or participation with Defendant, including licensees, be preliminarily and then permanently enjoined from using any trade practices whatsoever that injure the value and goodwill in the "Googles" mark and Plaintiff's related intellectual property, including claims that it has superior rights to any mark using the GOO- or -OGGLE formative marks;

h.  That Plaintiff be granted such further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

DATED this 4th day of May, 2005.

Harley S. Tropin (Fla. Bar #241253)
Kenneth R. Hartmann (Fla. Bar #664286)
Gail A. McQuilkin (Fla. Bar #969338)
KOZYAK TROPIN & THROCKMORTON, P.A.
2525 Ponce de Leon, 9th Floor
Miami, Florida 33134
T: 305-372-1800 / F: 305-372-3508

and

Adam T. Rabin (Fla. Bar #985635)
DIMOND KAPLAN & ROTHSTEIN, P.A.
525 S. Flagler Drive, Trump Plaza - Suite 200
West Palm Beach, Florida 33401
T: 561-671-1920 / F: 561-671-1951

3339/101//250784.2