UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| STELOR PRODUCTIONS, LLC, | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | |
| | ) | Case Number: 1:05-CV-0354-DFH-TAB |
| v. | ) | |
| | ) | |
| OOGLES N GOOGLES | ) | |
| FRANCHISING, LLC, | ) | |
| | ) | |
| Defendants/Counter-Plaintiffs | ) | |
| and, Third Party Plaintiff | ) | |
| | ) | |
| ********************************* | ) | |
| OOGLES N GOOGLES | ) | |
| FRANCHISING, LLC and OOGLES N | ) | |
| GOOGLES BRANDING, LLC, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STELOR PRODUCTIONS, LLC, | ) | |
| | ) | |
| Counter-Defendant, and | ) | |
| | ) | |
| STEVEN A. ESRIG, | ) | |
| | ) | |
| Third Party Defendant, | ) | |

**DEFENDANTS' RESPONSE TO STELOR'S MOTION
FOR PROTECTIVE ORDER**

Defendants, by counsel, for their Response to Stelor's Motion for Protective Order state

as follows:

## I. INTRODUCTION

The Court is well aware of Stelor's inability to meet deadlines for responding to

discovery, even those set by the Court. Stelor's conduct in this litigation with respect to written

discovery started as dilatory and progressed to obstructionist.  Stelor's conduct has now entered the realm of bad faith with spurious objections to discovery requests for clearly relevant documents and information known to be in its possession.  Stelor did not provide a complete set of responses to Defendants' First Interrogatories and Requests for Production served March 14, 2008, until September 26, 2008, and now attempts to blame the undersigned for its own lack of diligence and compliance with the Rules and the Case Management Plan deadlines.

In addition, Stelor has missed other important Case Management Plan deadlines, including:

> September 16, 2008 – Deadline to serve written discovery; and

> September 15, 2008 – Deadline for Plaintiffs to designate experts and submit expert reports.

Stelor claims Defendants infringed four (4) registered trademarks and one (1) unregistered trademark.  (See, Third Amended Complaint.)  Stelor claims that the Defendants infringed a word and design mark registered for use in connection with children's books.  Stelor is making the same allegations against Google Inc. (the search engine company) in the case of *Stelor v. Google, Inc.*, Case No. 9:05-cv-80387, in the Southern District of Florida.  The trademark is an alien's face that incorporates the word Googles as features of the face (hereinafter the Googles logo trademark). (Exh. 5)  It was registered in 1997 by Steven A. Silvers and owned at that time by The Google's Children's Workshop, Inc.  Stelor is also claiming that Defendants infringed the word marks Oogle, Oggle, and Iggle registered for use in connection with stuffed and plush toys. These word mark(s) were registered by Steven A. Silvers in 2001 and licensed to a Florida company called The Aurora Collection, Inc.  Stelor is also claiming trademark rights in the unregistered word "Googles" as a trademark for a website.

Stelor Productions, Inc. entered into a license agreement (Exh. 7) and Creative Consultant Agreement (Exh. 8) with Silvers to use the trademarks in June 2002. Stelor did not produce these documents; Defendants obtained them from Stelor filings in one of its lawsuits against Silvers. Upon information and belief, Stelor Productions, LLC became the owner of the marks in 2007 when Silvers and Stelor settled cross claims over which had the right to sue Google in the case of Silvers v. Google, Inc. Stelor refuses to produce copies of the agreement by which it obtained ownership of the marks and other agreements with Silvers and The Aurora Collection, Inc.

## II. OOGLES N GOOGLES USE OF ITS NAME PREDATES STELOR'S ACQUISITION OF THE ALLEGED TRADEMARKS

### A. Oogles n Googles History

Kevin and Danya Mendell are a Hoosier entrepreneurial success story. They are both Indiana University graduates, are married and have three children. After he graduated from Indiana University, Kevin went to work for Albert Chen, the entrepreneur that formed Telamon, Inc., a very successful company based in Carmel, Indiana. In late 2001, while preparing for one of their son's birthdays, Danya came up with the business idea of providing turnkey birthday parties to busy parents. Their son, Zachary, came up with the Oogles n Googles name because it sounded funny. In February or March of 2002, Kevin and Danya placed an ad in the Broad Ripple Topics newspaper advertising their start-up birthday business, and in March 2002, Oogles n Googles sold its first birthday party.

Thereafter, Kevin formed Oogles n Googles Franchising, LLC to offer franchises for the Oogles n Googles birthday party business. Oogles n Googles sold its first franchise in 2004, and has sold a total of forty-nine (49) franchises throughout the country.

Kevin's attorney, Bryan Redding, filed an application to federally register Oogles n Googles as a trademark. Stelor filed an opposition to the application. Kevin and Danya had never heard of Stelor Productions until Stelor filed its opposition to Oogles n Googles trademark application.

Oogles n Googles' use of its name predates Stelor's acquisition of its alleged trademarks from Silvers and Aurora; Stelor did not acquire the license to use its alleged trademarks until June, 2002.

**B. History of Stelor's Alleged Trademarks**

The undersigned has done extensive research to uncover the history of the alleged trademarks, and believes the following history to be true based on that research. Defendants' discovery to Stelor was specifically targeted to obtain documents and identify witnesses to complete the factual history of the non-use in commerce of the alleged trademarks by Stelor, Aurora, The Googles Children's Workshop, Inc. and Silvers. Much of this history comes from documents used as exhibits by Stelor in the Google case, which it claims are not discoverable in this case.

In 1984, Steven A. Silvers resided in South Florida with an idea for a toy he called "Googles the Perfect Pet" toy. (Exh. 9) Silvers thought he could create a media empire with his Googles character as the central figure in children's cartoons and associated merchandise. (Exh. 10) Nothing came of Silvers' toy idea, because he was also in the cocaine trafficking business. *United States v. Silvers*, 90 F32d 95 (4th Cir. 1996); *United States v. Silvers*, 732 F.Supp. (D.C. Md. 1996). In 1985, Silvers, his brother, Gary, and others conspired to distribute two loads of cocaine and marijuana flown into Miami by a pilot and former Miami police officer, John Gerald Gerant. *United States v. Silvers*, 891 F2d 287, (4th Cir. 1988); *United States v. Gerant*, 995 F.2d

505, (U.S. Ct. App., 4th Cir. 1993). In 1987, Steven A. Silvers ("Silvers"), his brother, Gary, and

George Chaconas a/k/a "Little George" Chaconas were indicted in U.S. District Court in

Maryland for their part in a major cocaine trafficking enterprise that transported cocaine from

Miami for distribution in Maryland and Virginia. *United States v. Steven A. Silvers*, 90 F.3d 95,

(U.S. Ct. App., 4th Cir. 1996):

> In February 1988, a jury found Silvers guilty of supervising a continuing criminal
> enterprise ("CCE") in violation of 21 U.S.C. § 848, conspiracy to possess with
> intent to distribute cocaine in violation of 21 U.S.C. § 846, three counts of
> possession with intent to distribute cocaine in violation of 21 U.S.C. § 841, two
> counts of interstate travel in aid of racketeering in violation of 18 U.S.C. § 1952,
> and conspiracy to defraud the United States in violation of 18 U.S.C. § 371. The
> district court vacated Silvers' conviction for conspiracy to possess and distribute
> cocaine because it was a lesser-included offense of the CCE conviction. In April
> 1988, Silvers was sentenced to 35 year on the CCE count, concurrent 15-year
> sentences on each of the possession with intent to distribute counts, and
> concurrent 5-year sentences on the remaining counts.

> *Id.*

Silvers wrote a children's book while in federal prison serving time for convictions on

those charges. The book featured characters named after Silvers' brother, Gary, and Silvers'

children, Joshua and Renee. Their father in the book is named "Mr. Silverton," who is not a

convicted felon like the real-life Silvers. The story revolves around an alien named Googles

landed in the Florida Everglades and befriended an earthling child, Joshua.

While Silvers was in prison, either Silvers or his father, Michael, formed a New Jersey

corporation, The Googles Children's Workshop, Inc., in 1994. (Exh. 11) The Googles

Children's Workshop, Inc. was an affiliate of SAS Entertainment Group. 'SAS" is Silvers'

initials. Defendants do not yet know if Stelor had a contractual or other relationship with The

Googles Children's Workshop or SAS Entertainment Group., because Stelor is refusing to

respond to requests for any such contracts.

While in prison, Silvers obtained a copyright registration for the children's book "Googles and the Planet of Goo" in 1995. The book was supposed to be part of a ten-book adventure series. (Exh. 10) Books two through ten have never materialized. In 1996, Silvers or his father, Michael, paid to have a thousand (1000) copies of the book printed by a vanity book publisher. (Exh. 12)

Silvers had a lady friend in Miami, Marsha Genaro, that appears to have been instrumental in trying to sell copies of Stelor's book. It appears that Genaro actually sold six (6) copies of the book in 1996 to friends or family in South Florida. Stelor has produced no documents showing any book sales by anyone since 1996.

Either Silvers or his father dissolved The Googles Children's Workshop, Inc. in October 1997, a couple of months after the federal registration for the Googles word and design mark was issued in 1997. (Exh. 11) Later, in 2003, Esrig retained lawyer Ira Edell to file renewal documents for the Googles logo trademark in the USPTO on behalf of The Googles Children's Workshop, Inc. long after it was dissolved.

After his release from prison, Silvers lived with his sister for a short time in Potomac, Maryland, then moved back to the Miami area where he lived when he was indicted. In 1998 and/or 1999, Silvers attempted to sell his book on the internet with no success. In 2000, Silvers purported to license his "intellectual property" to a start-up Miami area company called The Aurora Collection, Inc. ("Aurora") that was formed in 1999. (Exh. 6 – partial agreement) Stelor's president, Steven A. Esrig, testified in deposition in the opposition proceedings against Oogles n Googles that he has all of Aurora's business records "since they acquired the intellectual property," but Stelor refuses to produce Aurora's contracts with Esrig or Esrig's company, E.G.G. International, LLC.

Steven A. Esrig of Darnestown, Maryland claimed in his trademark opposition deposition that he learned of Aurora from a yet-to-be identified friend on Aurora's board of directors in the year 2000. Esrig later invested in Aurora, and claims he acted as a consultant for Aurora through his company E.G.G. International, LLC ("E.G.G."). Stelor refuses to produce documents regarding Esrig's ownership interest in Aurora.

E.G.G. appears to have been formed by Esrig's wife, Lori, to sell or distribute health and wellness products for Nikken, Inc., a multilevel marketing company like Amway. Esrig is currently listed on Nikken's website as a Nikken independent consultant. Defendants' believe E.G.G. was a Nikken distributor, but Stelor refuses to provide information about Esrig's work history in the years before he formed Stelor in 2002.

Nikken consultants can achieve different designations based upon the success of the business. The most successful Nikken distributors are dubbed "Royal Diamond" Nikken distributors. It appears Esrig has exploited wealthy Royal Diamond Nikken distributors by convincing them to invest literally millions of dollars in Stelor in the brief time it has been in business with the prospect of a big payday from Google, Inc. for trademark infringement of the same Googles logo trademark that Stelor asserts in this case.

Aurora had its own website, the auroracollection.com., and also briefly operated The Fun with Science Club with website, (www.funwithscienceclub.com) Stelor has produced records showing Aurora sold a few Google toys in 2001. Stelor has produced no documents showing Stelor has ever sold any trademarked toys since it acquired the right to use the trademarks.

In Stelor's own words, Aurora's efforts to commercialize the Googles trademark failed because of Silvers' adverse relationship with Aurora. After Esrig formed Stelor, Stelor entered

into an Asset Purchase Agreement with Aurora, which Stelor refuses to produce. Defendants do not have that Agreement.

In 2002, Esrig formed Stelor Productions, Inc. which operated out of his house in Darnestown, Maryland. Several other limited liability companies which appear to be related to Stelor also operated out of Esrig's house, including Stelor Investors LLC, Stelor Productions, LLC, and others. Stelor is refusing to respond to discovery about the relationship between Stelor and these related entities. In 2002, Stelor Productions, Inc. entered into a license agreement with Silvers (Exh. 7) and an asset purchase agreement with Aurora to use the trademarks asserted in this case. Stelor refuses to produce these agreements, even though it repeatedly uses the license agreement as an exhibit in its multiple lawsuits against Silvers and in its lawsuit against Google, Inc.

In 2003, Aurora's former president, Myles Farrington, was convicted on federal money laundering charges and sentenced to fifty-four (54) months in prison for a multi-million dollar investment scam (a Ponzi scheme) in South Florida that Farrington operated before and during the time he was president of Aurora. Esrig was an investor and stockholder in Aurora.

Archived web pages show that in 2003, Stelor had two (2) full-time and three (3) part-time employees. Silvers filed a spreadsheet as an exhibit in litigation between Stelor and Silvers that indentifies the directors and shareholders in Stelor Productions, Inc. (Exh. 13) There were seven (7) directors and approximately twenty-two (22) investors. Several of the shareholders appear to the "Royal Diamond" Nikken distributors, some of which are from Canada and Germany. The Spreadsheet shows Esrig had procured $3.4 million from investors as of 2004.

In 2005, Stelor Productions, Inc. stated that it converted to a limited liability company, Stelor Productions, LLC, in 2005. Stelor refused to respond to discovery regarding the reasons

for this conversion, and it is completely unclear at this point whether Stelor Productions, Inc. or Stelor Productions LLC is the owner of the alleged trademarks because Stelor refuses to produce the agreements by which it obtained ownership of the alleged trademarks in 2007.

Stelor's and Esrig's relationship with its investors and employees is clearly troubled, and directly relevant to Oogles n Googles' defense that Stelor was in the business of suing Google, Inc., not selling trademark goods in commerce. One of the shareholders, Michael Di Muccio, has threatened to sue Esrig personally because Esrig was slow to sue Silvers. (Exh. 14) Esrig claims one of the Stelor's employees threatened to kill him, further evidence that Stelor was a dysfunctional business. (Exh. 15).

According to income statements produced by Stelor, it had incurred $12,990,394.26 (almost $13 million) in expenses by the end of 2007. (Exh. 16, p. 6) Stelor has sold no trademarked children's books or plush toys in the registered classes. Stelor has sold less than $100 worth of Google's songs on the internet. (Exh. 17)

Defendants' theory of the case is that Stelor is not a legitimate business enterprise and it never had a bona fide intention to use the trademarks in commerce. Defendants discovery was directed to identify witnesses (officers, investors, and employees) to depose them regarding Esrig's representations as to whether Stelor ever intended to sell trademark goods in the registered classes, and if not, why not. Stelor's primary reason for existence appears to be to exploit the Googles logo trademarks against Google, Inc. as a trademark troll. It appears that Stelor and Esrig may also be defrauding investors, or at least misusing their investment funds to pay for Esrig's personal living expenses. Finally, Stelor, its investors, and directors may be using Stelor as a vehicle to avoid paying federal income taxes or to launder money. At best, Stelor is simply a failed business that has spent millions of dollars of investors' money with

literally no return on investment.  Defendants' inquiries into Stelor's financial documents are reasonably calculated to lead to the admissible evidence for the invalidity defense and counterclaim on the grounds that Stelor is not a legitimate business enterprise and had no intention of using the trademarks in commerce.

### III.  ADVERSE RELATIONSHIP AND LITIGATION BETWEEN SILVERS AND STELOR

#### A.    The Adverse Relationship Between Silvers and Stelor

Stelor is making a baseless claim that correspondence between Silvers and Esrig are protected by the attorney-client privilege and the common interest doctrine extension to that privilege.  The latter does not apply to parties that are adverse.

Stelor entered into its licensing agreement in June 2002, which gave Stelor the exclusive right to sue Google, Inc. for infringement of the Googles logo trademark. (Exh. 7)  The Creative Consulting Agreement between Silvers and Stelor expressly states there are no joint undertakings between Silvers and Stelor. (Exh. 8).  Silvers' and Stelor's relationship has been adverse from the beginning.  A primary source of contention between Silvers and Stelor is a dispute over who had the rights to sue Google for an alleged infringement of Silvers' Googles logo trademark. Stelor's motions and pleadings in the multiple lawsuits between Stelor and Silvers make it clear that Silvers and Stelor never jointly undertook to sue Google, Inc.

Stelor sued Silvers to seek an injunction to keep him from interfering with Stelor's litigation against Google, Inc.:

> "However, Defendant, having received from Stelor $186,500, obligations for option for Stelor stock, and health insurance, has not lived up to his part of the bargain.  (Id. ¶ 9.)  After giving Stelor the exclusive rights to develop and market the "Googles" concept without interference from him, Defendant commenced a campaign to inject and entwine himself into the very fabric of Stelor's business.  (Id.)  In breach of his contractual obligation to cooperate fully with Stelor in protecting,

preserving, and enforcing the Googles intellectual property rights, Defendant has subverted those efforts, going so far as to unilaterally divert official communications from the United States Patent and Trademark Office ("USPTO") from Stelor's intellectual property counsel to himself. (Id. ¶ 11; Ex. 6.) Under the irrevocable power of attorney Defendant bestowed on Stelor under the License Agreement, all such communications from the USPTO must go directly to Stelor, as Stelor has the right "to act for and on [Defendant's] behalf and instead of" Defendant in protecting and enforcing the Googles Intellectual Property. (Ex. 2, ¶ VIIIA.)

Stelor, in fulfilling its duty to enforce and defend the Googles Intellectual Property, retained counsel to bring actions against Google, Inc. in the USPTO. (Ex. 1 ¶ 15.) Defendant wrote to Stelor's counsel and instructed them to act no further on these matters and threatened to obtain his own attorney to handle them despite Defendant's having given Stelor an irrevocable power of attorney to act for and on Defendant's behalf to enforce and defend the Googles Intellectual Property. (Id.¶ 16; Ex. 7)"

(Exh. 18, pp. 4-5) It is bordering on fraud on the Court for Stelor to claim here that Stelor and Silvers jointly pursued claims against Google, Inc.

## B. Litigation Between Silvers and Stelor

Stelor is claiming common interest and attorney-client privilege for correspondence and e-mails between Silvers and Stelor, including e-mails it has used as exhibits in its litigation against Silvers. (Exh. 20-23)

Stelor's license agreement gave it the sole right to sue third parties. Silvers and Stelor have been adverse since the beginning of the licensor-licensee relationship. One point of contention was distribution of proceeds from the Google case. (Exh. 22, p. 2) Silvers claims that Stelor initiated domain name litigation against Google without his knowledge or permission (Exh. 23, p. 5) and that Stelor failed to commercialize the Googles trademarks or use them in commerce. The latter is Defendants position in this case. The discovery in the Google case and in the litigation between Silvers and Stelor pertain to the same issues here – that is, Stelor's

marks are invalid because Stelor did not use the marks in commerce and never had a bona fide intention of doing so.

In 2004 and thereafter, Silvers and Stelor Productions, Inc. sued each other in at least three (3) separate lawsuits in South Florida and filed cross-claims against each other in the lawsuit Silvers initiated against Google, Inc. Each claimed the rights to exploit the Googles word and design mark against Google, Inc. (the search engine company) and others. In 2005, Silvers sued Google, Inc. in U. S. District Court in the Southern District of Florida (Case No. 9:2005cv80387) alleging infringement of the same Googles word and design mark asserted in this case: Defendants here assert the same defenses as Google, Inc. of non-infringement and invalidity. Stelor and Silvers apparently settled their disputes over ownership in late 2007, and Stelor now claims it is owner of the trademarks and has been substituted Plaintiff in the case against Google, Inc. The following are brief excerpts and/or descriptions of those cases showing the relevance of those cases to Oogles n Goggles' defenses here.

## 1. *Stelor Productions, Inc. v. Silvers*, Case No. 04-80954, U.S. District Court, Southern District of Florida.

In the 2004 lawsuit against Silvers, Stelor makes it clear Stelor and Silvers were adverse and never jointly undertook to sue Google, Inc. or anyone else. To the contrary, Stelor claims Silvers interfered with Stelor's attorneys in litigation against Google:

> "4.     Thus, when on or around June 1, 2002 Stelor and Defendant entered into a "License, Distribution, and Manufacturing Agreement," and a Consulting Agreement, Stelor bargained for, and obtained, the following promises, commitments, and obligations from Defendant designed to ensure Stelor's ability to develop the "Googles" program free from undue interference by Defendant:
>> (a)     The License Agreement gives Stelor exclusive rights in the "Googles" products, trademarks, and intellectual property and specifies that those rights are exclusive even as to Defendant.
>> (b)     The License Agreement gives Stelor an irrevocable power of attorney to apply for, maintain, enforce and defend intellectual property

12

rights, including trademarks, websites, and domain names. Stelor, not Defendant, assumed responsibility for handling all Googles Trademark and other Intellectual Property matters.

6.      However, Defendant, having received from Stelor $186,500, obligations for options for Stelor stock, and health insurance, has not lived up to his part of the bargain. After giving Stelor the exclusive rights to develop and market the "Googles" concept without interference from him, Defendant commenced a campaign to inject and entwine himself into the very fabric of Stelor's business.  In breach of his contractual obligation to cooperate fully with Stelor in protecting, preserving, and enforcing the Googles intellectual property rights, Defendant has subverted those efforts, going so far as to unilaterally divert official communications from the United States Patent and Trademark Office ("USPTO") from Stelor's intellectual property counsel to himself.  Under the irrevocable power of attorney Defendant bestowed on Stelor under the License Agreement, all such communications from USPTO must go directly to Stelor, as Stelor, not Defendant, shoulders all responsibility for protecting and enforcing the Googles Intellectual Property.

28.      In breath of the License Agreement and/or the Consulting Agreement, Defendant has engaged in a pattern and practice of interfering with Stelor's business operations in violation of his express duty to cooperate, in violation of the irrevocable power of attorney Defendant granted to Stelor. This pattern of interference includes, but is not limited to, the following:

        (a)      Defendant has unilaterally, without authorization from Stelor, instructed the USPTO to send all correspondence for each application and registration for the Googles Trademarks to "Steven A. Silvers / Silvers Entertainment Group, Inc. / 8983 Okeechobee Blvd., Ste. 202, PMB 203 / West Palm Beach, FL 33411" instead of Stelor's duly appointed attorneys. This clearly violates Stelor's sole right, power, and duty to deal with the USPTO regarding the registration and maintenance of all the Googles Trademarks. Defendant's actions are not authorized under him limited role as a creative consultant and violate the parties' agreements.

        (b)      Defendant has repeatedly refused to provide Stelor with access to the Googles Domain Names by locking these Domain Names with the domain name registrar and by refusing to disclose to Stelor the passwords for these Domain Names. By not giving Stelor immediate, full and unfettered access to the Domain Names, Defendant is in material breach of the License Agreement and the Consulting Agreement which forbid him from interfering with, "direct[ing]", or "control[ling]" the daily activities of Stelor, and which require Defendant to assist Stelor and cooperate "in every way necessary" in connection with Stelor's maintenance of the Googles Intellectual Property. Defendant has also make it abundantly clear in correspondence to Stelor's counsel that he has "absolutely no intentions" of turning over to Stelor the passwords for any

13

of the Googles Domain Names, and that the only way he will turn over these passwords is "when a judge orders [him] to do so.

(c)     Defendant has repeatedly threatened to communicate with the press without requesting prior authorization from Stelor.

(d)     In breach of the License Agreement which expressly gives Stelor the exclusive right to take legal action against third parties infringing the Googles Intellectual Property, on October 5, 2004, Defendant improperly sent a letter to Stelor's counsel purporting to instruct Stelor's counsel to take no further action in the two proceedings (the cancellation and opposition) before the TTAB instituted by Stelor against Google, Inc.  That law firm currently represents Stelor in these proceedings against Google, Inc.

(e)     In breach of the License Agreement which expressly gives Stelor the exclusive right to defend all actions brought by third parties challenging the Googles Intellectual Property Rights, Defendant has purported to instruct Stelor's counsel to take no action in the proceeding brought by Google, Inc. at the TTAB to cancel the registration for GOOGLES & Design (Reg. No. 2,087,590), and has indicated to Stelor that he intends to defend the cancellation proceeding himself, although the License Agreement gives Stelor the sole right to do so."

(Exh. 24)

In response, Silvers claimed Stelor has failed to sell a single licensed product, which is one of the Oogles n Googles Defendants' many defenses in this case.  In Silvers' Answer, Affirmative Defenses and Counterclaim, Silvers states:

"20.     Stelor has breached the License Agreement by:

(a)     Failing to use commercially reasonable efforts to promote, market and sell the Licensed Products.  According to incomplete quarterly reports Stelor has provided (the accuracy of which has yet to be verified), Stelor has not sold a single Licensed Product, or entered into any agreements to do so in the 30 months it has had the benefits of the License Agreement.

(b)     Failing to sell or distribute any Licensed Products, despite Silver's having developed the process for the manufacture and production of such products.

21.     Stelor has also breached the License Agreement by acting beyond the authority granted by Silvers under the License Agreement.

(c)     Stelor has also filed claims before the United States Patent and Trademark Office and ICANN's National Arbitration Forum

14

> purportedly on behalf of Silvers, and hired counsel for Silvers, without
> Silvers' knowledge and consent."

(Exh. 25)

The 2004 case was settled with a Confidential Settlement Agreement which Stelor has

refused to produce here, but which has been used as an exhibit by both parties in the Google

case. (Exh. 26)  This agreement is relevant to showing that Stelor's purpose in acquiring the

marks was to sue Google, not use the marks in commerce for the registered goods, are also

shows Silvers and Stelor contemplated recovering millions of dollars from Google, Inc.

> "19.    Joint Settlement Negotiations with Google, Inc.:
>         (c)       .In the event a monetary, stock, or similar settlement with
> Google, Inc., Such sale will include a complete sale or assignment of the
> GOOGLES IP, The proceeds from that settlement shall be divided as
> follows:
>         Silvers shall receive 70% of the first $30 million; 50% of the next
> $20 million; 30% of the next $30 million; 20% of the next $20 million;
> 10% of the next $20 million and 5% of any amount over $120 million,
> with the remainder in each case going to Stelor. Silver's total share of the
> proceeds shall not exceed $50 Million in any event."

(Exh. 26)

## 2.  *Stelor Productions, LLC v. Silvers*, Case No. 05-80393, U.S. District Court, Southern District Florida

In the 2005 lawsuit against Silvers, Stelor claims that Silvers continued to interfere with

Stelor's litigation against Google despite the settlement agreement referenced above.

> "12.    Notwithstanding his contractual agreements, Silvers displayed an
> unwillingness to abide by his obligations and commenced a campaign to inject
> and entwine himself into the very fabric of Stelor's business.  He subverted
> Stelor's intellectual property rights by diverting communications from the
> USPTO from Stelor to himself. He interfered with litigation undertaken by Stelor
> against third parties. He held himself out as a Stelor representative at crucial
> industry trade shows. He threatened to communicate directly with the trade and
> press concerning the GOOGLES IP.  He withheld information vital to Stelor's
> ability to carry out the business of transforming the basic Googles idea into a

thriving and profitable business and denied it access to Googles domain names.
All of these actions were in violation of the License Agreement."

(Exh. 27, p. 5)

### 3. *Silvers v. Stelor Productions, LLC,* **Cause No. 05-18033 CA 03,** **Circuit Court Miami-Dade County, Florida.**

In this case, Silvers contends Stelor breached the license agreement by failing to actively

sell licensed products. (Exh. 28, p. 3).

### 4. *Stelor Productions, LLC v. Google Inc*., **Case No. 05-80387,** **U.S. District Court, Southern District of Florida.**

Silvers initiated this lawsuit, and Stelor was substituted as plaintiff when they settled their

cross-claim. The infringement claim is for the same Googles logo trademark in this case. (Exh.

29)

The claims and defenses of Google are nearly identical to Oogles n Googles'. The

primary defense in both cases is that Stelor has not used the alleged trademarks in commerce.

### 5. *Steven A. Silvers v. Google Inc*., **Case No. 1:06 CV 02658-WAN,** **U.S. District Court, District of Maryland.**

Upon information and belief, this is an ancillary discovery proceeding for depositions in

the Google case for depositions by Stelor of former Stelor employees regarding allegedly

unauthorized sale of Stelor's goods on the internet, which is directly relevant to Defendants'

defense that Stelor has sold no goods.

### 6. *Stelor Productions, LLC v. Lindsey R. Miller,* **Case No. 272024-V,** **Circuit Court for Montgomery County Maryland**

Upon information and belief, this is an ancillary discovery proceeding for depositions in

the Google case for depositions by Stelor of former Stelor employees regarding allegedly

unauthorized sale of Stelor's goods on the internet, which is directly relevant to Defendants'

defense that Stelor has sold no goods.

**7. *Stelor Productions, LLC v. Steven A. Silvers*, Case No. 272023-V,
Circuit Court for Montgomery County, Maryland**

Upon information and belief, this is an ancillary discovery proceeding for depositions in the Google case for depositions by Stelor of former Stelor employees regarding allegedly unauthorized sale of Stelor's goods on the internet, which is directly relevant to Defendants' defense that Stelor has sold no goods.

## IV. CORRESPONDENCE BETWEEN SILVERS AND STELOR

Stelor objects to producing correspondence between Silvers and Stelor, but uses Silvers e-mails as exhibits in the Google case. (Exh. 20-23). Stelor has produced over ten thousand pages of documents to Google (Exh. 30, p. 6), but has produced less than two thousand pages in response to Oogles n Googles written discovery. Stelor has produced almost a thousand pages of Silvers e-mails in the Google case, (Exh. 30, p. 8), but has produced none of the voluminous correspondence between Silvers and Esrig to the undersigned. In the Google case, Stelor made a privilege log. (Exh. 31) Some of the e-mails Stelor claims are privileged are used by Silvers as exhibits. (See e-mails noted on Exh. 31). Defendants request that Stelor be ordered to produce all correspondence between Silvers (and its attorneys) and Stelor (and its attorneys).

To move discovery along, the undersigned sent an e-mail in May requesting that Mr. Merz state whether he was going to make the same objections to the Silver's e-mails that Stelor made in the Google case. (Exh. 32) Mr. Merz never responded to the May inquiry about the Stelor – Silvers' correspondence.

Stelor makes claims of privilege in the instant case, but has not complied with the requirement to submit a privilege log. However, Stelor submitted a privilege log in the Google, Inc. case. (Exh. 31) None of those documents are privileged because there is no privilege for communications between adversaries like Stelor and Silvers. The same goes for correspondence

between Silvers' lawyers and Stelor's lawyers regarding breaches of the license agreement by Stelor and Silvers.

## V. DEFENDANTS' THEORY OF THE CASE

There is ample evidence to support Defendants' working hypotheses that Stelor is not and never has been a bona fide and legitimate business enterprise. Defendants' defense of invalidity is at lease two pro-pronged. First, Stelor is not and never has been a legitimate business enterprise. Secondly, Stelor and the predecessors in interest to the alleged trademarks have not offered to sell, let alone actually sold, trademark goods in the registered classifications. If that is indeed the case, Stelor's alleged trademarks are invalid, as trademarks exist only as appurtenances to the goodwill of a business. The book and trademarks were created by a convicted drug trafficker (Silvers) while he is in prison and later licensed to Aurora, whose president, Myles Farrington, became another convicted felon. Esrig, the president of Stelor, was a shareholder in Aurora, and his association with these felons is reasonable grounds to suspect Stelor is not a legitimate business enterprise.

Esrig appears to have absolutely no prior business experience relevant to producing children's cartoons for television or the movies or associated merchandise. The tremendous disparity between Stelor's business expenses of almost $13 million and its sales of less than $100 in six years, provide additional grounds to support the proposition that Stelor is not a legitimate business enterprise and that it never had any intention of selling goods in the trademarked class.

## VI. ISSUE OF LIMITATIONS ON WRITTEN DISCOVERY

Defendants responded to Stelor's Interrogatories and Request to Produce on February 11 and February 25, 2008. At that time, Stelor had served 17 Interrogatories and 25 Requests for Production to Oogles n Googles Franchising, LLC, Kevin Mendell and Danya Mendell. Stelor

had also served 9 Interrogatories and 12 Requests for Production to the eleven (11) franchise Defendants that were party to the case at this time. Collectively, Defendants had responded to a total of 150 Interrogatories and 207 Requests for Production before Defendants served written discovery upon Stelor and before Mr. Merz asked that the Case Management Plan be amended last March.

Attorney Robert Merz appeared for Stelor in March, 2008. Mr. Merz promptly sought, with the undersigned's agreement, to have the August 2008, trial date continued, and the Case Management Plan deadlines extended. Per this Court's procedure, counsel for the parties undertook to submit an Amended Case Management Plan. The undersigned proposed limitations on written discovery because of the sheer number of Defendants that Stelor has sued. The Federal Rules of Civil Procedure and Local Rules do not limit the Request for Production that can be served on a party.

Mr. Merz would not agree to limitations on written discovery and Mr. Merz deleted Defendants' proposed limitations from the proposed Case Management Plan submission sent to Mr. Merz by the undersigned.. In the discussions about the Case Management Plan, Mr. Merz also stated to the undersigned that he would be serving additional Interrogatories and Requests for Production to Defendants because of what he perceived to be inadequacies of Stelor's previous written discovery to the defendants added by the First Amended Complaint.

Because Mr. Merz deleted Defendants' proposed written discovery limitations from Defendants' submission to the Case Management Plan, the parties submitted separate proposed Case Management Plans. The Court entered an Order adopting Defendants' version of the Case Management Plan with respect to written discovery limitations.

According to the current Case Management Plan, Plaintiff is permitted to serve an additional twenty-five (25) Requests for Production to each Defendant. There are now seventy nine (79) Defendants in this case. If Stelor serves twenty-five (25) interrogatories and requests for production to Defendants, collectively the Defendants would be responding 1,975 interrogatories and 1,975 Requests for Production from Stelor. Limitations for Defendants in the current Case Management Plan are two hundred (200) Requests for Production in addition to the one hundred nineteen (119) Requests for Production which had already been served. The parties did not discuss and the undersigned did not propose limitations on the proposed Interrogatories because the trial rules limit the Interrogatories to twenty five (25) per party.

Plaintiff's assertion in its Motion to Amend the Case Management Schedule that it has been precluded form serving discovery to date is a misrepresentation to this Court. The current Case Management Plan permits the Plaintiff to serve an additional twenty five (25) Requests for Production to each Defendant.

## VII.  HISTORY OF WRITTEN DISCOVERY IN THIS CASESINCE MR. MERZ APPEARED

On March 14, 2008, the undersigned served Stelor with Defendants' First Interrogatories and Requests for Production. One purpose of the written discovery was to identify witnesses that could be deposed for the purpose of filing a Motion for Summary Judgment on all of Stelor's claims in this case. Stelor missed the first deadline of May 11, 2008, for responding to the First Interrogatories and Requests for Production, and the Court entered an order requiring Stelor to respond to the written discovery by July 11, 2008. The undersigned received partial discovery responses on July 25, 2008. A substantial number of the discovery responses were missing, apparently due to an envelope being torn while the documents were in transit in the U. S. mail. The numerical order of the written responses was scrambled, apparently due to clerical staff

issues at Stelor. For a period of four (4) or five (5) weeks thereafter, counsel for the parties corresponded to attempt to identify the discovery responses that did not arrive. Counsel for Stelor then offered and agreed to resend a second set of the written discovery responses which were finally received on September 26, 2008. The answers to the Interrogatories and responses to Requests for Production appear to be complete in that an answer and/or objection is provided to each Interrogatory and Request for Production. However, Defendants still have many issues with respect to documents and information being withheld due to Stelor's objections. Counsel for the parties scheduled a Local Rule 37.1 conference for October 7, 2008.

Defendants' first written Interrogatories and Requests for Production to Stelor have been the subject of several telephonic status conferences, with the Court. The telephonic conference was held on June 11, 2008. At the telephonic status conference, Mr. Merz represented to the Court that Stelor missed the May 14, 2008, deadline to respond to the written discovery because Stelor's president, Steven A. Esrig, had recent back surgery. Mr. Merz represented the Court that Stelor would respond to written discovery by July 11, 2008.

July 11, 2008, came and went with no written discovery responses by Stelor. At a telephonic status conference scheduled by the Court for July 24, 2008, Mr. Merz advised the Court that Stelor did not meet the deadline because Stelor's copier was not working. The undersigned received partial discovery responses from Stelor on July 25, 2008. The discovery responses as received were either intentionally or unintentionally scrambled and only partial responses were received. Stelor sent the undersigned an e-mail stating that some of the responses were apparently lost in the mail due to an envelope being torn in transit. Regardless of the in-transit loss of some of the discovery responses, the responses that were received were a complete mess. Interrogatory answers and Requests for Production answers were interspersed

with each other and no documents were stapled or clipped. Many of the documents produced did not appear to be related to the Requests for Production response that was closest in the stack. The undersigned attempted to make some sense of Stelor's written discovery responses and sent Mr. Merz several e-mails identifying what the undersigned believed to be the missing Interrogatory answers and missing responses to Requests for Production. Finally, Mr. Merz offered and agreed to make another copy of the discovery responses. Those were received on September 26, 2008.

A telephonic status conference was held on September 24, 2008. At the telephonic status conference on September 24, 2008, Mr. Merz represented to the Court that he was going to have to move to extend the Case Management Plan deadlines because he had been busy with depositions in Stelor's case against Google, Inc. pending in the Southern District of Florida. Mr. Merz also advised the Court that he would be filing a Motion to withdraw his appearance and that Chicago counsel would be appearing in this lawsuit. At no time in the three (3) telephone status conferences with the Court did Mr. Merz complain to the Court or the undersigned of the written discovery served on March 14, 2008, was too extensive or violated the Rules or Case Management Plan.

On August 28, 2008, the undersigned served Defendants' Second Interrogatories and Requests for Production. Many of the Interrogatories are directed at determining what documents Stelor has in its possession that it is refusing to produce.

At the September 24, 2008, conference, the undersigned advised the Court that a Motion to Compel was likely going to be necessary because it was already clear that Stelor was not producing many relevant requested documents known to be in Stelor's possession. The Court directed the undersigned to not file a Motion to Compel, but instead request a hearing in which

the Court would rule promptly, probably on the spot, with respect to Stelor's objections to written Interrogatories and Requests for Production after counsel held a Rule 37.1 conference.

The Rule 37.1 conference was held for two (2) hours on October 7, 2008. Thereafter, it was clear that Stelor was refusing to respond to approximately thirty seven (37) Requests for Production and seven (7) Interrogatories. In accordance with the Court's instruction, the undersigned requested a hearing for the purpose of obtaining on a ruling on Stelor's objections which Defendants believe have been waived and in any case are not well taken.

Stelor moved to continue the hearing scheduled for the Court because Mr. Merz was busy with Stelor's case against Google, Inc. On October 27, 2008, five (5) business days before the scheduled hearing, Stelor filed a Motion for Protective Order in which it asserted that Defendants served Stelor with too many Interrogatories and Requests for Production.

On October 17, 2008, Mr. Merz called the undersigned in follow-up to the earlier Rule 37.1 conference and advised that Steven A. Esrig was refusing to provide further answers to Defendants' First Interrogatories and Requests for Production. At the conclusion of that brief conversation, Mr. Merz stated to the undersigned that he would be filing a Motion for Protective Order with respect to the Second Interrogatories and Requests for Production served August 29 2008. To date, Mr. Merz has not requested a Local Rule 37.1 conference with respect to Defendants' Second Interrogatories and Second Requests for Production. Stelor has made no effort whatsoever, let alone a good faith effort, to seek an agreed resolution to what it now perceives as a discovery dispute with the Second Interrogatories and Second Requests for Production. The Local Rule 37.1 certification filed by Mr. Dorelli does not comply with the rules because the rules do not permit Mr. Dorelli to make such a certification on behalf of Mr. Merz. In addition to the technical shortcomings of the Rule 37.1 certification, it is flatly untrue

that Stelor has made a good faith effort to resolve any issues with respect to Defendants' Second Interrogatories and Second Requests for Production served August 29, 2008.

## VIII. STELOR'S OBJECTIONS ARE FRIVOLOUS AND SPURIOUS

### A. Stelor's Objections to Defendants' First Interrogatories and Request for Production are Waived

Stelor's objections to the First Interrogatories and Requests for Production are waived. Stelor missed two (2) deadlines for serving answers to Interrogatories and Requests for Production, one (1) of which is set by the Court. The first deadline that Stelor missed was the deadline set by the Order on Stelor's Motion for Extension of Time which was May 14, 2008. Stelor also missed the deadline set by this Court for responding to the First Interrogatories and the Requests for Production by July 11, 2008. (Doc.)

### B. Stelor's Overbroad Objections are Frivolous

Stelor's objections that the discovery requests are overbroad are frivolous. Many of the requests call for a single document and some called for no more than four (4) or five (5) documents. For example, Defendants requested that Stelor produce its business plans and marketing plans. The relevance of these documents is self-evident. It is incredible that Stelor will not produce documents which it clearly has in its possession and which are so obviously relevant to Stelor's alleged use in commerce of its alleged trademarks.

### C. Stelor's Attorney-client Privilege

Stelor objects to almost every Interrogatory and Requests for Production on the grounds of attorney-client privilege. First of all, there is not a single Interrogatory or Requests for Production that calls for privileged information. Stelor is using this objection to obstruct discovery of damaging correspondence between Silvers and Esrig.

Whether a document is subject to the attorney-client privilege is a mixed question of law and fact. Stelor makes nothing but conclusiary assertions that the attorney-client privilege applies here.

"Put simply, in order for the attorney-client privilege to attach, the communication in question must be made: (1) in confidence; (2) in connection with the provision of legal services; (3) to an attorney; and (4) in the context of an attorney-client relationship." *United States v. BDO Seidman, LLP*, 492 F.3d 806, 815 (7th Cir. 2007).

"The purpose of the privilege is to "encourage full disclosure and to facilitate open communication between attorneys and their clients." *BDO II*, 337 F.3d at 810. Open communication assists lawyers in rendering legal advice, not only to represent their clients in ongoing litigation, but also to prevent litigation by advising clients to conform their conduct to the law and by addressing legal concerns that may inhibit clients from engaging in otherwise lawful and socially beneficial activities. See *Frederick*, 182 F.3d at 500. The cost of these benefits is the withholding of relevant information from the courts. *BDO II*, 337 F.3d at 811." *Id.*

Recognizing the inherent tension between the beneficial goals of the attorney-client privilege and the courts' right to every person's evidence, the courts have articulated the following principles to inform our analysis of the scope of the common interest doctrine:

(1) "[C]ourts construe the privilege to apply only where necessary to achieve its purpose." *Id.*

(2) Only those communications which "reflect the lawyer's thinking [or] are made for the purpose of eliciting the lawyer's professional advice or other legal assistance" fall within the privilege. *Frederick*, 182 F.3d at 500.

(3) Because one of the objectives of the privilege is assisting clients in conforming their conduct to the law, litigation need not be pending for the communication to be made in connection to the provision of legal services. See *United States v. Schwimmer*, 892 F.2d 237, 243-44 (2d Cir. 1989).

(4)     Because "the privilege is in derogation of the search for truth," any exceptions to the requirements of the attorney-client privilege "must be strictly confined." *In re Grand Jury Proceedings* (Thullen, 220 F.3rd 568, 571 (7th Cir. 2000).

*United States v. BDO Seidman, LLP*, 492 F.3d 806, 815 (7th Cir. 2007).

### D.  Common Interest Doctrine

Stelor asserts the common interest doctrine as grounds to withhold relevant correspondence between Silvers and Esrig.

"Although occasionally termed a privilege itself, the common interest doctrine is really an exception to the rule that no privilege attached to communications between a client and an attorney in the presence of a third person.  See *Robinson v. Texas Auto. Dealers Ass'n*, 214 F.R.D. 432, 443 (E.D. Tex. 2003).  In effect, the common interest doctrine extends the attorney-client privilege to otherwise non-confidential communications in limited circumstances.  For that reason, the common interest doctrine only will apply where the parties undertake a joint effort with respect to a common legal interest, and the doctrine is limited strictly to those communications made to further an ongoing enterprise.  See *Evans*, 113 R.3d at 1467."

*United States v. BDO Seidman, LLP*, 492 F.3d 806, 815-816 (7th Cir. 2007).

The common interest doctrine has no application here, and does not shield Stelor from production of unfavorable documents.  Correspondence between a licensee and licensor is not privileged.  In this case, there are no facts whatsoever to indicate that Silvers and Stelor undertook Google, Inc. or anyone else jointly.  The evidence is overwhelming that Stelor and Silvers are adverse parties that never jointly undertook anything.

## IX. DEFENDANTS' REQUEST TO ORDER STELOR TO ANSWER FIRST INTERROGATORIES AND RESPONSE TO REQUESTS FOR PRODUCTION

The relevance of the contested interrogatories and requests for production is self-evident from the discovery requests themselves. The contested interrogatories are attached as Exh. 1 and the contested requests for production are attached as Exh. 2.

Stelor is refusing to provide information and answers for:

First Interrogatories Nos. 1, 2, 3, 7, 16, 17, and 24.

First Requests for Production Nos. 1, 2, 3, 4, 5, 9, 10, 33, 34, 36, 38, 39, 40, 41, 45, 46, 48, 49, 51, 53, 54, 55, 64, 65, 66, 67, 78, 98, 104, 105, 106, and 118.

A review of the discovery requests at the hearing will make it clear that each request is specific, reasonable, and should be answered by Stelor.

## X. REQUEST FOR FEES AND COSTS

Defendants request an award of attorney fees for the attorney time expended researching and drafting this response, time expended in preparing for the hearing, and time expended at the hearing. Defendants request fifteen (15) days from the Court's order on this motion to submit to the Court an accounting of those fees.

/s/ Stephen L. Vaughan
Stephen L. Vaughan, #2294-49
INDIANO VAUGHAN LLP
One N. Pennsylvania Street, Suite 1300
Indianapolis, IN 46204
Telephone: (317) 822-0033
Fax:     (317) 822-0055
E-mail:  Steve@IPLawIndiana.com

27

## CERTIFICATE OF SERVICE

I hereby certify that on November 13, 2008, a copy of the foregoing was filed

electronically.  Notice of this filing will be sent to all counsel of record by operation of the

Court's electronic filing system.  Parties may access this filing through the Court's system.

/s/ Stephen L. Vaughan
Stephen L. Vaughan, #2294-49
INDIANO VAUGHAN LLP
One N. Pennsylvania Street, Suite 850
Indianapolis, IN   46204
E-mail: Steve@IPLawIndiana.com